# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JESUS DIAZ,                                    )
                                               )
         Plaintiff,                       )
                                               )
    v.                                   )    C.A. No. 06-550-SLR
                                               )
WARDEN THOMAS CARROLL, CMS      )    JURY TRIAL DEMANDED
CORRECTIONAL MEDICAL SERVICE,   )
CPL MERSON, LEE ANNE DUNN,       )
DEBORAH RODWELLER, and CINDY    )
ATALLIAN,                               )
         Defendants.                    )

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### NATURE AND STAGE OF THE PROCEEDINGS

1.      Jesus Diaz ("Plaintiff" or "Diaz") initiated this action pursuant to 42 *U.S.C.* § 1983 by filing a Complaint and Motion to Proceed *In Forma Pauperis* with the Court on September 5, 2006. (D.I. 1, 2). Plaintiff's Complaint was filed pursuant to 42 *U.S.C.* § 1983 and alleges civil rights violations, breach of contract, and medial malpractice. Plaintiff named as defendants: Warden Thomas Carroll, Corporal Lise Merson, Cindy Atallian, Correctional Medical Services ("CMS") and CMS employees Lee Anne Dunn and Deborah Rodweller. The Court granted the Plaintiff *in forma pauperis* status on September 15, 2006 (D.I. 4).

2.      The Court dismissed the medical malpractice claims and the allegations related to filed grievances and the grievance procedure. (D.I. 7). Defendants Carroll, Merson, and Atallian ("State Defendants") answered the Complaint on March 12, 2007. (D.I. 17). Defendants CMS, Dunn, and Rodweller filed Motions to Dismiss. (D.I. 15,

20).  The motion was denied in part and granted in part by the Court on July 26, 2007.  (D.I. 27).  The Court dismissed Defendants Dunn and Rodweller, but denied the motion as to Defendant CMS.  The Court also dismissed the Plaintiff's breach of contract claim against the moving defendants for Plaintiff's failure to file an affidavit of merit as required by Delaware law.  The Court issued a scheduling order on July 27, 2007.  (D.I. 28).

3.     The remaining allegations are failure to provide adequate medical care by defendants Carroll, CMS, Merson, and Atallian, breach of contract to provide medical services to inmates by Carroll and CMS which caused injury to plaintiff as a third-party beneficiary, and negligent hiring of employees with criminal records by Carroll and CMS.

4.     This is State Defendants' Motion for Summary Judgment as to all of Plaintiff's claims.

## STATEMENT OF FACTS

5.     Plaintiff's cellmate informed him that something was covering part of his eye in August of 2003.  (Ex. "E" – September 6, 2005 Grievance).  Plaintiff filed a sick call slip and the medical provider at that time, First Correctional Medical ("FCM"),[1] scheduled Plaintiff to see medical staff.  (Ex. "B" – Progress Notes, Ex. "C" – Sick Call Slips).   Plaintiff was seen by medical staff for his eyes on September 10, 2003 and again on October 2, 2003 and a consult request was written.  (Ex. "A" – Medical Records, Ex. "B").  At that time, Plaintiff denied pain or vision problems but a small growth was observed by the examining physician.  (Ex. "B").

---

[1] FCM was the contracted medical provider for the Department of Correction ("DOC") from July 1, 2002 to June 30, 2005.  Thereafter, Correctional Medical Services ("CMS") was the contracted medical provider.

6.      Plaintiff submitted a sick call slip on December 13, 2003 requesting a specialist appointment and indicating that his eye was causing him pain.  (Ex. "C").  A consult request for an eye exam was written by FCM medical staff on December 18, 2003.  (Ex. "A").  Plaintiff was seen by medical for his eyes on March 10, 2004 and a consult request for an eye exam was written.  (Ex. "A", Ex. "B").  Plaintiff submitted a sick call request complaining about his eyes on May 1, 2005.  (Ex. "C").  The consult request was re-faxed by medical staff on May 20, 2005.  (Ex. "B").

7.      The DOC's medical provider changed from FCM to CMS on July 1, 2005.  On December 5, 2005, Plaintiff submitted a sick call slip stating that he was suffering from "xerophthalmia".  (Ex. "C").  Plaintiff indicated in his deposition that this was a self-diagnosis made by his cellmate using a medical dictionary.  (Ex. "D" – Diaz. Dep. 102-103).  A consult request for an eye doctor was written and faxed by CMS on December 27, 2005 and additional information was requested on the consult request. (Ex. "A").

8.      On January 19, 2006, Plaintiff's Counselor, Cindy Atallian, wrote to Plaintiff informing him that she met with medical staff to discuss Plaintiff's concerns with his eyes.  (Ex. "I" – Atallian Letters).  On February 8, 2006, Defendant Atallian received a letter from Plaintiff complaining about his eyes.  (Ex. "I").  On February 23, 2006, Defendant Atallian wrote to medical requesting that they review the letter she received from Plaintiff complaining about his eyes.  (Ex. "I").  On March 8, 2006, Defendant Atallian again wrote to Plaintiff informing him, among other things, that she talked with medical about his eyes.  (Ex. "I").

9.      Plaintiff was again seen by medical staff for his eyes on March 14, 2006.

(Ex. "B").  A consult request was signed off on by medical staff and the medical director on March 27, 2006.  (Ex. "A").  Plaintiff was seen by ophthalmologist Dr. Markowitz on May 22, 2006 and again on July 10, 2006.  (Ex. "A").  Plaintiff was again seen by Dr. Markowitz on October 4, 2006 for a surgical excision of pterygium on his left eye.  (Ex. "A").  Plaintiff has also seen an optometrist and has been prescribed eyeglasses.  (Ex. "A").

10.    It was not until September 6, 2005 that Plaintiff filed any institutional grievances, which are processed by correctional staff, complaining about his eyes.  The grievance dated September 6 was submitted by Lise Merson, the Inmate Grievance Chair at the time or "IGC" to the medical unit on September 13, 2005.  (Ex. "E").  An informal resolution was accepted and this grievance was signed off by Plaintiff on September 21, 2005.  (Ex. "E").  Plaintiff filed a grievance on April 13, 2006 and this grievance was submitted to the medical unit for review on April 26, 2006.  (Ex. "F").  This grievance was submitted to the next level for a hearing before the Medical Grievance Committee.  Plaintiff filed two grievances in May of 2006 on the 3rd and the 12th complaining about his eyes.  (Exs. "G", "H").  They were submitted to the medical unit for review on the 19th and the 25th respectively.  (Exs. "G", "H").  As discussed above, it was shortly after this, in May of 2006, when Plaintiff saw Dr. Markowitz.  In response to the May 3rd grievance, Plaintiff was instructed to file a sick call slip and in response to the May 12th grievance, a plan of care was outlined by CMS.  (Ex. "H").  Plaintiff did not agree with this plan and refused to sign the grievance.  (Ex. "H").  Plaintiff admitted in his deposition that he did not appeal any of these grievances to a higher level.  (Ex. "D" – Diaz Dep. 34:7, 95:23-24).

11.     Plaintiff continues to complain about his eyes.  He does not agree with the treatment he has received, nor does he feel that the surgery by Dr. Markowitz in October of 2006 helped his eyes.[2]  (Ex. "D" – Diaz Dep. 91-94, 100-101).  Plaintiff had not identified a medical expert to support his claims and Plaintiff testified that he was never told by a doctor that he had vision problems as a result of the growth on his eye.  (Ex. "D" – Diaz Dep. 56-57).  There is no evidence in the record that any treatment or alleged delay in treatment caused injury to Plaintiff.

12.     The DOC contracts with medical providers to provide inmates with medical care.  As testified by Plaintiff and as outlined above, Plaintiff was seen multiple times by medical staff for both FCM and CMS for problems with his eyes and thus was under the care of medical professionals.  (Ex. "D" – Diaz. Dep. 55).   The DOC defendants do not provide medical care and Plaintiff has been unable to identify a constitutional basis for including them in this suit.

13.     Plaintiff does not know Defendant Merson and could not clarify why she was named in the suit.  (Ex. "D" – Diaz Dep. 20:3-6, 71:1-3).  Plaintiff stated that Defendant Atallian was his counselor and he believed that Defendant Atallian was trying to help him.  (Ex. "D" –Diaz Dep. 44:13-24, 45:1-3)  He was aware that she was writing letters and communicating with medical on his behalf.  (Ex. "D" – Diaz Dep. 42).  Plaintiff even attached copies of letters written by Defendant Atallian on his behalf to the Complaint.  (Ex. "I", Complaint).  Plaintiff admitted that he never wrote to Defendant Carroll, or otherwise communicated with him, but he believes that because he was the Warden he should have knowledge of all inmates' medical records and medical care and

---

[2] Plaintiff's Complaint asserts violations of his civil rights dating from August 29, 2003 until the filing of the Complaint.  Plaintiff has not moved to amend his Complaint and the only claims before the Court are those which occurred up until the time of filing of the Complaint.

should have known about Plaintiff's problems with his eyes.  (Ex. "D" – Diaz Dep.  18-19, 64-65).

## ARGUMENT

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The United States Supreme Court holds that a court must enter summary judgment, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Carter*, 477 U.S. 317, 322-23 (1986).

To obtain summary judgment the moving party must demonstrate that he has met the standards of Rule 56(c).  *Carter v. Exxon Company USA*, 177 F.3d 197, 202 (3d Cir. 1999).  The summary judgment standard requires that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  Thus, only disputes that affect the outcome of a lawsuit will properly preclude the grant of summary judgment.  *Id.*

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  In deciding a motion for summary judgment "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." *Id.* at 252.

I.     **Diaz Cannot Establish an Eighth Amendment Claim Against Defendants Carroll, Merson, or Atallian.**

Plaintiff's Eighth Amendment claims against State Defendants must fail.  He cannot establish a claim for liability against Defendants Carroll, Merson, or Atallian because they had no personal involvement in the allegations of the Complaint and they cannot be held liable on the basis of *respondeat superior*.  Plaintiff also cannot establish that State Defendants were deliberately indifferent to his medical needs.

   A.     **Plaintiff's claims must fail because Defendants Carroll, Merson, and Atallian were not personally involved in the alleged wrongs and their liability cannot be based on respondeat superior.**

To support a claim for a civil rights violation pursuant to section 1983, a plaintiff must show that the defendant had *personal involvement* in the alleged wrongs.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (emphasis added).  A plaintiff must prove that the accused official "played an affirmative role in the deprivation of the plaintiffs' rights, i.e., there must be a causal link between the actions of the responsible officials named and the challenged misconduct."  *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981).  It is also well established that section 1983 will not support a claim based on the theory of *respondeat superior* or vicarious liability.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).  In addition, this Court has held that, "[g]rievances are not enough to impute knowledge to [a] defendant."  *Brookins v. Williams*, 402 F.Supp.2d 508, 512 (D. Del. 2005) (quoting *Rode*, 845 F.2d at 1208)).

There is no casual link between any action of Defendant Merson and any wrongdoing against Plaintiff.  The Plaintiff does not know who Lise Merson is and, when asked to explain why she was sued, Diaz stated that it was probably because she is in a

"higher position". (Ex. "D" – Diaz Dep. 20:3-6). Plaintiff was again asked to clarify why he had sued Lise Merson, and he responded by asking who she was. (Ex. "D" – Diaz Depo. 71:1-3). Clearly, Plaintiff does not believe that Lise Merson was personally involved any deprivation of his rights since he does not know who she is or why she was named as a defendant. Defendant Merson is entitled to judgment as a matter of law because she was not personally involved in any alleged wrongdoing and she cannot be held liable under a theory of *respondeat superior.*

Defendant Carroll was not personally involved in any alleged wrong committed against Plaintiff or any violation of Plaintiff's right. Diaz stated that he never met Warden Carroll, never wrote to him, or otherwise communicated with him. (Ex. "D" – Diaz Dep. 19:15-24). Plaintiff, throughout discovery, has been unable to provide any evidence or information indicating that Defendant Carroll was aware of Plaintiff's medical requests or medical condition. In his deposition, Plaintiff was also unable to provide any names or evidence supporting his allegation that Warden Carroll failed to do criminal background checks. (Ex. "D" – Diaz Dep. 66-68). There is no evidence to suggest that Warden Carroll was personally involved in any wrongdoing alleged in the Complaint and thus he can not be held liable under Section 1983.

Defendant Atallian was not personally involved in the alleged deprivation of Plaintiff's rights. Rather, she played an affirmative role in assisting Diaz and seeking help for him. Defendant Atallian is a counselor employed with the DOC. Defendant Atallian was Plaintiff's counselor during much of the time period specified in the Complaint. (Ex. "D" – Diaz Dep. 38-39). Plaintiff approached Defendant Atallian about his eyes and Defendant Atallian brought up the issue in a meeting and met with medical

staff to discuss the issue. (Ex. "I"). Defendant informed Plaintiff of this and also wrote to Plaintiff on January 19, 2006 informing him what she had done. (Ex. "D" – Diaz Dep. 41-42). On February 23, 2006, Defendant Atallian also forwarded a letter she received from Plaintiff complaining about his eyes to the medical staff. (Ex. "I"). She again wrote to Plaintiff on March 8, 2006 informing Plaintiff of the steps she had taken after she received an additional letter from Plaintiff. (Ex. "I"). Indeed, Plaintiff recognized that although Ms. Atallian was not a nurse or a doctor, she was trying to help Plaintiff. (Ex. "D" – Diaz. Dep. 41). Plaintiff does not know why he sued Defendant Atallian and he does not believe that she has done anything to violate his rights. (Ex. "D" – Diaz Dep. 44:13-24, 45:1-3).

Absent any evidence that State Defendants personally participated in the alleged wrongful conduct, State Defendants are entitled to judgment as a matter of law. *See Murphy v. Kearney*, 2004 WL 878467 (D. Del. April 19, 2004) (Ex. "K") (prison warden entitled to summary judgment where there were no allegations of personal involvement); *Gregory v. PHS Inc.*, 2001 WL 1182779 (D. Del. Sept. 21, 2001) (Ex. "L") (Department of Correction Commissioner and prison warden entitled to summary judgment where there were no specific allegations of misconduct). To the extent that Plaintiff seeks to hold any of the state defendants liable based on their "higher" or supervisory positions, such liability is not permitted under § 1983. *Rode*, 845 F.2d at 1207.

Plaintiff has not established any causal link between the allegations in his Complaint and any wrongdoing by Defendants Carroll, Merson or Atallian. Thus, he has not established personal involvement and Defendants are entitled to judgment as a matter of law.

**B.    Defendants Carroll, Merson, and Atallian were not deliberately indifferent to Plaintiff's medical needs.**

The Eighth Amendment protects from cruel and unusual punishment and requires that prison official provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).  To succeed on a claim of deliberate indifference against prison officials, a plaintiff must establish that he has a serious medical need and that prison officials were deliberately indifferent to that need.  *Id*. at 104.  The Supreme Court requires that the plaintiff demonstrate the prison official acted recklessly by consciously disregarding a substantial risk of harm to establish "deliberate indifference" on the part of that official.  *See Farmer v. Brennan*, 511 U.S. 825, 837-840 (1994) (adopting subjective recklessness standard from criminal law as the test for deliberate indifference under the Eighth Amendment).

Defendant Atallian was not deliberately indifferent to Plaintiff's medical needs. As previously discussed, Defendant Atallian was Plaintiff's counselor and took steps to help Plaintiff once she was made aware of the problems with his eyes.  She wrote letters to medical, brought the issue up during a meeting, and wrote to Plaintiff to keep him informed.  Rather than demonstrating deliberate indifference to Plaintiff's medical needs, Defendant Atallian actively sought help for Plaintiff.  Plaintiff agreed and admitted in his deposition that Defendant Atallian was trying to help him.  (Ex. "D" – Diaz Dep. 41:4-7).

Defendant Merson was also not deliberately indifferent to Plaintiff's medical needs.  Defendant Merson does not provide medical care.  Defendant Merson, as the grievance chair ("IGC"), processed inmate grievances, including Plaintiff's.  DOC Standard Operating Procedure ("SOP") 4.4 governs the inmate grievance procedure.  (Ex.

"J").  Medical grievances are to be logged in by the IGC and then forwarded to medical staff for action.  (Ex. "J", at 6).  The medical grievances submitted by Plaintiff related to his eyes, and processed by Defendant Merson during the relevant time period, were all timely forwarded to the medical unit by Defendant Merson.  The September 6, 2005 grievance was submitted to the medical unit on September 13, 2005.  (Ex. "E")  The grievance submitted by Plaintiff on April 13, 2005 was forwarded to medical on April 26, 2006.  (Ex. "F").  The grievance submitted by Plaintiff on May 12, 2006 was forwarded to medical on May 25, 2006.  (Ex. "H").   Defendant Merson logged in Plaintiff's grievances and then forwarded them to medical pursuant to SOP 4.4.  There is no evidence that she was deliberately indifferent to Plaintiff's medical needs.

Defendant Carroll was not deliberately indifferent to Plaintiff's serious medical needs.  As previously discussed, there is no evidence to suggest that Defendant Carroll was aware of Plaintiff's medical complaints or medical treatment.  Absent any evidence that Defendant Carroll had the requisite knowledge, Plaintiff cannot establish that he disregarded an excessive risk of harm to Plaintiff.   Plaintiff has an obligation to set forth specific facts through evidence to establish a genuine issue for trial.  *Celotex*, 477 U.S. at 322.  Plaintiff has not come forth with any evidence to establish that State Defendants were deliberately indifferent to his medical needs and State Defendants are entitled to judgment as a matter of law.

## II.    Plaintiff's Breach of Contract Claim Cannot Survive Summary Judgment Without an Affidavit of Merit.

Breach of contract for medical care is included in the parameters of a medical negligence lawsuit under Delaware law.  *Diaz v. Carroll, et al.*, 2007 WL 2154202 at *5; D.I. 26, at 9.  To pursue a medical negligence suit under Delaware law, a Plaintiff must

file an affidavit of merit as to each defendant and the affidavit must be signed by an expert witness. 18 *Del. C.* § 6853(a)(1).

Plaintiff has not filed an affidavit of merit. In the Court's earlier decision in this matter on Defendant Dunn, Rodweller and CMS' Motions to Dismiss, the breach of contract claims were dismissed by the Court for Plaintiff's failure to file an affidavit of merit. (D.I. 26 at 9). Similarly, here the State Defendants are entitled to summary judgment on Plaintiff's breach of contract claims for his failure to file an affidavit of merit.

**III.    Defendants Carroll, Merson, and Atallian Are Entitled To Dismissal Of Plaintiff's Claims As A Matter Of Law Because Plaintiff Has Failed To Exhaust Their Administrative Remedies Under the PLRA.**

Congress requires a prisoner to exhaust administrative remedies before filing a § 1983 action with respect to prison conditions. This requirement is codified in 42 *U.S.C.* § 1997e(a). Prison conditions are defined to include the physical environment in which a prisoner lives and the services provided to him. *Booth v. Churner*, 206 F.3d 289, 291 (3d Cir. 2000), *aff'd*, 531 U.S. 956, (2000). There is no futility exception to exhaustion and prisoners must exhaust administrative remedies even where the process would not provide them with the remedy they are seeking. *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000); *Booth*, 206 F.3d at 294-295. Medical services are included as "prison conditions" for purposed of § 1997e(a). *Eaton v. Correctional Medical Systems, Inc.*, 2007 WL2727154, at *4 (D. Del.).

The DOC grievance process, codified at SOP 4.4, is a three step process with two separate levels of appeals. (Ex. "J"). For medical grievances, the policy provides that the grievance is to be submitted to the grievance chair who, in turn, will forward the

grievance to the medical services provider. The medical services provider first attempts an informal resolution. If unresolved at the initial stage, the grievant is entitled to a hearing before the Medical Grievance Committee ("MGC"). If the hearing resolves the matter, the grievance is closed. If it is not resolved, the grievant must complete the second level of appeal from the MGC hearing and forward the appeal to the grievance chair who in turn forwards the file to the Bureau Grievance Officer ("BGO"). The BGO then recommends a course of action to the Bureau Chief of Prisons who renders a final decision. (Ex. "J", at p. 6-7). When all of these steps are completed, an inmate has exhausted all available administrative remedies.

As previously discussed, Plaintiff filed four medical grievances pertaining to his eyes during the relevant time period. The first, filed on September 6, 2005, was resolved with an informal resolution. (Ex. "E"). The second was filed on April 13, 2006 and Plaintiff was seen approximately one month later by an outside specialist, Dr. Markowitz. (Ex. "F"). The third and fourth grievances were submitted in May of 2006, which was the same month that Plaintiff saw Dr. Markowitz. (Exs. "G", "H"). Plaintiff was instructed to file a sick call in response to the May 3 grievance and the May 12, 2006 grievance concluded with an outlined plan of care set by the medical provider. (Exs. "G", "H"). Plaintiff did not agree with this plan of care and he did not sign off on the grievance. He did not, however, appeal the grievance to a higher level.

Indeed, Plaintiff admitted in his deposition that he did not appeal any of his grievances to a higher level. (Ex. "D" – Diaz Dep. 34:7, 95:23-24). An inmate is required to follow the grievance process through every appellate step in order to properly exhaust administrative remedies. *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004).

Thus, Plaintiff did not fully exhaust his administrative remedies and his claims are barred by the PLRA.

**IV.    State Defendants are Immune from Liability for Plaintiff's Claims.**

Plaintiff seeks to hold State Defendants liable in their official, as well as their individual capacities. State Defendants, however, are immune from such claims.

**A.    State Defendants are immune from liability in the official capacities pursuant to the Doctrine of Sovereign Immunity and the Eleventh Amendment.**

To the extent Plaintiff's Complaint names State Defendants in their official capacities, they are immune from liability under the Eleventh Amendment. The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment, however, only a clear indication of Congress's intent to waive the state's immunity will produce this result. *Id.* No such clear intent can be found in 42 *U.S.C.* § 1983. In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons. 42 *U.S.C.* § 1983.

A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the State Defendants in their official capacities are not "persons" for the purposes of 42 *U.S.C.* § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, this Court lacks jurisdiction over the State Defendants in their official capacities, and the State Defendants are outside the class of persons subject to liability under 42 *U.S.C.* § 1983.

Therefore summary judgment is appropriate.

      **B.**    **State Defendants are immune from liability in their individual capacities pursuant to the doctrine of qualified immunity.**

Plaintiff also cannot maintain an action against State Defendants in their individual capacities pursuant to the doctrine of qualified immunity. Government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Furthermore, State Defendants are entitled to qualified immunity where they acted in good faith, without gross or wanton negligence, in the performance of their discretionary duties. *Vick v. Haller*, 512 A.2d 249 (1986).

Because there is no evidence to establish a causal link between any action by the State Defendants and a deprivation of Plaintiff's constitutional right, it can not be said that they have violated a clearly established right of Plaintiff. Given the facts as available, State Defendants are entitled to qualified immunity as Defendants had no involvement with the alleged wrongdoings which form the basis of the Complaint.

State Defendants are immune from liability in their official and individual capacities. Plaintiff cannot maintain this action against them and the Motion for Summary Judgment should be granted.

IV.     **<u>CONCLUSION</u>**

For the above stated reasons, State Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment and dismiss Plaintiff's claims against them with prejudice.

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Stacey Xarhoulakos*
Stacey Xarhoulakos (#4667)
Deputy Attorney General
Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
*Attorney for State Defendants*

Dated: January 23, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2008, I electronically filed *Defendants'*

*Memorandum of Points and Authorities in Support of Motion for Summary Judgment*

with the Clerk of Court using CM/ECF and have mailed, by United States Postal Service,

the document to the following non-registered party:

    Jesus Diaz
    SBI # 474251
    Delaware Correctional Center
    1181 Paddock Road.
    Smyrna, DE. 19977

    /s/ Stacey Xarhoulakos
    Stacey Xarhoulakos, I.D. No. 4667
    Deputy Attorney General
    Department of Justice
    Carvel State Office Building
    820 North French Street, 6th Floor
    Wilmington, DE 19801
    (302) 577-8400
    stacey.xarhoulakos@state.de.us
    *Attorney for State Defendants*

# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JESUS DIAZ,                        )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )
                                   )
WARDEN THOMAS CARROLL, CMS         )   C.A. No. 06-550-SLR
CORRECTIONAL MEDICAL SERVICE,      )
CPL MERSON, LEE ANNE DUNN,         )
DEBORAH RODWELLER, and CINDY       )
ATALLIAN,                          )
                                   )
        Defendants.                )

        Deposition of JESUS DIAZ taken pursuant to notice
at the Delaware Correctional Center, 1181 Paddock Road,
Smyrna, Delaware, beginning at 1:00 p.m. on Tuesday,
November 20, 2007, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        JESUS DIAZ (pro se)
        SBI# 474251
          Delaware Correctional Center
          1181 Paddock Road
          Smyrna, Delaware  19977
          for himself,


CORBETT & WILCOX
230 North Market Street - Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Jesus Diaz

Page 18

1      Q.   Okay.  Do you know who Tom Carroll is?

2      A.   No.

3      Q.   Do you know that you sued him?

4      A.   Yeah.

5      Q.   Okay.  Do you know why you sued him?

6      A.   Well, when I was putting my lawsuit, right, I

7  didn't know too much about the law, right, but he just --

8  basically, I was trying to sue -- I don't know if he

9  running the jail or running the hospital.  Well,

10  basically, for -- it just like -- this is my point today.

11  Irresponsibility.  I'm suing him for being irresponsible

12  for ignoring me for almost four year.  Don't care about

13  me.  Even ignoring me, you know.  And me saying like, yo,

14  I'm going blind.  Can I get some help?  Can I get some --

15  can I see somebody?  I never -- and in four years

16  never -- the only people that I saw were nurses coming

17  and talk to me, telling me that they can do nothing.

18      Q.   Okay.  We're going to ask you about the

19  details of your medical care, so you'll have an

20  opportunity to get into that.

21      A.   All right.

22      Q.   Let me try to help you focus on what I'm

23  asking.  When you filed the suit, there was a bunch of

24  different people who were named.  You understand that;

Jesus Diaz

Page 19

1    correct?

2          A.    (The witness indicated.)

3          Q.    Do you understand that?

4          A.    Yes, yes.

5          Q.    Okay.  Did someone tell you who to name?

6          A.    No.  Nobody told me who to name.

7          Q.    Okay.  So one of the people that you named is

8    Thomas Carroll.  Okay?

9          A.    (The witness indicated.)

10          Q.    And I was asking if you know who he is or why

11    you named him in the lawsuit.

12          A.    Well, I think if he in the lawsuit he got

13    something to do with the prison or either with the

14    medical.

15          Q.    Do you ever recall writing to Tom Carroll?

16          A.    Well, the -- I put a grievance.

17          Q.    Okay.  I understand you might have written a

18    grievance.  But I'm asking if you ever wrote a letter or

19    any other document or communicated to Tom Carroll.

20          A.    Not that I can remember.  Not that I can

21    remember.

22          Q.    Do you remember ever meeting anyone named Tom

23    Carroll?

24          A.    No.  Not personally.

Page 20

1        Q.    Okay.  Do you know who Lise Merson is?

2        A.    No.

3        Q.    Do you know why she was sued?

4        A.    Probably because -- she got be -- probably in

5    a higher position in -- on this place, you know.

6    Probably that's why.

7        Q.    So your understanding is some of the people

8    who are in higher positions have been sued?

9        A.    Not like probably everybody in high position.

10    It just probably the people that when somebody -- if

11    somebody is dying, I think they the people that supposed

12    to make a decision right away to try to help that person

13    or get medication or -- it's, you know...

14        Q.    Do you know if you've ever written or talked

15    to Lise Merson?

16        A.    No.

17        Q.    No, you haven't?

18        A.    No, I haven't.

19        Q.    Do you believe that some people should be sued

20    because they're supervisors?

21        A.    I believe somebody -- they got to get sued

22    because -- they probably sitting in their office and they

23    don't know what's going on.  They don't know what's going

24    on.  And there's a lot of stuff be going on in here.  And

Jesus Diaz

Page 34

1    me for this grievance, they was just like -- they didn't

2    take me serious.  They didn't take me -- no.  They didn't

3    take me serious.  They like, okay, you sign here and like

4    you -- like the problem being taken care of.  And I say

5    no way I'm going to sign it if I didn't even -- I don't

6    being taken care of.

7          Q.    Did you appeal the decision?

8          A.    No.  I don't remember I appeal no decision.

9          Q.    Okay.  If you could turn three more pages.

10         A.    Three more.

11         Q.    At the bottom it says page 4 of 5.  Keep

12    going.  You got one more.

13         A.    Okay.

14         Q.    Okay.  On this page it says:  No appeal

15    returned as of today, 18 August 2006.  Do you see that?

16         A.    Yeah.

17         Q.    So you did not appeal this grievance; correct?

18         A.    Yeah.  Probably not.

19         Q.    Okay.  We have one more grievance that I'm

20    going to go through with you.

21                MS. XARHOULAKOS:  We'll mark this as

22    Exhibit 3.

23                (Diaz Deposition Exhibit No. 3 was

24    marked for identification.)

Page 38

1        Q.    And what was the date that this grievance was

2    received by the medical unit?

3        A.    5/25/06.

4        Q.    So, again, we reviewed that you submitted this

5    grievance on 5/12/06.  Or that's when you dated it.

6    Correct?

7        A.    I don't know if that's a 12 or a 2.  But we

8    can say 12.  You can say a 12.

9        Q.    I understand it's a little bit -- the 12 is

10   shady.  5/12 or 5/2 we'll say.  But on either date it was

11   submitted or dated by you.  Correct?

12       A.    Yes.

13       Q.    Okay.  And then this grievance was submitted

14   to the medical unit on 5/25.  Correct?

15       A.    Yeah.

16       Q.    All right.  Do you know who Cindy Atallian is?

17       A.    Yes.

18       Q.    Who's that?

19       A.    She was my counselor in 22.

20       Q.    And how long was she your counselor for?

21       A.    Huh?

22       Q.    How long was she your counselor?

23       A.    She was my counselor for like -- I want to say

24   for like 30 -- 33, 34 months.

Jesus Diaz

Page 39

```
 1        Q.    How did you like her as a counselor?

 2        A.    She was a good counselor.

 3        Q.    Do you remember -- it might be hard to

 4   remember.  But do you remember what year she started

 5   being your counselor?

 6        A.    She was my counselor as soon as I went on the

 7   building.

 8        Q.    As soon as you came in the building.

 9        A.    (The witness indicated.)

10        Q.    So that would have been back in 2002?

11        A.    No, no.  I was -- I went -- I wasn't here in

12   the compound in 2003.  So -- I got in trouble.  They sent

13   me back.  So I didn't come back out.  So I was over there

14   from 2003.  Okay.  I remember now.  I went over there.

15   Okay.  A little bit -- I put my first medical slip.  They

16   move me over there.  I got in trouble.  They give me a

17   write-up.  They move me over there.

18        Q.    And where do you mean by "over there"?

19        A.    Over there in 22.

20        Q.    Building 22?

21        A.    Yeah.  That was like -- I want to say like not

22   too far away from when I put my medical -- first medical

23   slip.  Okay.  So basically -- give me a second.  But what

24   I'm trying to say:  I was over there.  So from 2003,
```

Page 41

1    serious.  She was like, oh, God.  And, then, what they

2    doing?  She asked me a couple of question.  What they

3    doing about it?  What -- so she was trying to help me.

4         Q.    She was concerned for you?

5         A.    Yeah.

6         Q.    And she was trying to help you?

7         A.    Yeah.

8         Q.    Do you know if she is a nurse?

9         A.    Who:  Ms. Atallian?

10        Q.    Yes.

11        A.    No.

12        Q.    Is she a doctor?

13        A.    No.  That I know.

14        Q.    Do you know what she did?

15        A.    Yeah.

16        Q.    What?

17        A.    Well, she wrote me back.  The first letter

18   that she wrote me she said she met with mental health and

19   medical staff to discuss about my eye situation.  That's

20   in the letter that she sent me.

21        Q.    So your counselor, Ms. Atallian, told you that

22   she met with medical staff about your eye situation?

23        A.    Yes.

24        Q.    Okay.  And she wrote you a letter telling you

Jesus Diaz

Page 42

1    that.  Correct?

2         A.   Yeah.

3         Q.   And that letter is attached to this grievance.

4    Correct?

5         A.   Yeah.

6         Q.   Okay.  Did you want to flip to that to take a

7    look at those?  And we're still looking at Exhibit 3.

8    And on top of this exhibit it says Exhibit E.  Correct?

9         A.   Yeah.

10                   What's that mean?

11        Q.   Is this something that you wrote on top of the

12   letter?

13        A.   I don't recall.  I don't remember.

14        Q.   Do you recognize this as the letter from

15   Ms. Atallian?

16        A.   Yes.

17        Q.   And in that letter she states:  I took your

18   name to the mental health meeting to discuss your eye

19   issue.  Correct?

20        A.   That's the one?  Yeah.  Because she send me

21   like two or three different notes.

22        Q.   And this is dated January 19th, 2006.

23   Correct?

24        A.   Yeah.

Jesus Diaz

Page 44

1          Q.    Did you expect her to ever treat you

2    medically?

3          A.    Not treat me medically.  Like -- just like

4    trying to push a little bit.  Trying to push -- trying to

5    let them see my situation.

6          Q.    So you wanted her to push the medical people.

7    Is that what you're saying?

8          A.    The medical or probably somebody in charge.

9          Q.    Do you think that she did that?

10         A.    I think -- well, she wrote me, but I don't

11   know after this -- she probably did try.  But, you know,

12   there wasn't much done.  Nothing was done.

13         Q.    I guess I'm trying to understand why, you

14   know, if she was your counselor -- you had a good

15   relationship with her and she was writing these letters

16   on your behalf -- and you understand that she couldn't

17   treat you medically -- why you sued her.

18         A.    I don't know.  I think that she got -- I think

19   she got caught up in the mix.

20         Q.    She got caught up.  Is that what you're

21   saying?

22         A.    Yeah.

23         Q.    Okay.

24         A.    Being my counselor.

Jesus Diaz

Page 45

1       Q.    Okay.  Do you think she did anything to

2   violate your rights?

3       A.    No, I don't think so.

4       Q.    I'm going to shift a little bit here and talk

5   about your eye.  When was the first time you noticed a

6   problem with your eye?

7       A.    The first time I notice something about my

8   eyes I would say it was like probably the -- in the same

9   month they -- that I put my first medical slip, because

10  some of these buildings you don't got mirror.  You don't

11  got mirror where you can see yourself.  And you in a dark

12  room.  And they put the lights on when they want to.

13              So I remember me coming out of the

14  shower and the guy say, yo, why your eye so red?  So I

15  said probably the hot water.  We don't got -- we just got

16  either hot water or cold water to take a shower in.

17  That's something we got to deal with every day.

18              So he said something.  Your eye so red.

19  Your eye so red.  So I didn't take it serious.  So next

20  day he said something too.  And I said, "Are you sure?"

21  So they sell here this little plastic mirror.  So I asked

22  somebody for a mirror.  And I look and I see a little --

23  in the corner of my eye it was red.

24      Q.    Do you remember what year this was?

Jesus Diaz

Page 55

1    other doctors or nurses about your eyes --

2         A.    Yeah.

3         Q.    -- before then?

4         A.    Yeah.

5         Q.    Do you remember when?

6         A.    Well, I saw many time.  I don't even recall

7    the time.  Like in 2003 I saw -- well, I'm going to say

8    in 2004 I saw many, many nurses.  I don't know doctors,

9    because they always -- well, they used to tell me was we

10   make an appointment.  We made an appointment for you.  We

11   made an appointment.  We made an appointment.  So in 2004

12   I seen many nurses.  And in 2005 I seen many nurses come

13   and talk to me about it and stuff.

14        Q.    And when you saw these nurses, did you always

15   mention your eyes?

16        A.    Yeah.  Because everything was about my eyes.

17   Back then I wasn't getting like medication for my stomach

18   and I wasn't getting allergy pill.  But it was --

19   everything that I put back in that time, it was about my

20   stomach -- about my eyes.  I'm sorry.  Everything was

21   about my eyes.  So every time they come -- so many nurses

22   tell me, oh, they're not going to take care of you until

23   your whole eye get covered up.  Some of the nurses tell

24   me like:  Don't worry.  You're going to be seen.  We make

Page 56

1    an appointment.  And nothing doing.  When the nurse come

2    and see you, what she said, that's the way to go.

3    There's nothing I can do.

4         Q.    Okay.  Did a doctor ever tell you that your

5    vision problems are the results of the growths over your

6    eyes?

7         A.    Say that again.

8         Q.    You're having trouble with your vision now;

9    correct?

10        A.    Yeah.

11        Q.    Has a doctor ever said to you that the

12   problems you're having with your vision are caused by the

13   growths that you've had on your eyes?

14        A.    They probably never -- they never say that.

15   But I think that they don't want to probably -- they just

16   don't want to take the full responsibility.  They don't

17   want me to -- I don't -- see, I don't understand why

18   we -- why they just don't say -- I'm going to be here ten

19   year.  It was real simple.  Give me the surgery.  I told

20   them, you all give me surgery.  If it start growing back

21   again before I go home, I don't bother you no more.  I do

22   my surgery when I go home, because back there I can take

23   care of it.  But I told them I got to be here ten year.

24   I try many time.  I got to be here ten year.  And I

Jesus Diaz

Page 57

1    don't -- how am I going to -- how my eye -- my vision

2    going to be when I go home?

3        Q.    Have you ever asked them?  Did you ask if the

4    vision problems you're having are a result of the growths

5    on your eyes?

6        A.    Yeah, yeah.  I want to say myself yeah.

7    Because, you see, if I didn't have that skin growing

8    right here on my left eye, my eye would have been real

9    good.  If I didn't have that skin growing from my left to

10   the right, my eye would have been -- we wouldn't be here

11   today.

12       Q.    Have your eyes ever caused you any pain?

13       A.    Sometimes pain.  Sometimes -- well, it's not

14   like a big pain.  It's like sometimes I feel like I got a

15   needle on the -- right here on this -- on the corner of

16   my eye.  And sometime my eye just get black out or

17   sometime it's like that skin produce a fluid.  And the

18   fluid get on my eye and gets irritated.

19       Q.    Does that still happen today?

20       A.    That still happen all the time.  Like when I

21   take a shower in hot water, my eye get like real, real,

22   real red.  And more now than before.

23       Q.    And you keep pointing to your left eye.  Is it

24   your left eye that's bothering you?

Jesus Diaz

Page 64

1    or are you just making that assumption?

2        A.    I'm just saying, because I'm not the only one

3    probably complaining in this institution about probably

4    eye or stomach or -- I'm not the only one.

5        Q.    Do you think that the warden had any reason to

6    know about your medical problems?

7        A.    Yes.

8        Q.    Why?

9        A.    Because if he run this prison, he supposed to

10   know everything that is going on out here.

11       Q.    You think the warden knows the medical record

12   of every inmate in this prison?

13       A.    Probably not.  Every medical record that every

14   prisoner that go on here go -- when we talk about

15   spending money and operation, I think he probably know,

16   because they just not going to go ahead and grab me a

17   C/O, put me in a car and say, come one, we're going to

18   give you surgery.  That come from a higher level.

19       Q.    Do you think the warden makes decisions about

20   your medical care or do you think doctors make decisions

21   about your medical care?

22       A.    Who them hospital work for?  They work for the

23   prison.  So the hospital make a decision about -- okay.

24   Who hired the doctors and nurses in here?

Jesus Diaz

Page 65

1          Q.    Do you think the warden hired the doctors and

2     nurses?

3          A.    He probably don't, but he probably got

4     somebody doing it -- somebody that hire them people.

5     When those people come over here -- see, the thing about

6     doctors and nurses, right -- if you check the record --

7     not my record, like hospital record -- and you check how

8     many people they get hired and they get fired, because

9     they know they haven't -- nobody -- no -- see, they hire

10    anybody here, because we inmate.  And what they say,

11    that's what go.  And I know that's why there's so many

12    people fired.  I seen many faces that are not here no

13    more.

14         Q.    But what I'm asking you is if you think Warden

15    Thomas Carroll is the person who hires or fires medical

16    providers.

17         A.    He probably not but I know he know about it.

18         Q.    How do you know that he knows about it?

19         A.    Because he's the warden.  The warden is

20    somebody here.  I don't know what the warden -- if he the

21    one that run the jail or whatever.  But I think it's a

22    high position.

23         Q.    All right.  Let me move to something else.

24    Let's go to page 5, the next page.  On the second

Page 66

1    paragraph, it says that Plaintiff claims Thomas Carroll

2    has knowingly, willingly and intentionally failed to do

3    criminal background checks or hired employees, and this

4    negligence has caused people with criminal records to

5    work at DCC and lose Plaintiff's sick call slips and

6    grievance forms, thereby causing pain and loss of sight

7    in both eyes.

8                        What basis do you have for alleging that

9    Tom Carroll hires people with criminal backgrounds?

10        A.    Well, criminal background that's in here, it

11   going to stay here in this -- but I know for me -- for my

12   understanding, they hire people with no background check

13   probably, because they hire people in here with no

14   degree, no medical degree.  I see doctor get fired and a

15   lot of nurses.

16        Q.    Okay.  You said two separate things there.

17   First you said they hire people without doing a

18   background check.  What basis do you have for saying

19   that?  Why do you say that?

20        A.    Okay.  Because, like I say, how -- why they

21   hire person for a month and then fire?  And then you see

22   another person.  Like I say, between 2004 and 2005 -- or

23   in 2006 -- all them people that I see, they not working

24   here anymore.  There got to be a reason for that.

Jesus Diaz

Page 67

1       Q.   So are you just assuming that that's the

2    reason?

3       A.   I'm not assuming.  I know, because I asked.  I

4    asked about it.

5       Q.   Who did you ask?

6       A.   I asked nurses.  I asked --

7       Q.   No.  I need you to give me a name.

8            Who did you ask?

9       A.   I never keep track of nurses.  Never keep

10   track of the names.  Believe me, if I would have all them

11   people name, if I would have know who wouldn't be here

12   today, I would have everything wrote down.  It ain't my

13   intention being sitting here today.

14      Q.   Did a nurse tell you that Warden Thomas

15   Carroll hired somebody without doing a background check?

16      A.   No.  A nurse never told me that.  But there

17   was this nurse that every time she come and see me she

18   make the same comment.  She say:  You haven't been seen

19   yet?  And I say no.  You haven't been seen yet?  And that

20   was the girl that I give you the name Kiara.  She always

21   used to ask me that.  She come and see me two more -- two

22   more later.  She come and see me.  She be like:  "You

23   haven't been seen yet by a specialist or by somebody or a

24   doctor?

Jesus Diaz

Page 68

1          Q.    I understand that and those comments that she

2     made to you, but I'm trying to make the connection about

3     how those statements led you to state in the complaint

4     that Warden Carroll hired people without doing background

5     checks.  How does that conversation with that nurse lead

6     to that allegation?

7          A.    Can you repeat that question?

8          Q.    Okay.  In your complaint you stated that

9     Warden Carroll failed to do criminal background checks --

10         A.    Yes.

11         Q.    -- and that somehow -- well, I'll use your

12    language -- thereby causing pain and loss of sight in

13    both eyes, and this is a direct violation of Plaintiff's

14    8th and 14th Constitutional Amendment rights.

15         A.    Okay.

16         Q.    So what I want you to tell me is what evidence

17    you have to support that allegation.

18         A.    Okay.  I -- my evidence that I have right now

19    is my own self.  It's right here.

20         Q.    Do you know a name of anyone who was hired by

21    Thomas Carroll without him doing a criminal background

22    check?

23         A.    Probably not.  But there's some out there.

24         Q.    Let me move to another.

Jesus Diaz

Page 71

```
 1        Q.    Okay.   What is it that you're alleging

 2   Corporal Lise Merson did to violate your rights?

 3        A.    Who is she?

 4        Q.    Oh.

 5                    Okay.   Do you understand that eventually

 6   in this case there might be a trial?

 7        A.    Yeah.

 8        Q.    Okay.   And do you plan to call witnesses if

 9   the case goes to trial?

10        A.    Well, if the court can provide me medical

11   staff name and stuff, I got witness.   Nurses that they

12   were trying to help.

13        Q.    But can you recall any names of those nurses?

14        A.    Kiara.   I'm going to find out.   Believe me, I

15   I'm going to get some more -- I'm going to get some name.

16        Q.    Okay.   And if you find out, do you understand

17   you have to send those names to me?

18        A.    Yeah.   I'll send you the names.

19        Q.    Okay.   What are you seeking from this lawsuit?

20        A.    What you mean?

21        Q.    What do you want?   Why did you file the

22   lawsuit?

23        A.    I file the lawsuit because I run out of -- I

24   run out the -- I keep trying.   Something like -- can you
```

1          Q.    Or you had some procedure done on your eye?

2          A.    Yeah.  I had some -- supposed to have some --

3    I went for the procedure on 10/3/06.

4          Q.    Okay.

5          A.    The surgery never take place.  I don't know

6    why.

7          Q.    But the doctor that you saw outside of the

8    facility, you said he scrubbed your eye.

9          A.    Yeah.  That's what he explain to me.  He said

10   we're going to give you a surgery to make sure that it

11   will never come back.  But to be honest with you, the

12   scrubbing that he was giving me was the cheap way.  It

13   was the cheap -- the low -- that's what they were trying

14   to do.  And I went along with it.  I said this is

15   probably going to be painful.  This is probably going to

16   be bad.  They going to give me medication.  The

17   medicine -- I going to scrub your eye.  And it never --

18   it will not come back.  They give me the scrubbing

19   surgery.

20              The C/O that brought me here for the

21   hospital supposed to call the hospital here and say we

22   got this man here that need Percocet.  Okay.  The

23   hospital got Percocet.  But they have nothing for me.

24         Q.    So --

Page 92

1          A.    The next day and the next day too.   Then the

2    third day they give me regular Tylenol.

3          Q.    Okay.  So you did get Tylenol?

4          A.    On the third day of my operation.

5          Q.    And I think you said that you went back to

6    this doctor on October 4th --

7          A.    Yeah.

8          Q.    -- of 2006.

9          A.    Yeah.  Going crazy.  I went -- I was going

10   crazy before I went.

11         Q.    And this doctor is the doctor that is outside

12   of the prison?

13         A.    Yeah.  The one that's supposed to do the

14   surgery.

15         Q.    So if I understand you correctly, I mean, he

16   did something -- some procedure to your eye.

17         A.    To be honest with you, I think that when he

18   scrub my eye, he was about to mess up my eye completely.

19         Q.    Okay.

20         A.    And he stopped and sent me back.  And these

21   people here -- excuse me -- instead of go -- see, if I

22   had it in my hand, he would have a lawsuit too.  But I

23   don't have it.  I'm by myself.  He is a powerful man.  I

24   need a strong lawyer to go behind him so he can explain

Jesus Diaz

Page 93

1    to the court why I still got that on my eye.  Why -- see,

2    you never been through that like me, never.  Get my eye

3    scrub?  You don't want to go through that.  Believe me.

4         Q.    Well, it sounds to me like -- just tell me if

5    you agree with this.  Something was done to your eye.

6    You just don't agree with what was done.  Is that fair?

7         A.    To be honest with you, the only thing that was

8    done with my eye, he got me for an -- he was experiment

9    with me.

10        Q.    So you don't like the treatment that you

11   received?

12        A.    I still got it.  There was nothing done.

13   How -- if he would remove it -- if he would have removed

14   it, then I wouldn't be sitting here with you, and my eye

15   wouldn't be -- you don't see the skin of my eye.  You be

16   like, okay, you got the surgery.  We might come up with

17   some understanding.  The surgery never take place.

18              And another thing:  Never -- I went to

19   see the institution doctor and I explain to him.  Can you

20   explain to me why if I just had the surgery like 15 days

21   ago -- or a month ago or two month ago when I saw him --

22   why this thing is still over my eye?  And he said, oh.

23   He don't even know what he was saying.  See, every -- see

24   the thing about is they don't want to see me.  They --

Page 94

1    because they know...

2        Q.    So let me go back to the question I asked you.

3    Okay?

4        A.    (The witness indicated.)

5        Q.    It sounds to me like you don't like the

6    treatment you received.  Is that correct?

7        A.    Yeah.

8        Q.    Has anybody told you that your loss of sight

9    in your eyes is caused by any care you received in the

10   prison?

11       A.    No.

12       Q.    Okay.  Has anybody told you that your loss of

13   eyesight is the result of care that you didn't receive or

14   should have received while you were in the prison?

15       A.    They don't say nothing to me.  They don't tell

16   me nothing.

17       Q.    And actually, while I have this, I think I'm

18   going to give you a copy.  This is the copy of the answer

19   of CMS to your complaint.  I think there were some

20   filings that you made that you hadn't received a copy of

21   that for one reason or another.

22       A.    Yeah.  They never -- oh, that -- this is the

23   one.

24       Q.    That's the answer.  So I'm giving you a copy

Jesus Diaz

Page 95

1    of that now.  Okay?  So if you didn't get the other two

2    that I sent to you, at least now I know you have a copy

3    of it.

4        A.    When you send me this?

5        Q.    Actually, I just handed that one to you.  But

6    I sent it back on August 31st, I believe.

7        A.    Oh, this is the one that I supposed to receive

8    back then?

9        Q.    Correct.

10       A.    You suppose to give it to me here?  I mean, if

11   I don't want to take it is because --

12       Q.    Well, you can refuse it if you want to refuse

13   it.  You can do whatever you want with it.

14       A.    Me, I be arguing about I never received that.

15       Q.    Okay.

16       A.    It might have got lost in the mail.  It may

17   be -- and they got proof of that.  See, they -- this --

18   my building got proof of that.  Every time I got legal

19   mail I got to sign a sheet.

20       Q.    Okay.  Well, I'm just giving you a copy of it.

21   Okay?

22       A.    (The witness indicated.)

23       Q.    Have you appealed any grievances?

24       A.    No.

Jesus Diaz

Page 100

```
 1        Q.   Okay.

 2        A.   Maybe a month and a half ago there was eye

 3   drop in my cell.

 4        Q.   And that's something that you would administer

 5   yourself?

 6        A.   Yeah.  When my eye get like real dry,

 7   irritated.

 8        Q.   Okay.  And I think you testified earlier you

 9   also have sunglasses that were prescribed for you.

10        A.   They wasn't prescribed.  When I had my

11   surgery, that was the glasses that I was supposed to use

12   for the sun --

13        Q.   Okay.

14        A.   -- for the light.

15        Q.   Who gave them to you?

16        A.   The surgery outside.

17        Q.   Okay.

18        A.   They prescribe them to me because they know my

19   name.  I got prescription for it.  But I took -- I take

20   maybe 10 day, 20 day -- the pain go away.  I'm good.

21   When I take the bandage out and all that stuff, I was

22   still needing glasses.

23        Q.   Okay.  Now, you testified earlier that you

24   don't agree with what CMS has done regarding your
```

Jesus Diaz

Page 101

1    treatment; correct?

2         A.    Yeah.  I do not agree with that.

3         Q.    What do you think they should have done?

4         A.    I think they -- when I put my first medical

5    slip, right, I would expect at least somebody to see me.

6    And if not somebody see me, see the eye doctor.  And then

7    when I see the eye doctor, okay, we're going to give you

8    this eyedrop.

9         Q.    Okay.

10        A.    I never -- for 2003 when I start putting my

11   first complaint, I never seen an eye doctor until when I

12   went outside April of 2006.  And they suppose to have

13   it -- I don't know if they have an eye doctor in here.

14   But after my surgery there was an eye doctor here.  And I

15   never saw him.

16        Q.    Do you know what pterygium is?  Have you ever

17   heard that word?

18        A.    Oh, no.  I mean, if I know the word, I might

19   be able to answer.

20        Q.    Do you know what xerophthalmia is?

21        A.    No.

22        Q.    You've never heard that term before?

23        A.    Xerophthalmia?

24        Q.    Correct.

Jesus Diaz

Page 102

1                        · I'm going to show you -- and we'll mark

2    this as an exhibit here.

3                        (Diaz Deposition Exhibit No. 4 was

4    marked for identification.)

5    BY MR. THOMPSON:

6         Q.    Is that your signature?

7         A.    Yes.

8         Q.    Okay.  And what is this form?

9         A.,   This is medical slip.

10        Q.    Okay.  And that's your signature?

11        A.    Yes.

12        Q.    And is that the word "xerophthalmia"?

13        A.    Yes.  But I can explain that -- the medical

14   slip.  See, this medical slip -- if you see right here,

15   it was put in by a fellow inmate in another cell that he

16   was reading book.  He was going through book trying to

17   find out what was going on with me.  And if you see right

18   here, he put his cell number.

19        Q.    You're pointing to a D --

20        A.    Yeah.

21        Q.    -- 02.

22        A.    That's -- that was my fellow man, a

23   Puerto Rican dude, Michael Rojas.  I think he still in

24   the institution.  I don't know where.  Michael Rojas, he

Jesus Diaz

Page 103

1    reading book.  And he said I think I know what's wrong

2    with you.  And he filled out this medical slip for me.  I

3    sign it.  But he said don't worry about it.  Now we going

4    to let them know what kind of problem you got, and then

5    maybe they can get on top of it.

6        Q.    Okay.  So a fellow inmate told you you had

7    xerophthalmia, but no doctor ever told you that.

8        A.    No doctor, yeah.

9        Q.    Okay.

10       A.    That's what he was saying, you know.  That was

11   probably his -- he was reading book, and he saw an eye

12   with the skin growing.  And he probably say, okay, that's

13   what he got.  That's what we wrote -- that's what we put

14   in.

15       Q.    Now, you testified earlier that you think you

16   need surgery.  Did that same inmate tell you that he

17   thinks you need surgery?

18       A.    No.  I know I need surgery because -- like I

19   said earlier, I don't -- I got ten year to do.  I got

20   five more.  I be done five year in December.  I got five

21   more.  I don't know what going to happen.

22       Q.    But did any doctor tell you you need surgery?

23       A.    I haven't seen no doctor since then.

24       Q.    Well, you saw the doctor outside, correct, the

# EXHIBIT E

DCC  Delaware Correctional Center                                      Date: 12/05/2005
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 17147 | **Grievance Date** : 09/06/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status** : Level 1 | **Resol. Date** : 12/05/2005 |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 08/29/2003 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 22, Lower, Tier D, Cell 6, Bottom | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: Since 8-29-03, I have been complaining of a type of growth on my left eye. I filed a medical slip on the above date and several after. My original slip was returned and it indicated that I was referred to sick call. I have placed many medical slips on this issue in the medical box and still have not been seen. As of now, the growth is now on my right eye. It is causing me much pain and irritation. I do not understand why I have not been seen by a doctor. If this growth is cancerous, tumerous or some sort of cataract, then it would be necessary to have them looked at and removed.

**Remedy Requested** : Inmate states: That I am treated.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 09/13/2005 |
| **Investigation Sent :** 09/13/2005 | **Investigation Sent To** : Dunn, Lee Anne |
| **Grievance Amount :** | |

000007

**FORM  #585**

**MEDICAL GRIEVANCE**

FACILITY: Delaware Correctional Center

INMATE'S NAME: Jesus Diaz

HOUSING UNIT: M.H.U 22-D-1-6

DATE SUBMITTED: 9/6/05

SBI #: 474251

CASE #: 17147

////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: 9/6/05 — (8/29/03 First Filing of Medical slip)

TYPE OF MEDICAL PROBLEM: Since  8/29/03, I have been complaining of a type of growth on my left eye. I filed a Medical slip on the above date and several after. My original slip was returned and it indicated that I was referred to ~~call~~ sick call. I have placed many medical slips on this issue in the medical box and I still have not been seen. As of now, the growth is now on my right eye. It is causing me much pain and irritation. I do not understand why I have not been seen by a doctor. If this growth is cancerous, tumerous, or some sort of catarac, then it would be necessary to have them looked at and removed. Failure to do so would mean that Medical is effectively risking the health and life of an inmate.

GRIEVANT'S SIGNATURE: _____    DATE: _____

ACTION REQUESTED BY GRIEVANT: That I am treated pursuant to guide-lines stated in the Medical contract that this medical organization has with Delaware D.O.C. If not, I ask that my grievance be recorded so that I may pursue further relief in court pursuant to a 28 U.S.C 2255 petition.

DATE RECEIVED BY MEDICAL UNIT: _____

**RECEIVED**

SEP 0 8 2005

Inmate Grievance Office

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL
GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

000009

**DCC  Delaware Correctional Center**                           **Date:** 12/05/2005
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** DIAZ, JESUS C | **SBI# :** 00474251 | **Institution :** DCC |
| **Grievance #** : 17147 | **Grievance Date :** 09/06/2005 | **Category :** Individual |
| **Status** : Resolved | **Resolution Status:** Level 1 | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 08/29/2003 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 22, Lower, Tier D, Cell 6, Bottom | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name** : Dunn, Lee Anne                    **Date of Report** 09/13/2005

**Investigation Report :** will get sneelen & rosenbaun done if interfering with vision will send t o optometry but if it problems we will just f/u every 2 months

**Reason for Referring:**

Offender's Signature:_____

Date                    :_____

Witness (Officer)    :_____

ꞮꞮꞮꞮꞮ0000Ꞓ

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date:09/14/2005

## INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 17147 | **Grievance Date** : 09/06/2005 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 08/29/2003 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 22, Lower, Tier D, Cell 6, Bottom | |

### INFORMAL RESOLUTION

**Investigator Name** : Dunn, Lee Anne            **Date of Report**  09/13/2005

**Investigation Report :**

**Reason for Referring:**

Will get sneellen & rosenbaum done
If inf interfering with vision will send
to Optometry but if + problems we will
just F/u every 2 months

**Offender's Signature:** Jesus Diaz

**Date** : 9-21-05

**Witness (Officer)** :

000010

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 12/05/2005

# GRIEVANCE INFORMATION - IGC

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** DIAZ, JESUS C

**Grievance # :** 17147

**Status :** Resolved

**Grievance Type:** Health Issue (Medical)

**IGC :** Merson, Lise M

**SBI# :** 00474251

**Grievance Date :** 09/06/2005

**Resolution Status :** Level 1

**Incident Date :** 08/29/2003

**Housing Location :** Bldg 22, Lower, Tier D, Cell 6, Bottom

**Institution :** DCC

**Category :** Individual

**Inmate Status :**

**Incident Time :**

## IGC

**Medical Provider:**                                    **Date Assigned**

**Comments:**

☐ **Forward to MGC**                ☐ **Warden Notified**

☐ **Forward to RGC**                **Date Forwarded to RGC/MGC :** 12/05/2005

☑ **Offender Signature Captured**   **Date Offender Signed :** 12/05/2005

00011

# EXHIBIT F

DCC   Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 34204 | **Grievance Date** : 04/13/2006 | **Category** : Individual |
| **Status** : Withdrawn | **Resolution Status** : | **Resol. Date** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/13/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg V, Tier A, Cell 6, Top | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claim: For the past 3 years I have been complaining to the medical staff through the sick call slips about my cataracts. I have filed medical grievances and I have been ignored. The cataracts started on my left eye and is now forming on my right eye. One of my eyes are completely covered. I am irritated at the fact that the medical department has done nothing for the past three years that I have been complaining about this problem.

**Remedy Requested** : To provide some type of treatment for my cataracts. If not, provide an answer to the inmate of medical staff failure to provide medical treatment.

## INDIVIDUALS INVOLVED

| Type | SBI# | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 04/26/2006 |
| **Investigation Sent** : 04/26/2006 | **Investigation Sent To** : Rodweller, Deborah |
| **Grievance Amount :** | |

000012

*Rodweller*

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: Delaware Correctional Center          DATE SUBMITTED: 4-13-06

INMATE'S NAME: Jesus Diaz          SBI#: ~~424251~~ 474251

HOUSING UNIT: 22-D-L-5          CASE #: 34204

//////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: 2003-2006

TYPE OF MEDICAL PROBLEM: Catteraccs

For the past 3 years I have been complaining to the Medical Staff through the sick call slips about my catteraccs. I have filed Medical grievances and I have been ignored. The catteraccs started on my left eye and is now forming on my right eye. One of my eyes are completely covered. I am irritated at the fact that the medical department has done nothing for the past three years that I have been complaining about this problem. This staff has failed to comply with my right to be free from non-compliance of medical staff in treating a serious medical condition such as mine. Medical Staff has not, nor can they, justify not providing me with Medical care. This is a clear violation of Title 11 § 6536.

GRIEVANT'S SIGNATURE: *Jesus Diaz*          DATE: _____

ACTION REQUESTED BY GRIEVANT: To comply with title 11 § 6536 and provide same type of treatment for my catteraccs. If not, provide an answer to the inmate of Medical staff failure to provided medical treatment so the inmate can file a habeas corpus with the federal courts on this issue.

DATE RECEIVED BY MEDICAL UNIT: _____

000013

RECEIVED

APR 17 2006

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 04/26/2006

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 34204 | Grievance Date : 04/13/2006 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 04/13/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location :Bldg 22, Lower, Tier D, Cell 6, Bottom | |

| INFORMAL RESOLUTION | |
|---|---|
| Investigator Name : Rodweller, Deborah | Date of Report  04/26/2006 |
| Investigation Report : | |
| Reason for Referring: | |

Upgrade to Level II

Offender's Signature: _Refuse to sign_

Date : _6-5-06_

Witness (Officer) : _Jamila McKenzie RN_

Page 2 of 2

000014

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/18/2006

# INFORMAL RESOLUTION

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 34204 | **Grievance Date** : 04/13/2006 | **Category** : Individual |
| **Status** : Withdrawn | **Resolution Status:** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/13/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg V, Tier A, Cell 6, Top | |

## INFORMAL RESOLUTION

**Investigator Name** : Rodweller, Deborah        **Date of Report** 04/26/2006

**Investigation Report** : next level

**Reason for Referring:**

**Offender's Signature:**_____

**Date**              :_____

**Witness (Officer)**   :_____

U00015

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/18/2006

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 34204 | Grievance Date : 04/13/2006 | Category : Individual |
| Status : Withdrawn | Resolution Status : | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 04/13/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg V, Tier A, Cell 6, Top | |

### IGC

Medical Provider:                              Date Assigned

Comments:

[x] Forward to MGC                    [ ] Warden Notified

[ ] Forward to RGC                    Date Forwarded to RGC/MGC : 06/16/2006

[x] Offender Signature Captured       Date Offender Signed :

000016

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/18/2006

# GRIEVANCE INFORMATION - Appeal

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 34204 | **Grievance Date** : 04/13/2006 | **Category** : Individual |
| **Status** : Withdrawn | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/13/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg V, Tier A, Cell 6, Top | |

## APPEAL REQUEST

No appeal returned as of today 18 August 2006. Grievance Withdrawn.

## REMEDY REQUEST

000017

## M. G. C Decision

**Inmate:** Diaz, Jesus C.        **SBI#:** 00474251    **Case#:** 34204

Review Chart + follow up c
MD as to procedures ordered or need
to be ordered

I. G. C.:

**M. G. C.:**                    ◯ Deny                    ✓ Uphold

C.M.S. Staff & Title:

C.M.S. Staff & Title:                    M A

C.M.S. Staff & Title:                    MRC

Date:                    8·1·06

CC: File

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 08/18/2006

# GRIEVANCE INFORMATION - MGC

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 34204 | Grievance Date : 04/13/2006 | Category : Individual |
| Status : Withdrawn | Resolution Status : | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 04/13/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg V, Tier A, Cell 6, Top | |

### MGC

Date Received : 06/16/2006       Date of Recommendation: 08/02/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI# | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Uphold |
| Staff | | Heddinger, Brenda | Uphold |
| Staff | | Gordon, Oshenka | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| | | |
|---|---|---|
| Uphold : 3 | Deny : 0 | Abstain :1 |

### TIE BREAKER

| Person Type | SBI# | Name | Vote |
|---|---|---|---|
| | | | |

### RECOMMENDATION

Hearing held Tuesday 1 August 2006.
Uphold: Review chart & follow up with MD as to procedures ordered or need to be ordered.
Appeal Provided. Appeal due Tuesday 8 August 2006.

00019

# EXHIBIT G

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#**         :  00474251 | **Institution**   : DCC |
| **Grievance #**   : 40724 | **Grievance Date** : 05/03/2006 | **Category**   : Individual |
| **Status**       : Non Grievable | **Resolution Status** : | **Resol. Date** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date**  : 05/03/2006 | **Incident Time** : |
| **IGC**          : McCreanor, Michael | **Housing Location** : Bldg 23, Lower, Tier B, Cell 6, Top | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Jesus Diaz has put in several complaints pursuant to Medical Grievances about the growth within the covering of his eye. Its been years and nothing has been done which is unduly prejudical. Medical staffs failure to respond undermines the fundamental legality, reliability, and integrity or fairness of the proceedings.

**Remedy Requested**   : Diaz would like his eye fixed by the growth being taken out because Diaz cannot see that good and this causes harm.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance** : YES | **Date Received by Medical Unit** : 05/19/2006 |
| **Investigation Sent** : 05/19/2006 | **Investigation Sent To**          : |
| **Grievance Amount** : | |

000045

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 40724 | Grievance Date : 05/03/2006 | Category : Individual |
| Status : Non Grievable | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 05/03/2006 | Incident Time : |
| IGC : McCreanor, Michael | Housing Location :Bldg 23, Lower, Tier B, Cell 6, Top | |

**INFORMAL RESOLUTION**

Offender's Signature:_____

Date                :_____

Witness (Officer)    :_____

00046

# GRIEVANCE INFORMATION - IGC

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 40724 | **Grievance Date** : 05/03/2006 | **Category** : Individual |
| **Status** : Non Grievable | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 05/03/2006 | **Incident Time :** |
| **IGC** : McCreanor, Michael | **Housing Location :** Bldg 23, Lower, Tier B, Cell 6, Top |

## IGC

**Medical Provider:**                              **Date Assigned**

**Comments:**

This Grievance returned because:

Request. You need to follow procedure and file a sick call slip.

[ ] Forward to MGC                [ ] Forward to Medical Provider        [ ] Warden Notified

[ ] Forward to RGC                Date Forwarded to MGC :        05/19/2006

[ ] Offender Signature Captured        Date Offender Signed        :

D 0 0 0 4 7

DCC   Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

000048

# EXHIBIT H

Ex. 2

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 11/06/2006

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC |
| **Grievance #** : 41965 | **Grievance Date** : 05/12/2006 | **Category** : Individual |
| **Status** : Withdrawn | **Resolution Status** : | **Resol. Date** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 05/12/2006 | **Incident Time** : |
| **IGC** : Merson, Lise M | **Housing Location** : Bldg V, Tier A, Cell 6, Top | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: This is his second grievance on the matter of improper medical care to his eye.

**Remedy Requested** : Inmate would like the matter dealt with ASAP. The growth in his eye has gotten worse.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 05/25/2006 |
| **Investigation Sent :** 05/25/2006 | **Investigation Sent To** : Rodweller, Deborah |
| **Grievance Amount :** | |

000020

*Rodweller*

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: _D.C.C._                                   DATE SUBMITTED: _5/2/06_

INMATE'S NAME: _Jesus Diaz_                          SBI#: _474251_

HOUSING UNIT: _MUH-22-D-Lower 6_                     CASE #: _41965_

_ALL MAY 23 2006_

//////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: _____

TYPE OF MEDICAL PROBLEM:

_Hendricks v Coughlin 114 F3d 390 2nd Cir grievance clearly protected by Federal Constitution This is Jesus Diaz second grievance on the matter of inproper medical care pursuant to his eye._
_The exhibits attached show unduly prejudical proceedings which undermine the Fundamental Legality, reliability, integrity or Fairness of the proceedings._

GRIEVANT'S SIGNATURE: _Jesus Diaz_                   DATE: _5-12-06_

ACTION REQUESTED BY GRIEVANT: _Mr Diaz would like the matter dealt with A.S.A.P. the growth in his eye has got worse._
_To hinder proper medical care is illegal._
_Federal department Grievance Board_

DATE RECEIVED BY MEDICAL UNIT: _____

_C/C Stephen Hampton esq_
_Medical department_

_00002_

**RECEIVED**

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

MAY 18 2006

Inmate Grievance Office

exhibit
Affidavit

To: Lawyer

From Jesus Diaz Lower 6 b-Tric

Subject 6536 Medical Care
The Department shall promulgate
Reasonable standards and shall
establish reasonable health and
medical services. exhibits A, B, C, D, E, F
These services were not given
which cause haem. This undermines
the Fundamental, Legality reliabilit
integrity or Faireness of the proc-
eedings.
Unduly prejudical due process was
violated. This brought about 8th
Amendment violation.

Inmates eye is really bad which
is causing him haem
By the proper procedures being over
looked is a Miscarriage of justice

(1)

000022

RECEIVED

MAY 18 2006

Inmate Grievance Office

These peac proceedings cause deliberate and callous indifferen toward Inmate and violated his Due process rights U.S.C.A. 5th Amendment

Documentation sent will show prejudice.

Medical has concealed False entry which hinders proper Treatment Falsely altering Teratment yeaes causes serious haem to Inmates eye.

The whole medical proceeding has been Tainted which affects progress Foc Inmate which is illegal.

Not giving proper opportunity Foc Teatment of greuth within eyes causes haem.

Respect Fully

Jesus Diez

Inmate should of never had To be tinder yeaes without any Treatment.

c/c Grievance
    Stephen Hompton Esc
    Medical depatmt

000023

RECEIVED

MAY 18 2006

Inmate Grievance Office

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/14/2005

ex A

11-26-05

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Offender Name : | DIAZ, JESUS C | SBI# | : 00474251 | Institution | : DCC |
| Grievance # | : 17147 | Grievance Date | : 09/06/2005 | Category | : Individual |
| Status | : Unresolved | Resolution Status : | | Resol. Date | : |
| Grievance Type: | Health Issue (Medical) | Incident Date | : 08/29/2003 | Incident Time : | |
| IGC | : Merson, Lise M | Housing Location : | Bldg 22, Lower, Tier D, Cell 6, Bottom | | |

## OFFENDER GRIEVANCE DETAILS

Description of Complaint: Inmate claims: Since 8-29-03, I have been complaining of a type of growth on my left eye. I filed a medical slip on the above date and several after. My original slip was returned and it indicated that I was referred to sick call. I have placed many medical slips on this issue in the medical box and still have not been seen. As of now, the growth is now on my right eye. It is causing me much pain and irritation. I do not understand why I have not been seen by a doctor. If this growth is cancerous, tumerous or some sort of cataract, then it would be necessary to have them looked at and removed.

Remedy Requested     :   Inmate states: That I am treated.

## INDIVIDUALS INVOLVED

| Type | SBI# | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Medical Grievance : YES | Date Received by Medical Unit : | 09/13/2005 |
| Investigation Sent : 09/13/2005 | Investigation Sent To | : Dunn, Lee Anne |
| Grievance Amount : | | |

000024

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/14/2005

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 17147 | Grievance Date : 09/06/2005 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 08/29/2003 | Incident Time : |
| IGC : Merson, Lise M | Housing Location :Bldg 22, Lower, Tier D, Cell 6, Bottom | |

| INFORMAL RESOLUTION | | |
|---|---|---|
| Investigator Name : Dunn, Lee Anne | | Date of Report  09/13/2005 |
| Investigation Report : | | |
| Reason for Referring: | | |

Will get snellen & rosenbaum done
If inf interfering with vision will send
to Optometry but if 4 problems we will
just F/u every 2 months

Offender's Signature: _Jesus Diaz_

Date : _9-21-05_

Witness (Officer) _[signature]_

000025

11-13-06

**DCC Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 04/26/2006

ex B

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 34204 | Grievance Date : 04/13/2006 | Category : Individual |
| Status : Unresolved | Resolution Status : | Resol. Date : |
| Grievance Type: Health Issue (Medical) | Incident Date : 04/13/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg 22, Lower, Tier D, Cell 6, Bottom | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claim: For the past 3 years I have been complaining to the medical staff through the sick call slips about my cataracts. I have filed medical grievances and I have been ignored. The cataracts started on my left eye and is now forming on my right eye. One of my eyes are completely covered. I am irritated at the fact that the medical department has done nothing for the past three years that I have been complaining about this problem.

**Remedy Requested** : To provide some type of treatment for my cataracts. If not, provide an answer to the inmate of medical staff failure to provide medical treatment.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| Medical Grievance : YES | Date Received by Medical Unit : 04/26/2006 |
| Investigation Sent : 04/26/2006 | Investigation Sent To : Rodweller, Deborah |
| Grievance Amount : | |

000026

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 34204 | Grievance Date : 04/13/2006 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 04/13/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location :Bldg 22, Lower, Tier D, Cell 6, Bottom | |

| INFORMAL RESOLUTION | |
|---|---|
| Investigator Name : Rodweller, Deborah | Date of Report  04/26/2006 |

Investigation Report :

Reason for Referring:

Offender's Signature:_____

Date                      :_____

Witness (Officer)   :_____

Page 2 of 2

EX C

# DELAWARE DEPARTMENT OF CORRECTIONS
## REQUEST FOR MEDICAL/DENTAL SICK CALL SERVICES
## FACILITY: DELAWARE CORRECTIONAL CENTER
This request is for (circle one): (MEDICAL) DENTAL MENTAL HEALTH

Jesus Diaz
Name (Print)

22 D-U-2
Housing Location

9-10-74
Date of Birth

424251
SBI Number

12/05/05
Date Submitted

Complaint (What type of problem are you having)? I've been (suffering) from
Xerophthalmia, now its on my other eye Please Give me some
type of help, because my eye is really bothering me Give
me some help, I'm not trying to lose my sight! Thank You

Jesus Diaz
Inmate Signature

12/5/05
Date

**The below area is for medical use only. Please do not write any further.**

S: Consult for eye doctor written 12/27/05

O:   Temp:____   Pulse:____   Resp:____   B/P:____   WT:____ 1-3-06

A:

P:

E:

_____          _____
Provider Signature & Title                    Date & Time

000028

# DELAWARE DEPARTMENT OF CORRECTIONS
## REQUEST FOR MEDICAL/DENTAL SICK CALL SERVICES
## FACILITY: DELAWARE CORRECTIONAL CENTER
### This request is for (circle one): MEDICAL  DENTAL  MENTAL HEALTH

Jesus Diaz
_____
Name (Print)

C-Building
_____
Housing Location

9-10-74
_____
Date of Birth

00474251
_____
SBI Number

8-29-03
_____
Date Submitted

Complaint (What type of problem are you having)? Have a bump on the
inside of my left eye. Have something that is starting
to cover the brown part of my eye. It's on the
left one. It's coming from the right side of my eye.

Jesus Diaz
_____
Inmate Signature

8-29-03
_____
Date

### The below area is for medical use only.  Please do not write any further.

S: You have been referred to sick call - mp

O:    Temp:_____    Pulse:_____    Resp:_____    B/P:_____    WT:_____

A:

P:

E:

RECEIVED SEP 0 3 2003

_____
Provider Signature & Title

_____
Date & Time

3/1/99 DE01
FORM#:
MED
263

J00029

*ex E*

January 19, 2006

Jesus Diaz, 474251
22
DL6

I took your name to the mental health meeting to discuss your eye issue. Also, today, I met with medical staff about your issue. The staff advised me that they are aware of your eye concerns, and that you should be waiting for an appointment/referral now for an ophthalmologist (who would be an eye specialist). They have to work out the details for you to be seen at this time, but I am hopeful that it will not take long.

Please write to me after you are seen and let me know how you make out.
Thank you,

Cindy Atallian
Counselor – 22

ex F

February 23, 2006

Medical
MHU

Could you please review the attached letter from Jesus Diaz, 474251 – 22 – DL6 with
medical concerns over his eyes?

Thank you so much.

Cindy Atallian
Counselor – 22

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date:08/31/2006

## INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Offender Name : DIAZ, JESUS C | | SBI# | : 00474251 | Institution | : DCC |
| Grievance # | : 41965 | Grievance Date | : 05/12/2006 | Category | : Individual |
| Status | : Unresolved | Resolution Status: | | Inmate Status : | |
| Grievance Type: Health Issue (Medical) | | Incident Date | : 05/12/2006 | Incident Time : | |
| IGC | : Merson, Lise M | Housing Location :Bldg V, Tier A, Cell 6, Top | | | |

### INFORMAL RESOLUTION

| | |
|---|---|
| Investigator Name  : Rodweller, Deborah | Date of Report  05/25/2006 |

Investigation Report :

Reason for Referring :

- Patanol ī gtt OU Bid x 60 days ordered 6-1-06
- Vigamox OS ī gtt q6° until 9-29-06 ordered 9-5-06
- Patanol KOP'd on 7-3-06 ē approx June 22

Offender's Signature : Refuse to sign

Date : 9-7-06

Witness (Officer) : Jamila McKenzie RN

000032

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 11/06/2006

## INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 41965 | Grievance Date : 05/12/2006 | Category : Individual |
| Status : Withdrawn | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 05/12/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location :Bldg V, Tier A, Cell 6, Top | |

### INFORMAL RESOLUTION

Investigator Name : Rodweller, Deborah          Date of Report  05/25/2006

Investigation Report : PATANOL DROPS X 60 DAYS ORDERED 6-1-06
PATANOL KOP'D ON APPROX 6-22-06 & 7-3-06
VIGAMOX DROPS UNTIL 9-29-06 ORDERED 9-5-06

Reason for Referring: I/M DOESN'T AGREE W/ PLAN OF CARE

Offender's Signature:_____

Date            :_____

Witness (Officer)   :_____

000033

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date:11/06/2006

# GRIEVANCE INFORMATION - IGC

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** DIAZ, JESUS C | **SBI#** : 00474251 | **Institution** : DCC | |
| **Grievance #** : 41965 | **Grievance Date** : 05/12/2006 | **Category** : Individual | |
| **Status** : Withdrawn | **Resolution Status :** | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 05/12/2006 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg V, Tier A, Cell 6, Top | | |

## IGC

**Medical Provider:**                                 **Date Assigned**

**Comments:**

  [x] Forward to MGC                    [ ] Warden Notified

  [ ] Forward to RGC                    Date Forwarded to RGC/MGC : 09/14/2006

  [x] Offender Signature Captured      Date Offender Signed          :

DC0034

**DCC  Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 11/06/2006

# GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 41965 | Grievance Date : 05/12/2006 | Category : Individual |
| Status : Withdrawn | Resolution Status : | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 05/12/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg V, Tier A, Cell 6, Top | |

| APPEAL REQUEST |
|---|
| No appeal returned as of 6 November 2006. Grievance considered Withdrawn. |

| REMEDY REQUEST |
|---|
| |

000035

**M. G. C Decision**

**Inmate:** Diaz, Jesus C.          **SBI#:** 00474251          **Case#:** 41965

6/1/06 Su for Eyes & Eye gts
7/10/06 Seen by Dr Eye Car -
i Being addressed

I. G. C.:

M. G. C.:                    Deny                    Uphold

C.M.S. Staff & Title:     G Eller Rn. Dow

C.M.S. Staff & Title:     BGoldier MD

C.M.S. Staff & Title:     O. Bowden MRC

Date:                     9.27.06

CC: File

000036

**DCC  Delaware Correctional Center**
Date: 11/06/2006
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

# GRIEVANCE INFORMATION - MGC

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : DIAZ, JESUS C | SBI# : 00474251 | Institution : DCC |
| Grievance # : 41965 | Grievance Date : 05/12/2006 | Category : Individual |
| Status : Withdrawn | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | Incident Date : 05/12/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg V, Tier A, Cell 6, Top | |

## MGC

Date Received : 09/14/2006          Date of Recommendation: 09/27/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Uphold |
| Staff | | Heddinger, Brenda | Uphold |
| Staff | | Gordon, Oshenka | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| Uphold : 3 | Deny : 0 | Abstain :1 |
|---|---|---|

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|

### RECOMMENDATION

Hearing held 9/27/2006.
Uphold: 6/1/06 FU for eyes & eye glts.
7/10/06 seen by Dr. eye can - being addressed.

Inmate verbally informed of MGC decision and appeal form was supplied.
Appeal due 10/4/2006.

000037

# EXHIBIT I

January 19, 2006

Jesus Diaz, 474251
22
DL6

I took your name to the mental health meeting to discuss your eye issue. Also, today, I met with medical staff about your issue. The staff advised me that they are aware of your eye concerns, and that you should be waiting for an appointment/referral now for an ophthalmologist (who would be an eye specialist). They have to work out the details for you to be seen at this time, but I am hopeful that it will not take long.

Please write to me after you are seen and let me know how you make out.
Thank you,

Cindy Atallian
Counselor – 22

February 23, 2006

Deneen Bull
DCC Education Department

Please see the attached letter from Jesus Diaz, 474251 regarding school participation and medical problems.

Thank you,

Cindy Atallian
Counselor – 22

000002

February 23, 2006

Medical
MHU

Could you please review the attached letter from Jesus Diaz, 474251 – 22 – DL6 with medical concerns over his eyes?

Thank you so much.

Cindy Atallian
Counselor – 22

To: Cindy Atalian
From: Jesus Diaz 22-D-L-6

I am writing to inform you that I am removing myself from school for medical reasons. I am having a problem with some type of growth on both of my eyes. I have filed medical slips on this issue for over a year and medical has done nothing. I am told that this growth is a result of cataracs. It is causing pain as well as impairing my vision. I would like to note that once the medical department has provided some type of relief, I would like to resume schooling. As of now I have to rely on other inmates to write for me as I am unable to see without there being some type of irritation. Please inform the education department. Thank you!

Jesus Diaz,

RECEIVED
FEB    2010
Treatment Services

March 8, 2006

Jesus Diaz, 474251
22
DL6

You do not receive any points for participating or not participating in school.  I have talked with medical about your eye condition.  I can reference that in your classification, so that it will be understandable why you are not participating.  I also wrote to Education to explain about your situation.

If you have any other questions, let me know.

Cindy Atallian
Counselor – 22

000005

To: Counsler Cindy Atallian
From: Jesus Diaz
RE: classification questioning
DATE: 3·1·06


Mrs. Cindy Atallian,

I want you to know that the only reason I stopped going to school is because my eyes are sensitive to light and reading material. But if you think that by me not going to school is going to affect my upcoming classification and hinder my movement to minimum security, I want you to put me back in school. Please when you recieve this note write me back and let me know if this will have any negitive outcomes.

Thank You

# EXHIBIT J

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| | 4.4 | 1 OF 7 |
| BUREAU OF PRISONS | RELATED ACA STANDARDS: | |
| | 36 | |
| PROCEDURE MANUAL | | |
| CHAPTER: 4 DECISION-MAKING RELATING TO INMATES | SUBJECT:    INMATE GRIEVANCE PROCEDURE | |
| APPROVED BY THE CHIEF, BUREAU OF PRISONS: | | |
| EFFECTIVE DATE: Revised 5/15/98 | | |

I.    AUTHORITY:  DOC Policy 4.4

II.   PURPOSE:

To establish an Inmate Grievance Procedure designed to reduce tension in correctional facilities and to effectively resolve the vast majority of cases within our system.  Every inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed. NOTE:  Inmates are encouraged to seek their counselors' advice on how to best pursue a response to concerns before prematurely filing a grievance under the guidelines that follow.

III.  APPLICABILITY:

All BOP employees, volunteers, persons or organizations conducting business with the BOP: all inmates under BOP custody or supervision.

IV.   DEFINITIONS:

A.    Bureau Grievance Officer (BGO):  A BOP employee who reviews and mediates appeal of the Warden's/Warden's Designee decision.

B.    Emergency Grievance:  An issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal, physical or psychological harm.

C.    Grievance:  A written complaint concerning the substance or application of a policy or practice; any action toward an inmate by staff or other inmates; any condition or incident within the institution that affects an inmate.

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 2 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

D.   Inmate Grievance Chair (IGC):  An institutional employee designated to handle inmate grievances.

E.   Inmate Grievance Procedure (IGP):  The formal process provided to inmates to resolve disputes.

F.   Outside Reviewer:  An individual not associated with DOC who hears inmate grievance appeals referred by the BGO and Bureau Chief of Prisons.

H.   Resident Grievance Committee (RGC):  A committee comprised of institutional staff and inmates that hears inmate grievances and makes a recommendation to the Warden/Warden's Designee.

I.   Reprisal:  Any action or threat of action against inmates or staff based solely on their participation or use of the IGP.

J.   Medical Grievance Committee (MGC): An institution's specific medical review authority comprised of a minimum of three medical services contractual staff from the following list:

     Health Services Administrator
     Director of Nursing
     Charge Nurse
     Chief Medical Officer
     Medical Records Clerk
     Mental Health Counselor
     Chief Dental Officer
     Dental Assistant

V.   PROCEDURE:

1.   Copies of the IGP shall be available in each institutional housing unit, in each library, in each counselor's office, and in each IGC office.

2.   All inmates, regardless of physical condition/security status/administrative status, shall be entitled to use the IGP.  Inmate complaints regarding policies and conditions must be within DOC jurisdiction.  This includes actions by employees, inmates, and incidents occurring within the institution that affect them personally.  NOTE: Policies that have their own formal appeal mechanisms are not grievable through the IGP. Specifically excluded from the IGP are issues concerning Disciplinary, Classification, and Parole

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 3 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

Board decisions.

3.  The IGP shall afford the grievant a meaningful remedy. Relief may include an agreement by the Warden/Warden's Designee to remedy an objectionable condition within a reasonable, specified time period; change in institutional policy or practice; or restitution.

4.  The IGP prohibits reprisals against staff or inmates for their use or participation in the process.  If either participant experiences adverse reactions, they may appeal directly to the Warden/Warden's Designee. The Warden/Warden's Designee shall offer a written response within 10 calendar days upon receipt of the appeal.  This decision is appealable to the Bureau Chief of Prisons for final disposition.

5.  No staff or inmate named as a party to the grievance shall participate in any capacity in the resolution decision.  This instruction includes contact for purposes of information gathering not merely decision making.  Grievances filed against the IGC or appealing authority shall be referred to the next higher authority.

6.  All grievances shall be kept separate from the inmate's master file.  Neither staff or inmates shall have access to these records except to the extent necessary for clerical processing, resolution, or decision compliance.

7.  The maximum period between initial grievance receipt and final appeal response shall not exceed 180 calendar days.  If a full RGC cannot be convened as scheduled, another hearing shall be rescheduled within 7 calendar days.

8.  Inmates are prohibited from submitting more than one grievance arising from a single incident.

9.  If more than one inmate files a grievance on the same incident, the IGC will consolidate the staff investigations and RGC hearings into a single "group grievance".  All individuals involved will be notified by the IGC.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 4 OF 7 |
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

10.  The IGC shall provide a copy of the response to each IGP step to the grievant within 7 calendar days of IGC receipt.

11.  The RGC shall be comprised of two inmates who are elected by a majority vote from their own housing unit and two staff designated by the Warden/Warden's Designee.  Designated staff should include custody and treatment staff, as well as, those who have frequent contact with the grievant's housing unit.  Each RGC member has one vote; the IGC shall only vote to break a tie.

12.  Inmate RGC members and two inmate alternates shall serve for a term of six months.  Staff RGC members serve at the discretion of the Warden/Warden's Designee.  One staff member shall be from Treatment and one from Security.

13.  The RGC shall deliberate on its findings and forward its recommendation to the Warden/Warden's Designee.

14.  All investigative work must be completed and documented prior to the RGC hearing.

15.  Inmates are allowed to retract a grievance at any time during the process by written notice to the IGC.

16.  The IGC shall submit a monthly IGP status report to the BGO and the Bureau Chief of Prisons.

17.  The BGO and the Bureau Chief of Prisons share responsibility for IGP revisions/amendments. Distribution to all points of inquiry listed in #01 above shall be the responsibility of the Warden/Warden's Designee.

18.  Remedies which are dependent on departments or agencies outside of the DOC may require more time for coordination of implementation steps.  The IGC shall notify the grievant of the implementation plan and schedule upon receipt of written notification of concurrence by the outside entity.

19.  The specific duties of the IGC and BGO are listed in the "Inmate Grievance Procedure Training Manual". Analysis of their performance is the sole responsibility of their immediate supervisors.

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 5 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

## IGP RESOLUTION LEVELS

**Level I (Informal Resolution):**

The IGP process begins when an inmate files Form #584. The grievant must complete this form within 7 calendar days following the incident and forward to the IGC. The IGC shall forward the grievance to the inmates' housing unit supervisors within two days of their receipt. Housing unit supervisors shall investigate, document all findings on Form #175, attempt resolution and report results to the IGC within 3 calendar days of their receipt of the grievance. Resolution ends the IGP process; the IGC closes the file and monitors issues of compliance. Unresolved grievances are referred to Level II administration.

**Level II (RGC Recommendation/Warden's Decision):**

The RGC will convene within 30 calendar days of IGC receipt of the grievance to examine the issue and documented investigative data from Form #175, hear testimony, and make a recommendation. The Grievant will be offered the opportunity to participate in the RGC hearing through examination of all information presented and discussion with all participants. The RGC shall ask any question it feels relevant to the issue. If the RGC determines that further investigation is required it may grant an additional five days, by majority RGC member vote and grievant consent, to complete its work. All RGC work is to be documented and forwarded to the IGC on Form #584 RGC Recommendation. The IGC forwards the RGC recommendation to the Warden/Warden's Designee. The Warden/Warden's Designee responds on Form #584 within 10 calendar days and forwards that response to the IGC for distribution. If the Warden/Warden's Designee and grievant concur with the RGC recommendation the grievance is deemed resolved; the IGC closes the file and monitors issues of compliance. If there is no concurrence, the case is referred to Level III administration.

**Level III (The Final Decision):**

The BGO will review the grievance file upon receipt. Concurrence with the Warden/Warden's Designee decision and signature by the BGO and Bureau Chief of Prisons ends the IGP process; the IGC closes the file and monitors issues of compliance. At the BGO's discretion, mediation between grievant and the Warden/Warden's Designee may be attempted or Outside Review recommended. The BGO shall recommend Outside Review in only those instances where interpretation of law or expansion of policy are necessary. The Bureau Chief of Prisons may accept or reject the BGO's written

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 6   OF 7 |
| SUBJECT:   INMATE GRIEVANCE PROCEDURE | | |

recommendation.  Decisions by the Bureau Chief of Prisons are
final and not open to grievant interpretation.  The Bureau Chief
of Prisons will return his final decision and the grievance file
to the IGC for closure and monitoring for issues of compliance.

**Emergency Grievance:**

Issues that concern substantial risk of personal, physical or
psychological inmate injury shall be addressed immediately by the
Warden/Warden's Designee.  A copy of the grievance shall be sent
to the IGC upon receipt by the Warden/Warden's Designee.  And the
Warden/Warden's Designee shall respond within one calendar day.
Grievant appeals of the Warden/Warden's Designee decision will be
decided by the Bureau Chief of Prisons within one calendar day
upon receipt of the emergency appeal.  NOTE: If the
Warden/Warden's Designee should determine that the grievance does
not meet the emergency criteria, the grievance shall be returned
to the inmate for processing through the normal IGP process
steps.

**Medical Grievance:**

All medical grievances must be submitted to the Inmate Grievance
Chairperson (IGC) at the respective institution on Form #585.
If, by chance, an inmate sends a grievance directly to the
medical services contractual staff, they are to forward it first
to the IGC who will log it in the institution's grievance log and
then return it to the medical services contractual staff for
action.

The appropriate medical staff will review the grievance and
denote actions taken on the Medical Log Form #586

The medical services contractual staff will attempt an informal
resolution with the inmate, upon discussion over the treatment
defined on the Medical Log Form.  If the Medical Grievance is
resolved the inmate acknowledges this by his signature on Form
#585 Informal Resolution.  This signed form is forwarded to the
IGC who will close out the case.

Failure to resolve the grievance informally, results in a Medical
Grievance Committee hearing which will not include any medical
services contractual staff previously involved in the informal
resolution process.  The IGC and the inmate must be present at
this hearing.

Resolution closes the case; failure to resolve the case results
in the inmate completing the MGC Appeal Statement section of Form
#585.  Upon receipt, the IGC forwards the file to the Bureau

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 7 OF 7 |
|---|---|---|
| SUBJECT: INMATE GRIEVANCE PROCEDURE | | |

Grievance Officer (BGO).  The BGO recommends a course of action to the Bureau Chief of Prisons, who renders a final decision.

**Universal Grievance:**

Issues that concern the entire system and not just one inmate, a group of inmates, or one institution shall be presented by the BGO to the Bureau Chief of Prisons.

**Institutional Transfer:**

When possible, transfers shall be delayed for any inmate who has filed a grievance and been notified of an RGC hearing date until the hearing has concluded.  If circumstance requires immediate transfer, the IGC at the institution where the grievant filed will proceed in the grievant's absence utilizing the normal IGP process steps through Level II.  The Warden/Warden's Designee decision will be forwarded to the IGC at the grievant's new location for review.  If the grievant appeals to Level III, the IGC at the grievant's new location shall forward the file to the IGC at the original location for BGO review.  Grievances filed against the sending institution after an inmate's transfer, but inside the standard seven day window following an incident, shall be forwarded by the IGC at the new location to the IGC at the original location for processing.

**Appeals:**

Grievant appeals must be signed, dated and state the specific reasons on Form #584 Grievance Appeal.  This form must be given to the IGC who is responsible for tracking the status of each grievance.  The IGC will forward the appeal and grievance file to the BGO.  Grievants shall have 3 calendar days upon receipt of their copy of the Warden/Warden's Designee decision to appeal, as well as, to include any additional information for review at the next level.  NOTE:  The Bureau Chief of Prisons decisions are final and not appealable.

Attachments

# EXHIBIT K



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**c**

Murphy v. Kearney
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Jon R. MURPHY, Plaintiff,
v.
Rick KEARNEY, Susan Rickards, Barbara
Showell, and Correctional Medical Services,
Defendants.
**No. Civ.03-554-SLR.**

April 19, 2004.

Jon R. Murphy, Eastern Correctional Institution, Westover, Maryland, Plaintiff pro se.
Stuart B. Drowos, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, Delaware, for Rick Kearney.
Steven F. Mones, McCullough & McKenty, P.A., Wilmington, Delaware, for Susan Rickards and Barbra Showell.
Kevin J. Connors, Marshall, Dennehy, Warner, Coleman & Goggin, Wilmington, Delaware, for Correctional Medical Services.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 10, 2003, Jon R. Murphy, a *prose* plaintiff proceeding in *formapauperis,* filed the present action pursuant to 42 U.S.C. § 1983, against defendants Rick Kearney, Susan Rickards, Barbara Showell, and Correctional Medical Services ("CMS "), alleging claims predicated upon inadequate medical treatment. (D.I. 1, 2 at 3). When plaintiff filed his complaint, he was a Delaware prison inmate incarcerated at the Sussex Correctional Institute ("S.C.I.") in Georgetown, Delaware. (D.I.2) Currently, plaintiff is being held at the Eastern Correctional Institution in Westover, Maryland. (D.I.28) Plaintiff seeks damages in the amount of $350,000. (D.I. 2 at 4) The court has jurisdiction over the instant suit pursuant to 28 U.S.C. § 1331.

On August 18, 2003, plaintiff submitted a motion to set aside/stay proceedings. (D.I.11) The court responded to plaintiff's motion on August 19, 2003, with a notice of deficiency stating that plaintiff had failed to provide an original signature on the motion, and the motion was improperly captioned for two separate cases. (*Id.*) In addition, plaintiff failed to provide proof of service upon defendants. (*Id.*) On August 27, 2003, the court received another motion to set aside/stay proceedings with an original signature and certificate of service. (D.I.11) On October 2, 2003, defendant CMS submitted a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. (D.I.19) The court granted plaintiff's motion to set aside/stay proceedings for a period of ninety (90) days on October 6, 2003. (D.I.21) The court also ordered plaintiff to notify the court in writing within ninety (90) days of whether he had exhausted his administrative remedies. (*Id.*) On October 7, 2003, defendants Susan Rickards and Barbara Showell filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. (D.I.22) On October 14, 2003, attorney Steven Mones filed an affidavit in connection with defendants' motion to dismiss, which was included as exhibit six. (D .I. 24) Defendant Kearney filed a motion to dismiss on December 19, 2003. (D.I.25, 26) On January 5, 2004, the court sent a letter of rejection to plaintiff for failure to provide proof of service on all local counsel of record regarding plaintiff's notice of status. (D.I.27) Plaintiff requested a notification of status and an extension/continuance to set aside/stay proceedings in order to pursue his remedies in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

lower court on February 6, 2004. (D.I.29) On February 12, 2004, the court denied plaintiff's status report and ordered plaintiff to respond to all pending motions to dismiss by March 26, 2004. (D.I.30) The court also ordered defendants to file reply briefs by April 4, 2004. (*Id.*) Finally, on February 27, 2003, plaintiff filed an untimely response to defendants' motions to dismiss. (D.I.31) For the reasons that follow, the court grants defendants' motions to dismiss.

## II. BACKGROUND

*\*2* While incarcerated in S.C.I., plaintiff alleges that he suffered from a herniated disk in his back. (D.I. 2 at 3) On May 24, 2003, plaintiff submitted a medical grievance stating: "I have been to medical (six) times. I am getting the 'runaround[.] ' I am no longer in the key program. I have a herniated disk in my spine."(D.I.2) Plaintiff claims the problem existed before his incarceration and grew worse during the term of his incarceration.(*Id.* ) Plaintiff also describes his pain as severe. (*Id.*) He asserts that he requested a bottom bunk on the bottom floor, but that his requests have been denied. (*Id.*) In addition, plaintiff contends that he has been x-rayed and that these x-rays confirm his condition. ( *Id.*) Plaintiff further states that he has complained about his herniated disk to the medical department, but the medical department told him that nothing was wrong. (D.I. 2 at 3)

## III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, defendants' motions to dismiss shall be treated as motions for summary judgment. *See*Fed.R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that

no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *SeeAnderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *SeeCelotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

A. Defendants' Motions to Dismiss For Failure to Exhaust Administrative Remedies

*\*3* Defendants Kearney, Showell, and Rickard argue that plaintiff did not exhaust his administrative remedies prior to filing this action. (D.I. 22 at ¶ 10; D.I. 26 at ¶ 5) Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, "no action shall be brought with respect to prison conditions under § 1983 of this title ... by a prisoner confined in any jail, prison, or other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3

Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

correctional facility until such administrative remedies as are available exhausted."A plaintiff-inmate, therefore, must exhaust his administrative remedies before filing a civil action, even if the ultimate relief sought is not available through the administrative process. See*Booth v. Churner,* 206 F.3d 289, 300 (3d Cir.2000); see*also Ahmed v. Sromovski,* 103 F.Supp.2d 838, 843 (E.D.Pa.2000) (quoting *Nyhuis v. Reno,* 204 F .3d 65, 73 (3d Cir.2000)). In order for § 1997e to apply, however, two requirements must be met. First, a prisoner's complaint must concern prison conditions. Prison conditions are defined as conditions with respect to the conditions of the confinement. See*18 U.S.C. § 3626(g)(2). The Third Circuit has interpreted this language to relate "to the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein."*Booth,* 206 F.3d at 294.

    Second, the department of correction must have an administrative procedure in place to remedy prisoner complaints. The State of Delaware has an established and comprehensive Inmate Grievance Review System. The Inmate Grievance Procedure states that "[e]very inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed."*State of Delaware Department of Correction Procedure Manual, Procedure Number 4.4, § II (revised May 15, 1998). The procedure creates a three-step grievance process with two levels of appeal. *Id.* at § V. To exhaust all available administrative remedies, a prisoner must complete all stages of review or take part in the appeals process. The procedure also provides for medical grievances.

    Delaware Department of Correction administrative procedures provide that

    medical grievances be submitted to the [Inmate Grievance Chair], who will forward the grievance to the medical service contractual staff for review. The medical services contractual staff will attempt informal resolution of the matter. If such resolution fails, a Medical Grievance Committee ("MGC") hearing will be conducted, which hearing will be attended by the grievant and the [Inmate Grievance

Chair]. If the matter is resolved at that stage, the case is closed; otherwise, the grievant is directed to complete the MGC Appeal Statement section of the written grievance and forward it to the [Inmate Grievance Chair].

    *Smullen v. Kearney,* Civ.A.No.02-082-SLR, 2003 WL 21383727, *2 (D.Del.2003) (quoting Department of Correction Policy 4.4).

    **\*4** In the case at bar, plaintiff submitted a medical grievance on May 24, 2003 complaining of a herniated disk in his back. (D.I.2) On June 6, 2003, defendant Showell responded to plaintiff's grievance in accordance with procedures outlined for medical grievances, stating: "Your x-ray showed no herniation (hernias can repair). You refused medication and you do not meet the bottom floor or bunk criteria. Return to sick cell if you have continued or worsened symptoms."(*Id.*) There is no evidence of record to determine whether plaintiff pursued his grievance before the Medical Grievance Committee or whether he completed an appeal. There is likewise no evidence showing that plaintiff filed additional grievances concerning his back condition. Due to the lack of evidence of record to support a finding that plaintiff exhausted his administrative remedies, the court finds that plaintiff failed to exhaust his administrative remedies and grants defendants' motions to dismiss based on this ground.

**B. Defendants' Motions to Dismiss on Respondeat Superior Liability Grounds**

    Assuming that plaintiff exhausted his administrative remedies, the court shall consider the substance of the motions at bar. CMS contends that it is not liable for the actions of its alleged employees under the doctrine respondeat superior. (D.I. 19 at ¶ 7) Kearney likewise argues that he is being sued in his capacity as the prison warden and that the doctrine of respondeat superior may not be used. (D.I. 26 at ¶ 7) Rickards contends that she had no personal involvement in plaintiff's medical care and was merely acting in a supervisory capacity. (D.I. 22 at ¶ 16; *Id.* at ex. 10)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

The Third Circuit has held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."*Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *Monell v. Dep't. of Social Servs.,* 436 U.S. 658 (1978); *see*Swan *v. Daniels,* 923 F.Supp. 626, 633 (D.Del.1995) (applying principle to liability of private corporations that provide medical services for the State of Delaware). Personal involvement can be established through allegations of either personal direction or actual knowledge and acquiescence; however, such allegations must be made with particularity. *See Rode,* 845 F.2d at 1207.

Viewing the facts in a light most favorable to plaintiff, the court finds that plaintiff has not provided sufficient evidence to show that CMS, Kearney, or Rickard had any personal involvement with his medical treatment. Plaintiff only mentioned these defendants in the caption of his complaint and in the space provided for defendants on the third page of his complaint. (D.I.2) Plaintiff did not cite to any specific incidents where CMS, Kearney, or Rickard personally participated in his treatment or diagnosis. The court, therefore, concludes that plaintiff has failed to state a claim upon which relief can be granted.

**C. Defendants' Motions to Dismiss on** *Estelle* **Grounds.**

***5** Defendants allege they did not violate plaintiff's Eighth Amendment rights by providing inadequate medical treatment. To state a violation of the Eighth Amendment right to adequate medical care, plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *White v. Napoleon,* 897 F.2d 103, 109 (3d Cir.1990). Deliberate indifference is demonstrated when " prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment."*Monmouth County Corral. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). In addition, either actual intent or recklessness will afford an adequate basis to show deliberate indifference. *Estelle,* 429 U.S. at 105.

A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."*Pace v. Fauver,* 479 F.Supp. 456, 458 (D.N .J.1979). A prison official may be found to have violated an inmate's Eighth Amendment rights only if the official knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See*Farmer *v. Brennan,* 511 U.S. 825, 837 (1994).

Moreover, mere medical malpractice is insufficient to present a constitutional violation. *Estelle,* 429 U.S. at 106;*Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). Prison authorities are given extensive liberty in the treatment of prisoners. *See*Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979); *see*also*White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (" Certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."). The proper forum for a medical malpractice claim is in state court under the applicable tort law. *Estelle,* 429 U.S. at 107.

The court finds that plaintiff is unable to satisfy the *Estelle* test. Plaintiff has not provided sufficient evidence to show that he had a serious medical condition. In his response to the instant motions, plaintiff provided a medical report dating June 19, 1991, stating "the MRI shows a herniated nucleus pulposus to the left at C5-6."(D.I.31) However, this report is dated twelve years prior to the more recent x-ray report which was evaluated on June 6, 2003 by Showell. (D.I.2) The latest x-ray report showed no signs of a herniated disk in plaintiff's back. (*Id.*) Plaintiff also stated that he saw a doctor a week prior to February 6, 2004, but failed to provide any report from the doctor verifying that plaintiff had a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5

Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

herniated disk that required medical attention. (D.I. 31 at ex. C) The court, therefore, finds that plaintiff fails to meet the "serious need" requirement to state a claim for inadequate medical care.

   **\*6** The court also finds that plaintiff has failed to allege facts sufficient to show that defendants were deliberately indifferent. CMS, Kearney, and Rickards were not personally involved with plaintiff's treatment, as mentioned above. (D.I. 19 at ¶ 7, D.I. 26 at ¶ 7, D.I. 22 at ¶ 16; *Id.* at ex. 10) These defendants, consequently, could not have acted with deliberate indifference with respect to plaintiff's medical condition. Although Showell did provide medical care to plaintiff, there has been no evidence presented to show that she knew of and disregarded the risk to plaintiff's health posed by his alleged herniated disk. Showell examined plaintiff's x-ray and did not find any indication of a herniated disk. (D.I.2) Showell did not provide any medication to plaintiff because plaintiff refused all medication. (D.I. 22 at ex. 8) She advised plaintiff, however, that he did not meet the criteria for a bottom bunk on the bottom level and told him to return to the sick cell if the pain continued or the symptoms worsened. (D.I.2) Therefore, the court grants Kearney's, Rickards's, Showell's, and CMS's motions to dismiss for inadequate medical care.

## V. CONCLUSION

   For the reasons stated, defendants' motions to dismiss for failure to state a claim are granted. (D.I.19, 22, 25) An appropriate order shall issue.

D.Del.,2004.
Murphy v. Kearney
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L



Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Gregory v. PHS Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
William GREGORY, Plaintiff,
v.
PHS INC., Mr. Fish, (Dir.MPCJF), Dr. Ivens,
(Med.Dir.), Stanley Taylor (Comm.Doc), and
Warden Williams (MPCJF), et al, Defendants.
**No. Civ.A. 00-467-SLR.**

Sept. 21, 2001.

William Gregory, MPCJF, Wilmington Delaware.
pro se.
Seth J. Reidenberg, Esquire, White and Williams,
Wilmington, Delaware, for Defendants PHS Inc.,
Mr. Fish, Dr. Ivens.
Ophelia M. Waters, Deputy Attorney General, State
of Delaware Department of Justice, Wilmington,
Delaware, for Defendants Taylor and Williams.

MEMORANDUM OPINION

ROBINSON, Chief J.

## I. INTRODUCTION

*1 On May 8, 2000, *prose* plaintiff William
Gregory filed a civil rights action pursuant to 42
U.S.C. § 1983, asserting that defendants PHS, Inc.,
Mr. Fish, Dr. Ivens, Stanley Taylor, and Warden
Williams [FN1] violated his constitutional rights by:
(1) failing to properly treat a cut on his elbow
caused by the teeth of another inmate; and (2)
failing to administer an HIV test. (D.I.2) Plaintiff
seeks to hold defendants responsible for any future
medical problems, mental anguish he has suffered
and to compel them to administer the "proper blood
work." (*Id.*)

FN1. According to plaintiff, PHS, Inc. is
the company contracted to provide medical
services to inmates, Mr. Fish is the
Director of the Multi-Purpose Criminal
Justice Facility ("M.P.C.J.F."), Dr. Ivens is
Medical Director, Stanley Taylor is the
Commissioner of the Department of
Correction and Warden Williams is the
Warden of M.P.C.J.F. (D.I.2).

On December 15, 2000, defendants PHS, Inc.,
Ivens and Fish ("medical defendants") filed a
motion to dismiss plaintiff's complaint, arguing: (1)
plaintiff failed to exhaust his administrative
remedies pursuant to 42 U.S.C. § 1997e(a); (2) his
allegations do not rise to a constitutional level; and
(3) plaintiff has failed to demonstrate any personal
involvement by defendants. (D .I. 14) On December
18, 2000, plaintiff filed a motion for the
appointment of counsel. (D.I.15) Defendants Taylor
and Williams ("state defendants") moved to dismiss
on December 27, 2000, asserting: (1) plaintiff did
not exhaust his administrative remedies; and (2)
under Fed.R.Civ.P. 12(b)(6), plaintiff has failed to
state a claim upon which relief can be granted.
(D.I.16) Plaintiff has not filed opposition to either
motion. For the reasons discussed below, medical
defendants' motion to dismiss is granted, state
defendants' motion is granted, and plaintiff's motion
for appointment of counsel is denied.

## II. FACTS

According to plaintiff, while in the yard he was
cut on the elbow by the tooth of another inmate.
(D.I.2) He was taken to the medical ward where a
nurse washed the wound and then applied
steri-strips to close the cut. Although HIV is "
rampant in the system," plaintiff was not given an
HIV test. (*Id.* at 3) He further complains of not
receiving stitches even though the nurses
recommended them. Plaintiff indicates he filed a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

grievance pursuant to the prisoner grievance system, but never received an HIV test and his "cut wasn't treated to as they promised."(*Id.* at 2)

III. STANDARD OF REVIEW

Since medical and state defendants have referred to matters outside the pleadings, their motions shall be treated as ones for summary judgment. *See*Fed.R.Civ.P. 12(b)(6); *Camp v. Brennan,* 219 F.3d 279, 280 (3d Cir.2000) (consideration of matters beyond the complaint converts a motion to dismiss into a motion for summary judgment). A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no material issue of fact is in dispute. *See*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986) . Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)). "Facts that could alter the outcome are ' material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assur. Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *See*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The mere existence of some evidence in support of the party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *See*Anderson nonmoving v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986). This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d

Cir.1995);*Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999).

IV. DISCUSSION

A. Exhaustion of Administrative Remedies

**\*2** Medical and state defendants contend plaintiff did not exhaust his administrative remedies prior to filing this action pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and accordingly, his complaint must be dismissed. (D.I. 14 & 16) The Prison Litigation Reform Act provides that

[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted.

(Amended by Pub.L. 104-134.Title I, § 101(a), 110 Stat, 1321-71(1996)). Before filing "a civil action with respect to prison conditions,"[FN2] a a plaintiff-inmate must exhaust his administrative remedies, even if the ultimate relief sought is not available through the administrative process. *Booth v. Churner,* 206 F.3d 289, 294-95 (3d Cir.2000), *aff'd,*531 U.S.956, 121 S.Ct. 1819 (2001). The United States Supreme Court has concluded that exhaustion of administrative remedies is required " as long as [the] grievance tribunal has the authority to take some action in response to the inmate's complaint."*Booth v. Churner,* 531 U.S. at ___, 121 S.Ct. at 1821.

> FN2. The term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement of the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison. 18

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S.C. § 3626(g)(2).

Although the Supreme Court has specifically mandated exhaustion prior to commencement of a civil rights action, the Court has been silent on whether the plaintiff must affirmatively demonstrate exhaustion at the time of instituting the action or whether the defendant must raise the issue as an affirmative defense. The PLRA itself does not specifically state which party bears the burden. *Freeman v. Snyder,* Civ.A.No. 98-636-GMS, 2001 WL 515258 (D.Del. April 10, 2001).

While other circuits have ruled on this issue, the Third Circuit [FN3] has not yet articulated whether the PLRA exhaustion requirement is an affirmative defense or a condition precedent to filing. *Ahmed v. Sromovski,* 103 F.Supp.2d 838, 842 n. 13(E.D. Pa 2000). The Third Circuit has determined, however, that the PLRA's exhaustion requirement is not jurisdictional.*Nyhuis v. Reno.* 204 F.3d 65, 69 n. 4 (3d Cir.2000). And " [c]ompliance with the administrative remedy scheme will be satisfactory if it is substantial."*Id.* at 77-78.

> FN3. Specifically, the Sixth Circuit has interpreted the PLRA with a condition precedent, whereby the prisoner must allege and show he has exhausted all administrative remedies prior to bringing suit. *Brown v. Toombs,* 139 F.3d 1102, 1103-04 (6th Cir.1998), *cert.denied*525 U.S. 833 (1998). Accordingly, a prisoner must submit, along with his § 1983 complaint, the administrative decision, if it is available, showing the administrative disposition of his claims or specifically detail the administrative proceeding and its outcome. *Knuckles El v. Toombs,* 215 F.3d 640, 642 (6th Cir.2000), *certdenied*531 U.S. 1040 (2000). District courts in the Sixth Circuit are directed to enforce the exhaustion requirement *suasponte* if not raised by the defendant. *Brown.* 139 F.3d at 1104;*Curry v. Scott,* 249 F.3d 493, 502 (6th Cir.2001).

In contrast, the Seventh Circuit has concluded

that Section 1997e(a) creates an affirmative defense. *Perez v. Wisconsin Department of Corrections.* 182 F.3d 532 (7th Cir.1999); *Massey Helman,* 196 F.3d 727 (7th Cir.1999), *cert.denied* ___ U.S. ___, 121 S.Ct 2214 (2001). Following the path created by the Seventh Circuit, other courts have imposed the affirmative defense on defendants when there is silence in their circuits.*Jackson v. District of Columbia,* 89 F.Supp.2d at 56;*Freeman v.. Snyder,* 2001 WL 515258 at *5 (the court holds that prisoner's failure to exhaust administrative remedies before filing a claim constitutes an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure, rather than a precondition to suit.) *Compare Ahmed v. Sromovski,* 103 F.Supp.2d 83 (E.D. Pa 2000) (notes that the Third Circuit has not defined whether it is a defense or a condition precedent, but does not reach the issue). This court finds the reasoning of the Seventh Circuit persuasive. Moreover, considering the Third Circuit's conclusion that failure to exhaust does not deprive a federal court of subject matter jurisdiction, *Nyhuis v. Reno,* 204 F.3d at 69, supports the conclusion that exhaustion under § 1997e(a) is an affirmative defense. *AccordFreeman v. Snyder,* 2001 WL 515258 at *5.

In *Bowers v. Mounet,* Civ.A.No. 99-533-JJF, the court was faced with an issue similar to that presented at bar. There, plaintiff claimed to have filed a grievance regarding his medical complaints, but he did not receive anything in response. *Id.* at *2. Neither plaintiff nor defendants attached plaintiff's grievance nor were any documents submitted regarding the grievance. Nonetheless, the court did not dismiss plaintiff's complaint for failure to exhaust administrative remedies because

it [was] clear from Plaintiff's Original Complaint that Plaintiff filed his grievance on or prior June 21, 1999. (D.I.2) This means that the grievance was filed almost two years before Defendant Marvel refiled the instant motion, and that prison authorities have not responded. Although the relevant grievance procedures have not been included as part of the record in this case, it is safe to assume that such a lengthy delay in handling Plaintiff's grievance exceeded the amount of time allowed for prison authorities to respond under said grievance procedure.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** *Id.* at \*2.

Although there is no record evidence of such, the medical defendants at bar concede that plaintiff filed a grievance.[FN4]Plaintiff's complaint was filed on May 8, 2000. Medical defendants moved to dismiss on December 14, 2000 (D.I.13), and state defendants moved for dismissal on December 27, 2000. (D.I.16) There has been nothing introduced to the court subsequently to indicate a response by medical or prison officials. Considering the grievance procedure mandates prompt resolution of claims (D.I. 14, Ex. B, A-3 ¶ 4; A-4 ¶ 10,A-5, A-6), it is reasonable to conclude that the time afforded to respond has expired.

> FN4. According to the affidavit of a Department of Correction secretary, plaintiff "did not file a medical grievance stating he wanted to make an appointment with the doctor for additional medical treatment."(D.I.16) This secretary does not aver to be a grievance officer or to possess any of the responsibilities of a grievance officer, nor does she claim to have searched for records for any grievance filed by plaintiff. Although she is a senior secretary, she does not claim to be charged with logging or maintaining grievance logs. Further, she is not a member of the medical staff who would see a grievance after being documented by the grievance chairperson, nor is she a member of the grievance committee, which should have held a hearing if efforts to resolve the problem informally failed. Consequently, the affidavit does not adequately establish that plaintiff failed to follow the grievance procedure.

Consistent with *Bowers,* the court shall not dismiss for failure to exhaust administrative remedies and instead will turn to the substantive issues. *Cf.Chapman v. Brewington-Carr,* C.A.No. 97-271-JJF, slip op. at 3-6 (D.Del. May 1, 2001) (court held dismissal for failure to exhaust inappropriate where prison authorities completely ignored prisoner's grievance).

**B. Eighth Amendment: Medical Care**

Plaintiff's assertions of inadequate medical care invoke the Eighth Amendment. Under the Eighth Amendment, the States have a duty to provide " adequate medical care to those it is punishing by incarceration."*West v. Keye,* 571 F.2d 158, 161(3d Cir.1978). To hold a prison official liable for violating a prisoner-plaintiff's Eighth Amendments rights, the plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *accordWhite v. Napoleon,* 897 F.2d 103, 109 (3rd Cir.1987).

The seriousness of a medical need may be demonstrated by showing that the need is " 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." ' *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) ( *quotingPace v. Fauver,* 479 F.Supp. 456, 458 (D.N.J.1979)). Moreover, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

As to the second requirement, a prison official's denial of an inmate's reasonable requests for medical treatment constitutes deliberate indifference if such denial subjects the inmate to undue suffering or a threat of tangible residual injury. *Seeid.* at 346. Deliberate indifference may also be present if necessary medical treatment is delayed for non-medical reasons, or if a prison official bars access to a physician capable of evaluating a prisoner's need for medical treatment. *Seeid.* at 347. However, a prison official's conduct does not constitute deliberate indifference unless it is accompanied by the requisite mental state. Specifically, "the official [must] know ... of and disregard ... an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer v. Brennan,* 511 U.S. 825, 837 (1994). While a plaintiff must allege that the official was subjectively aware of the requisite risk,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

he may demonstrate that the prison official had knowledge of the risk through circumstantial evidence and "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."*Id* at 842.

**\*4** As noted above, it is undisputed that plaintiff was cut by the teeth of another inmate while in the yard. (D.I.2) The medical notes reflect the wound was cleaned and TYLENOL was given for pain. (D.I.16, Ex. B) Defendant Dr. Ivens was " contacted".*Id.* About two hours later, steri-strips were applied and plaintiff was instructed to " minimize flexing of [his] arm." *Id.* The following day, plaintiff was given a Diptherea-Tetanus shot. This is the last entry in the medical notes related to this injury.

While plaintiff states a nurse applied the treatments, he does not name this individual as a defendant. Instead, the medical notes refer to only one named defendant-Dr. Ivens. *Id.*Still, plaintiff does not assert any complaints about the care provided by Dr. Ivens. The medical notes reflect treatment, medication and follow-up care were provided. The record is devoid of facts suggesting defendant Ivens acted with deliberate indifference to a serious medical condition. The decision of whether to test for HIV is a medical determination left to the discretion of a physician and not the court. Accordingly, the court grants defendant Ivens' motion for summary judgment.

**C. Respondeat Superior**

Turning to the remaining defendants, plaintiff's theory of liability is premised on the doctrine of respondeat superior since all of the defendants hold a supervisory position and are not addressed with particularity in the complaint. Section 1983 actions, however, do not recognize liability under a theory of respondeat superior. *SeeDurmer v. O'Carroll,* 991 F.2d 64, 69 n. 14 (3d Cir.1993). Thus, a private entity cannot be vicariously liable for its employees' deprivations of other's civil rights. *SeeRouse v. Plantier,* 182 F.3d 192, 200 (3d Cir.1999). Private corporations dispensing medical services can be held liable, however, for a "policy" or "custom" that demonstrates deliberate indifference. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658 (1978). In order to hold PHS liable, therefore, plaintiff must show that PHS has an established "policy" or "custom" that resulted in a deliberate indifference to plaintiff's serious medical needs. *SeeLawson v. Correctional Officer Burns,* Civ.A.No. 94-0780, 1994 WL 583264, at \*2 (E. D.Pa. Oct. 24, 1994).

The essence of plaintiff's complaint is that his cut was not properly treated and he was not given an HIV test. Assuming it was PHS personnel who made the decision not to provide further treatment and not to administer an HIV test, the question is whether this decision constitutes a "policy" or " custom" that demonstrates a deliberate indifference to serious medical needs. Plaintiff admits that he was examined and received treatment for his cut, although not the treatment he deems most appropriate. The decision not to use stitches, therefore, is not a "policy" or "custom", as those terms are commonly understood,[FN5] but merely a disagreement over the course of medical treatment which does not rise to a constitutional issue. Indeed, courts grant prison authorities a significant amount of "latitude in the diagnosis and treatment of prisoners."*Durmer,* 991 F.2d at 67. Accordingly, plaintiff's claim against PHS shall be dismissed.

FN5. A "policy" is a course of action meant to determine future decisions, while a "custom" is a course of action customarily repeated.

**\*5** Turning to defendants Fish, Taylor, and Williams, plaintiff proffers no specific allegations of alleged misconduct. He never mentions them in the body of his complaint. (D.I.2) Given that each is a supervisor, it is evident he wishes to hold them liable in their supervisory positions. However, supervisors cannot be held liable for actions conducted in their supervisory roles. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Therefore, summary judgment for these defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

is appropriate.

**D. Motion for Appointment of Counsel**

Plaintiff contends appointment of counsel is warranted since the case is complex, he is unskilled in the law and it is likely he will prevail on the merits. (D.I.15) A *pro se* litigant proceeding *informa pauperis* has no constitutional nor statutory right to representation by counsel. *See* *Ray v. Robinson,* 640 F.2d 474, 477 (3d Cir.1981). Typically, *pro se* litigants are afforded counsel, if at all, only after a threshold evaluation of the merits of their case. *See Tabron* at 155. In light of the court's finding that summary judgment is appropriate for all defendants, plaintiff's motion for appointment of counsel is denied.

**V. CONCLUSION**

For the reasons stated, defendants' motions shall be granted. An appropriate order shall issue.

**ORDER**

At Wilmington this 21st day of September, 2001, consistent with the memorandum opinion issued this date;

IT IS ORDERED that:

1. Defendants' motions to dismiss (D.I.13, D.I.16) are granted.

2. Plaintiff's motion for appointment of counsel (D.I.15) is denied.

3. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.

D.Del.,2001.
Gregory v. PHS Inc.

Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.