IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JESUS DIAZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-550 SLR |
| | ) | |
| WARDEN THOMAS CARROLL, CMS | ) | JURY TRIAL |
| CORRECTIONAL MEDICAL SERVICE, CPL. | ) | DEMANDED |
| MERSON, LEE ANNE DUNN, DEBORAH | ) | |
| RODWELLER and CINDY ATALLIAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION OF DEFENDANT, CORRECTIONAL MEDICAL SERVICES, INC.,
FOR SUMMARY JUDGMENT**

COMES NOW Correctional Medical Services, Inc., by and through its undersigned counsel,

and respectfully moves this Honorable Court to enter an Order pursuant to Federal Rule of Civil

Procedure 56(c) granting summary judgment to Correctional Medical Services, Inc. and against

Plaintiff.  In support of this Motion, Correctional Medical Services, Inc. offers the Memorandum of

Points and Authorities filed simultaneously herewith.

MARSHALL, DENNEHEY, WARNER,
COLEMAN AND GOGGIN

BY:    /s/ Eric Scott Thompson
KEVIN J. CONNORS, ESQ. (DE ID #2135)
ERIC SCOTT THOMPSON, ESQ. (DE ID # 4633)
1220 N. Market Street, 5th Floor
P.O. Box 130
Wilmington, DE  19899-0130
(302) 552-4302
Attorneys for Defendant,
Correctional Medical Services, Inc.

DATED: February 29, 2008
15/580944.v1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JESUS DIAZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-550 SLR |
| | ) | |
| WARDEN THOMAS CARROLL, CMS | ) | JURY TRIAL |
| CORRECTIONAL MEDICAL SERVICE, CPL. | ) | DEMANDED |
| MERSON, LEE ANNE DUNN, DEBORAH | ) | |
| RODWELLER and CINDY ATALLIAN, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have served upon all persons listed below two true and correct copies of the **Motion of Defendant, Correctional Medical Services, Inc., for Summary Judgment** in the above-captioned matter this date by regular mail to:

Jesus Diaz
SBI # 474251
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

and by electronic filing upon the person listed below:

Stacy Xarhoulakos, Esquire
Department of Justice
Carvel State Office Building
820 North French Street, 8th Floor
Wilmington, DE  19801

                              MARSHALL, DENNEHEY, WARNER,
                              COLEMAN AND GOGGIN

                    BY:    /s/ Eric Scott Thompson
                              ERIC SCOTT THOMPSON, ESQ. (DE ID # 4633)
                              1220 N. Market Street, 5th Floor
                              P.O. Box 130
                              Wilmington, DE  19899-0130
                              (302) 552-4302
                              Attorney for Defendant,
                              Correctional Medical Services, Inc.

DATED: February 29, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JESUS DIAZ,                              )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        Civ. No. 06-550 SLR
                                         )
WARDEN THOMAS CARROLL, CMS               )        JURY TRIAL
CORRECTIONAL MEDICAL SERVICE, CPL.       )        DEMANDED
MERSON, LEE ANNE DUNN, DEBORAH           )
RODWELLER and CINDY ATALLIAN,            )
                                         )
            Defendants.                  )


**MEMORANDUM OF POINTS AND AUTHORITIES OF
CORRECTIONAL MEDICAL SERVICES, INC., IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Correctional Medical Services, Inc. ("CMS"), through its undersigned

counsel, hereby respectfully moves this Honorable Court to enter the attached Order, granting

summary judgment in its favor and, in support thereof, avers as follows:

**I.      STATEMENT OF FACTS AND PROCEDURAL POSTURE**

Plaintiff, an inmate incarcerated at the Delaware Correctional Center ("DCC") in Smyrna,

Delaware, filed a Complaint naming CMS, Lee Anne Dunn and Deborah Rodweller, as

defendants.  D.I. #2.  This Court dismissed the medical malpractice claims and all claims relating

to the filing of grievances and the grievance procedure.  D.I. #7.  On July 26, 2007, in ruling

upon the Motion to Dismiss filed by Defendants, CMS, Dunn and Rodweller, the Court

dismissed all claims against Lee Anne Dunn and Deborah Rodweller.  D.I. #27.

CMS is a private corporation that has provided medical care for inmates. CMS contracted with the State of Delaware to provide medical services in Delaware prisons from July 1, 2000 until June 30, 2002 and from July 1, 2005 through the present[1].

In his Complaint, plaintiff asserts that CMS breached a contract to provide adequate medical care to Plaintiff, refused and delayed providing Plaintiff with adequate medical care to his eyes, refused and delayed to provide medical care due to its not wanting to spend money for Plaintiff's health care, and failed to perform criminal background checks or drug testing on employees which caused people with criminal records and drug addictions to work at D.C.C.[2] Plaintiff has provided no expert testimony to support any of these claims.

Plaintiff moved from the Dominican Republic to the United States in 1993. (Diaz, 9-10)[3]. He was trained as a welder in the Dominican Republic, but has never held a job in the United States. (Diaz, 12). He is in the United States illegally and supported himself prior to being incarcerated by selling drugs. Id.

Plaintiff was incarcerated on December 31, 2002 after being arrested for possessing 800 bags of crack cocaine. (Diaz, 78-79). He pled guilty to the drug possession charge as well as to shooting a person. (Diaz, 79-80).

While incarcerated, Plaintiff has been reprimanded for committing violations of prison rules, including the prohibited use of tobacco and obtaining medical prescriptions from another inmate. (Diaz, 107-108).

---

[1] See State Defendant's Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, n.1.
[2] CMS shall address only the remaining claims against it as the Court previously dismissed the medical malpractice claim asserted against CMS. D.I. #7.
[3] The transcript of the November 20, 2007 deposition of Plaintiff will be referred to as (Diaz, page no.). A copy of the transcript is attached as Exhibit "1".

No one has ever told Plaintiff that he has a loss of vision or, if so, to what extent. (Diaz, 89). In fact, Plaintiff has never been told his alleged vision problems were caused by the growths on his eyes. (Diaz, 56). Dr. Markowitz' records show Plaintiff has 20/20 vision OD, referring to the right eye. See Delaware Eye Care Center's records attached as Exhibit "2". Surgery was performed on the left eye. Id.

No one has ever told Plaintiff that he suffered a loss of vision as a result of any care he received while in prison. (Diaz, 94). In addition, no one has told him he has suffered a loss of vision as a result of not being provided care. Id.

Plaintiff claims that he first noticed something about his eyes in approximately 2003. (Diaz, 45). CMS was not the medical provider in Delaware at this time. Another inmate indicated to Plaintiff that his eye was red, but Plaintiff did not take him seriously until the next day when the inmate again asked Plaintiff why his eye was red. Id. At this point, Plaintiff looked in a mirror and saw a little redness in the corner of his eye. Id.

Upon reporting the redness in his eye to medical staff, plaintiff has been regularly treated by medical staff for his eye condition. (Diaz, 55). Copies of Plaintiff's medical records are attached as Exhibit "3". With regard to the period of time which Plaintiff claims he had the eye condition, CMS did not contract with the State of Delaware to provide medical services at the prisons until July 1, 2005[4].

Plaintiff underwent elective surgery to remove a pterygium[5] from his left eye. In May of 2006, Plaintiff was seen by Dr. Markowitz with Delaware Eye Care Center for a consultation regarding his eye condition. (Diaz, 50). Copies of medical records from Delaware Eye Care

---

[4] See State Defendant's Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, n.1.
[5] A triangular thickening of bulbar conjunctiva extending from inner canthus to border of the cornea with apex toward pupil. Taber's Cyclopedic Medical Dictionary, 1412 (15th ed. 1985).

Center are attached as Exhibit "2". An examination showed all measurements of the eyes to be within normal limits. A 2.5 millimeter pterygium was noted on the left and a 1 millimeter pterygium was noted on the right. Dr. Markowitz prescribed Patanol which was provided by medical staff at DCC. Following the exam, Dr. Markowitz notes under the "Plan" as follows: "Discussed pterygium 2[nd degree] sun exposure and risk of re-growth if removed (30% chance of regrowth)." Dr .Markowitz also notes "May consider excision of pterygium, if desires-OS." (emphasis added) Dr. Markowitz told Plaintiff that scrubbing his eye was better than laser surgery because the condition would not return. (Diaz, 48-49).

On October 3, 2006, Plaintiff underwent surgery with Dr. Markowitz. (Diaz, 5). However, Plaintiff does not believe the surgery was ever performed. (Diaz, 73-74). He believes Dr. Markowitz put him to sleep, scrubbed his eye and sent him back to prison. Id. Plaintiff believes scrubbing was the "cheap way". (Diaz, 91). Plaintiff returned to Dr. Markowitz for post surgical care on October 4, 2006. (Diaz, 51).

Dr. Markowitz prescribed medication for pain relief, Percocet, and Plaintiff was provided pain medication by the medical staff at DCC in the form of Tylenol 3. See prescriptions, Physician Orders and Medication Administration Records attached as Exhibit "4". In fact, when Dr. Markowitz prescribed Patanol in May of 2006, Patanol was provided to Plaintiff by the prison medical staff.

Plaintiff submitted medical slips which were completed by fellow inmates. (Diaz, 102-103). On December 5, 2005, Plaintiff submitted a sick call slip claiming he had xeropthalmia;[6] however, this was a term a fellow inmate had looked up in a book and had written on the sick call slip. No doctor has ever told Plaintiff he has xerophthalmia. (Diaz, 103).

---

[6] Conjuctival dryness with keratinization of epithelium following chronic conjunctivitis and in disease due to deficiency of vitamin A. Taber's Cyclopedic Medical Dictionary, 1887 (15th ed. 1985).

Plaintiff does not agree with or like the treatment which has been provided for his eye. (Diaz, 93-94). Plaintiff believes his vision was better before he underwent surgery. (Diaz, 48-49). He claims that he now experiences sensitivity to bright lights. (Diaz, 48). In addition, he claims that he experiences a needle like pain in the corner of his left eye and that the eye produces fluid at times which irritates his eye and blurs his vision. (Diaz, 57-58). Plaintiff asserts further that his eye also gets red after taking a shower, more now than before the surgery. Id.

Plaintiff also has a small growth on his right eye which is not a "big problem". (Diaz, 58).

Following surgery, Plaintiff was contacted by a doctor at the prison and was prescribed glasses to wear as needed (Diaz, 51-53, 90). When the glasses did not help Plaintiff's vision in bright light, sunglasses were prescribed. A copy of the records from Institutional Eye Care are attached as Exhibit "5". He wears the sunglasses to watch TV or when it is bright outside. (Diaz, 60).

Plaintiff has never appealed any grievances even though he has submitted grievances and refused to agree with the remedy proposed by the panel hearing the grievance. (Diaz, 95-96). A copy of the grievances are attached as Exhibit "6".

## II.    STANDARD OF REVIEW

A court may grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is subject to judgment as a matter of law.[7] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8] A

---

[7] Fed. R. Civ. P. 56(c).
[8] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)

fact is "material" when it "might affect the outcome of the suit under the governing law."[9]
Disputes over facts which are irrelevant or unnecessary will not preclude a grant of summary
judgment.[10]

The initial burdens of informing the court of the basis for a motion for summary
judgment and identifying the portions of the record which demonstrate the absence of a genuine
issue of material fact fall on the moving party.[11]  Once the moving party can satisfy these initial
burdens, Rule 56 (e) states that the nonmoving party "may not rest upon the mere allegations or
denials of his [or her] pleadings, but his [or her] response. . . must set forth specific facts
showing that there is a genuine issue for trial."[12]  Thus, plaintiff must show more than a mere
scintilla of evidence; she must introduce evidence from which a reasonable trier of fact could
find in his favor.[13]

### III.    LEGAL ARGUMENTS

### A.    CMS CANNOT BE LIABLE FOR CONSTITUTIONAL CLAIMS ASSERTED BY PLAINTIFF

"To establish a constitutional violation, the indifference must be deliberate and the
actions intentional."[14]  An inadvertent failure to provide adequate medical care cannot be said to
constitute a violation of the Eighth Amendment.[15]  In the context of medical care, an act of a
prison official only becomes a constitutional violation when it results from the "deliberate
indifference to a prisoner's serious illness or injury."[16]  Thus, *Estelle* requires Plaintiff to satisfy a
two-prong test in order to impose liability under § 1983:  i) deliberate indifference on the part of

---

[9] <u>Id</u>.
[10] <u>Id</u>.
[11] <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)
[12] <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing Fed. R. Civ. P. 56 (e)), <u>cert. denied</u>, 474 U.S. 1010 (1985).
[13] <u>Colburn v. Miller</u>, 946 F.2d 1017 (3rd Cir. 1991).
[14] <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1081 (3rd Cir. 1976).
[15] <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-106 (1976).
[16] <u>Id</u>. at 105.

prison officials; and ii) the prisoner's medical needs must be serious.[17]   However, the *Estelle*

Court has also clarified this standard in that:

> an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. [18]

A mere difference of opinion concerning the treatment received by an inmate is not

actionable under the Eight Amendment and § 1983.[19]   The "deliberate indifference" prong from

*Estelle* is satisfied when the plaintiff alleges that the defendant acted to *deny* an inmate's

reasonable request for medical treatment subjecting the prisoner to undue suffering or if medical

treatment is delayed for non-medical reasons.[20]   The acts complained of must be accompanied by

a "reckless disregard" of or "actual intent" to disregard a serious medical condition.[21]   Thus, a

defendant's conduct does not constitute a "deliberate indifference" unless it is alleged to occur in

conjunction with the requisite mental state.  Furthermore, "'*where the plaintiff has received some*

*care, inadequacy or impropriety of the care that was given will not support an Eighth*

*Amendment claim.*'"[22]

---

[17]   *Id*. A prisoner's medical need is sufficiently serious if diagnosed by a physician as requiring treatment or so obvious that a lay person would easily recognize the necessity of a physician's attention.  *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981).

[18]   *Id*. at 105-06 (citations omitted)(emphasis supplied).

[19]   *Id*.

[20]   *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987)(emphasis added).

[21]   *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985).

[22]   *Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) .  *See also* *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir. 1979) ("Courts will 'disavow any attempts to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment.'")(citations omitted).

In the seminal case of *Estelle*, the Supreme Court was considering a Fed. R. Civ. P. 12 (b)(6) motion on appeal. By way of factual background, the doctors diagnosed the prisoner's injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Plaintiff-prisoner contended that more should have been done by way of diagnosis and treatment, and suggested a number of options that were not pursued. The Court of Appeals agreed with the prisoner-plaintiff, stating: "Certainly an X-ray of [prisoner-plaintiff's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing."[23] The Supreme Court found error in this portion of the holding by the Court of Appeals:

> But the question whether an X-ray - or additional diagnostic techniques or forms of treatment - is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most, it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act…The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand.[24]

Thus, matters of medical decision or judgment *do not* constitute cruel and unusual punishment for the purposes of a § 1983 action. When some care has been given, allegations of improper or inadequate treatment that was given *do not* support an Eighth Amendment claim.

Expert testimony is required to show that an injury or illness is serious unless it is "apparent to a lay person".[25] An inmate's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death.[26] In addition, a medical need is "serious" if it has been "diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the need for a doctor's attention."[27] In

---

[23] 516 F.2d at 241.
[24] Estelle, 429 U.S. at 107 (1976).
[25] Boring v. Kozakiewicz, 833 F.2d 468, 473 (3rd Cir. 1987).
[26] Colburn, 946 F.2d at 1023.
[27] Fitzgerald, 834 F.2d at 347.

cases where the Courts found a medical condition to be "serious" there has been competent

medical testimony indicating either the need was serious, that some form of treatment was

needed or a constitutionally protected choice was involved such as abortion.[28]  In addition, it is

"serious" if it causes a life-long handicap or permanent loss.[29]  The common thread to all of these

requirements is that they require expert medical testimony unless it is apparent to a lay person.

In Boring, the third Circuit affirmed the District Court's finding that expert testimony was

required to prove whether an ulnar nerve injury, scalp condition, chronic knee disorder and

migraine headaches were serious.[30]

Plaintiff has offered no testimony or evidence: CMS was required to perform background

checks and drug tests on employees; it failed to do so, even if they were required; or any harm

was caused to him as a direct result of CMS performing or not performing background checks or

drug tests on employees.  Therefore, CMS is entitled to summary judgment on Plaintiff's claim

that CMS failed to perform criminal background checks or drug testing on employees which

caused employees with criminal records and drug addictions to work at D.C.C. and resulted in

harm to Plaintiff as a matter of law.

---

[28]  Id. (Female inmate cannot be denied constitutionally protected right to an abortion.); Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985)(Court dismissed Plaintiff's claim when medical records showed treatment had been rendered and Plaintiff had no expert testimony to substantiate her claims under § 1983); Hampton, 546 F.2d 1077 (Court granted summary judgment where medical records showed inmate had received treatment and Plaintiff had no expert testimony supporting her § 1983 claims);  Ramos v. Lamm, 639 F.2d  559 (10th Cir. 1980)(Plaintiff's and Defendant's experts agreed there was an inadequacy of on-site physician coverage); Laaman v. Helgemoe, 437 F. Supp 269 (D.N.H. 1977)(Expert testimony supporting Plaintiff's claim regarding woeful prison conditions); Derrickson v. Keve, 390 F. Supp. 905 (D. Del. 1975)(Failure to perform elective surgery on prisoner serving life sentence despite doctor's recommendation surgery be performed)

[29]  Id.

[30]  Id.

### 1.    PLAINTIFF DOES NOT HAVE A SERIOUS MEDICAL NEED

Expert testimony is required to show an injury or illness is serious unless it is apparent to a lay person.  Whether Plainitff's eye condition is serious is not apparent to a lay person.  All measurements of both eyes were within normal limits.

Plaintiff's eye condition does not meet the standard set forth by the Third Circuit in Fitzgerald to qualify as a serious medical need.  As of the date CMS contracted with the State of Delaware to provide medical services in the prisons, July 1, 2005, which is relevant to Plaintiff's claims, Plaintiff's complaint was that he had a growth on his left eye that was spreading to the right eye.  It is Plaintiff's contention that this growth could cause serious harm to him; however, on May 22, 2006, when Plaintiff underwent a consultation with Dr. Markowitz, Dr. Markowitz stated "may consider excision OS then OS (it is assumed this was a typographical error and should have been OD) if desires."  The surgery is clearly elective since it is only if Plaintiff desires.  There is no other recommendation or note that Plaintiff is suffering from any eye condition that without undergoing a specific treatment for it, would cause Plaintiff to suffer irreparable harm.  Clearly, Plaintiff's condition is not one which would result in a life-long handicap, unnecessary suffering, injury or death if surgery or some other treatment was not performed.  This is not a serious medical need.

An exam performed on May 22, 2006 by Dr. Markowitz showed all measurements of the eyes to be within normal limits.  A 2.5 millimeter pterygium was noted on the left and a 1 millimeter pterygium was noted on the right.  Dr. Markowitz prescribed Patanol which was provided by medical staff at DCC.  Following the exam, Dr. Markowitz notes under the "Plan": "Discussed pterygium 2 [degree] sun exposure and risk of re-growth if removed (30% chance of regrowth)."  Dr. Markowitz also notes "May consider excision of pterygium, if desires-OS."

This evidences the procedure is elective and not a medical necessity. In fact, a reading of the doctor's records reveals no indication that any treatment is required or necessary beyond that which Plaintiff had already been receiving.

As in <u>Hamm</u>, where the Third Circuit affirmed dismissal where there was no expert testimony, and unlike in <u>Hampton</u>, <u>Ramos</u>, <u>Laaman</u> and <u>Derrickson</u>, where expert testimony was proffered, Plaintiff has produced no expert testimony to support his claims or to indicate surgery or any other treatment beyond that already being received was needed. Thus, Plaintiff's eye condition was not a serious medical need and the surgery he underwent, about which he now complains, was elective and not required.

Without expert testimony to the contrary, there is no genuine issue of material fact that Plaintiff's condition is not a serious medical need in light of his treating physician's indication that it was the result of sun exposure and surgery was elective and not a necessity. Therefore, CMS is entitled to summary judgment as a matter of law.

## 2.    THERE IS NO CONDUCT BY CMS THAT DEMONSTRATES A DELIBERATE INDIFFERENCE TO PLAINTIFF'S SERIOUS MEDICAL NEED

Even if Plaintiff had a serious medical need, he received appropriate care. Plaintiff has offered no testimony to support his claims that CMS delayed or denied treatment to Plaintiff. In fact, he testified he was regularly treated by medical staff for his eye condition. (Diaz, 55). There is no evidence of deliberate or intentional indifference to Plaintiff's serious medical needs. Plaintiff has clearly received some care and Plainitff's belief the care was inadequate or improper does not support his Eighth Amendment claims.[31]

From the time CMS contracted with the State of Delaware to provide medical services at the prisons, July 1, 2005, Plaintiff has been provided pain medication, Patanol, Visine, Natural

---

[31] <u>See</u> <u>Norris</u>, 585 F.2d at 1186.

Tears and has been sent for consultations with Delaware Eye Care Center where he underwent elective surgery. See Exhibits "2" and "5". In addition, he was sent for a consultation with Institutional Eye Care for prescription glasses. When the glasses did not help Plaintiff see in bright light, sunglasses were prescribed and provided. See Exhibit "5". Medical care was clearly provided and has not been recklessly or intentionally denied or delayed to cause unnecessary harm.

Plaintiff alleges CMS delayed or denied medical treatment for his eye. However, from the time CMS contracted with the State of Delaware to provide medical services at the prisons, July 1, 2005, Plaintiff has received adequate medical treatment for the duration of his confinement at DCC including consultations and surgery with Gary I. Markowitz, M.D. with the Delaware Eye Center. Dr. Markowitz prescribed: Patanol on May 22, 2006 with five (5) refills; five (5) 10 ml. single use injection vials of sterile Fluorouracil on July 10, 2006; and Percocet and Voltaren, with two (2) refills, on October 4, 2006. Following a consultation with Dr. Markowitz on May 22, 2006, a Consultation Request was submitted on August 18, 2006 for excision of pterygium. On July 10, 2006, plaintiff underwent a pre-operative appointment with Dr. Markowitz. On October 3, 2006, plaintiff underwent excision of pterygium of the left eye which was performed by Dr. Markowitz. On October 4, 2006, he was seen by Dr. Markowitz for follow-up treatment. In addition to treatment for his eye, Consultation Requests were also made for a spiral CT of the abdomen and pelvis on March 27, 2006 and to a GI specialist and for a repeat colonoscopy on March 30, 2006.

The crux of Plaintiff's complaints against CMS is that he does not believe Delaware Eye Care Center performed the elective surgery and that he does not agree with the treatment provided. (Diaz, 73-74, 93-94). However, no doctor has ever told him he has suffered a loss of

vision as a result of any care he received or any care that he did not receive. (Diaz, 94). No doctor has told him he has a loss of vision as a result of any treatment he has or has not received or that his vision problems are the result of the growth on his eye. (Diaz, 56, 89). In fact there is no testimony that Plaintiff has suffered or will suffer any injury or pain as a result of any treatment he received or that he should have received.

There is no testimony that Plaintiff was intentionally denied or delayed treatment. Plaintiff's complaints are that he does not agree with the treatment he received and a mere difference of opinion as to the treatment received in not actionable under the Eighth Amendment.[32] Plaintiff must show reckless disregard or actual intent and there is no testimony in this case to establish that CMS acted in this manner. In fact, the exact opposite is true as evidenced by the treatment, prescriptions, consultations with Dr. Markowitz and Institutional Eye Care and glasses Plaintiff received from the period of time CMS contracted with the State of Delaware to provide medical services in the Delaware prisons.

Even after the consultation with Dr. Markowitz and subsequent elective surgery, Plaintiff received treatment. On October 19, 2006, plaintiff filed a medical sick call slip complaining of his left eye still hurting following surgery. On November 17, 2006, he received treatment, was prescribed sunglasses and was informed he would be seen in follow-up in three (3) months. He also filed a medical sick call slip on December 12, 2006 requesting refills of his medication and these were provided. See Physician Order Sheets, Medication Administration Records attached as Exhibit "4". He has also received pain medication, Patanol and Natural Tears for his eye condition.

Just as in Estelle, where the medical decision not to perform a diagnostic exam was deemed not to constitute cruel and unusual punishment, the decision to undergo surgery was a

---

[32] Estelle, 429 U.S. at 105-106.

medical decision as was the type of medication which Plaintiff was provided.  Whether the treatment was sufficient or not is not a proper claim under the Eighth Amendment.[33]  Plaintiff received regular treatment for his condition and the sufficiency of the treatment received is not within the purview of the District Court under a § 1983 claim.[34]

There is no record evidence or expert testimony to demonstrate deliberate indifference to Plaintiff's serious medical needs.  Therefore, CMS is entitled to summary judgment as a matter of law.

### B.    PLAINTIFF FAILED TO EXHAUST ALL ADMINISTRATIVE REMEDIES UNDER THE PLRA

CMS adopts by reference the argument of State Defendants in Paragraph III of its Motion for Summary Judgment that Plaintiff has failed to exhaust all administrative remedies.

### C.    CONCLUSION

Based upon the foregoing, Defendant, Correctional Medical Services, Inc., moves this Honorable Court to enter summary judgment in its favor and against Plaintiff on all remaining constitutional claims pursuant to Federal Rule of Civil Procedure 56.

MARSHALL, DENNEHEY, WARNER,
COLEMAN AND GOGGIN

BY:    /s/  Eric Scott Thompson

KEVIN J. CONNORS, ESQ.  (DE ID #2135)
ERIC SCOTT THOMPSON, ESQ. (DE ID # 4633)
1220 N. Market Street, 5th Fl.
P.O. Box 8888
Wilmington, DE  19899-8888
(302) 552-4370
Attorneys for Defendant, Correctional Medical Services, Inc.

DATED:  February 29, 2008

15/587358.v1

---

[33]  Id. at 107.
[34]  Id.

## CERTIFICATE OF SERVICE

I hereby certify that I have served upon all persons listed below two true and correct

copies of the **Memorandum of Points and Authorities of Correctional Medical Services,**

**Inc., In Support of Its Motion for Summary Judgment** in the above-captioned matter this date

by regular mail to:

Jesus Diaz
SBI # 474251
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

and by electronic filing upon the person listed below:

Stacy Xarhoulakos, Esquire
Department of Justice
Carvel State Office Building
820 North French Street, 8th Floor
Wilmington, DE  19801

<div style="margin-left:auto;">

MARSHALL, DENNEHEY, WARNER,
COLEMAN AND GOGGIN

BY:    /s/  Eric Scott Thompson
KEVIN J. CONNORS, ESQ.  (DE ID #2135)
ERIC SCOTT THOMPSON, ESQ. (DE ID # 4633)
1220 N. Market Street, 5th Fl.
P.O. Box 8888
Wilmington, DE  19899-8888
(302) 552-4370
Attorneys for Defendant, Correctional Medical
Services, Inc.

</div>

DATED: February 29, 2008
15/587358.v1

Page 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JESUS DIAZ,                          )
                                     )
      Plaintiff,                     )
                                     )
v.                                   )
                                     )
WARDEN THOMAS CARROLL, CMS           )    C.A. No. 06-550-SLR
CORRECTIONAL MEDICAL SERVICE,        )
CPL MERSON, LEE ANNE DUNN,           )
DEBORAH RODWELLER, and CINDY         )
ATALLIAN,                            )
                                     )
      Defendants.                    )
                                     )

    Deposition of JESUS DIAZ taken pursuant to notice at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, beginning at 1:00 p.m. on Tuesday, November 20, 2007, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

        JESUS DIAZ (pro se)
        SBI# 474251
          Delaware Correctional Center
          1181 Paddock Road
          Smyrna, Delaware  19977
          for himself,

CORBETT & WILCOX
230 North Market Street - Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Jesus Diaz

2 (Pages 2 to 5)

Page 2

1  APPEARANCES (CONT'D):
2      STACEY XARHOULAKOS, ESQ.
       STATE OF DELAWARE DEPARTMENT OF JUSTICE
3          820 North French Street - 6th Floor
           Wilmington, Delaware 19801
4          for the Defendants Warden Thomas Carroll,
           CPL Merson and Cindy Atallian,
5
       ERIC SCOTT THOMPSON, ESQ.
6      MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
           1220 North Market Street - 5th Floor
7          Wilmington, Delaware 19801
           for the Defendant CMS.
8              - - - - -
9          JESUS DIAZ,
10         the witness herein, having first been
11         duly sworn on oath, was examined and
12         testified as follows:
13  BY MS. XARHOULAKOS:
14      Q.  Mr. Diaz, my name is Stacey Xarhoulakos. I'm
15  representing three defendants in this case -- Tom
16  Carroll, Lise Merson and Cindy Atallian.
17          Have you ever had your deposition taken
18  before?
19      A.  What's that mean?
20      Q.  This is what we're sitting in right now.
21  We're going to ask you question, and the court reporter
22  is going to take down the answers. It's called a
23  deposition.
24      A.  Okay.

Page 3

1      Q.  Have you ever had a deposition before?
2      A.  No.
3      Q.  Okay. One of the first rules is that
4  everything is being transcribed so we have a record of
5  what was said. So anytime myself or Mr. Thompson asks
6  you a question, you just have to make sure you verbalize
7  it, yes or no; because once we get comfortable, some
8  people tend to nod their heads. And if you nod, the
9  court reporter can't take that down.
10     A.  All right.
11     Q.  So if you forget, I'll remind you.
12     A.  I'd appreciate it if you -- when you ask me a
13  question if you can speak a little bit slow.
14     Q.  Sure. Absolutely.
15     A.  So I can...
16     Q.  And to that end, if you ever need me to repeat
17  a question, feel free to say it. I will try to remember
18  to slow down. I'm happy to repeat any question that I've
19  asked. Okay?
20     A.  (The witness indicated.)
21     Q.  If I ask any questions of you and you don't
22  understand the question, ask me to rephrase it, state it
23  in a different way or just restate the question. I'm
24  happy to do that. You don't have to answer any question

Page 4

1  that you don't understand.
2          You were sworn in. That means that the
3  statements that you made in the beginning when you put
4  your hand up -- that was an oath. And the statements
5  that you make today are made under oath.
6      A.  Okay.
7      Q.  Okay. So you are subject to penalties of
8  perjury. And any parts of the record that's made today
9  can be used in future parts of this case. Do you
10  understand that?
11     A.  Yes.
12     Q.  Okay. Another thing that happens a lot is
13  that you might know what I'm going to ask before I finish
14  the question, and you might interrupt and answer it
15  before I get it all out. And if that happens, we also
16  don't have a clear record because I haven't completed the
17  question. So I might just re-ask it again so that the
18  record is clear. I'm not trying to insult you by doing
19  that. I'm just trying to keep a clear record.
20     A.  Mm-hmm.
21     Q.  Do you understand that?
22     A.  Yes.
23     Q.  The court reporter is, as I said, taking
24  everything down, and this is going to be converted to a

Page 5

1  document which is a record of the proceedings. And you
2  do have the option to purchase that, if you'd like. And
3  you can do so through the court reporting --
4      A.  You mean like a copy?
5      Q.  Yes.
6          You can purchase a copy through the
7  court reporting company. Okay?
8      A.  What you mean company? Like go to like the
9  court?
10     Q.  No. The court reporter works for a company
11  who we pay for the transcript.
12     A.  Oh.
13     Q.  So you can also do the same.
14     A.  Okay.
15     Q.  Do you understand that?
16     A.  Like you'll give me the address?
17     Q.  No, no. I'm just saying you have the option,
18  if you want, to purchase a copy of this record that we're
19  making today.
20     A.  Okay.
21     Q.  Does that make sense?
22     A.  Yeah.
23     Q.  Okay. Are you taking any medications?
24     A.  Yeah.

Page 6

1   Q.   Which ones?
2   A.   Heartburn pill and allergy pill.
3   Q.   Do you believe either of these would cloud
4   your judgment or your ability to answer the questions
5   today?
6   A.   No.  Because I only use them when I eat
7   something and it's disturbing to my stomach.  So I didn't
8   have no medication today.
9   Q.   So the medication is as needed?
10  A.   Yeah.
11  Q.   And you didn't take it today?
12  A.   Not today.
13  Q.   Did you take any medication at all today?
14  A.   No.
15  Q.   At the end of the questioning, you'll have an
16  opportunity, if you want, to add to the record and say
17  whatever you want that you think we didn't cover.  Okay?
18  A.   (The witness indicated.)
19  Q.   I'm going to try to remember to remind you
20  about that.  But just in case I forget, I'm letting you
21  know now at the end you can say, you know, I want to make
22  a statement or there's something I want to say.
23  A.   Okay.
24  Q.   Okay.

Page 7

1   A.   That's fine.
2   Q.   You will also have an opportunity to read
3   everything that's taken down today and review it to see
4   if anything was transcribed incorrectly, meaning that you
5   said one word and the court reporter maybe misunderstood
6   you.  So when you read it, you want to correct that word.
7   And that would be something you would do after today.  Is
8   that something you would like to do?
9   A.   Maybe.  Because I don't read too much English.
10  Q.   Do you read it at all?
11  A.   No.  I understand maybe a little word, but I
12  don't understand English, anyways.
13  Q.   Okay.
14  A.   I speak a little bit and understand better
15  when somebody talk to me.
16  Q.   Okay.  Are you stating today that you don't
17  understand English?
18  A.   No.  Not -- like reading.  If you give me like
19  a document so I can read, I might have a difficult
20  problem reading.
21  Q.   I see.
22       So you believe you might have trouble
23  reading English.
24  A.   Yeah.

Page 8

1   Q.   Okay.  But you do understand English; correct?
2   A.   Yeah, yeah.
3   Q.   Okay.  Have you ever filed a civil lawsuit
4   before?
5   A.   No.
6   Q.   Did anyone help you with the drafting of the
7   complaint in this case?
8   A.   Yes.
9   Q.   Who was that?
10  A.   A friend of mine.
11  Q.   Okay.  And what's his name?
12  A.   I only know him by his -- by the name that
13  everybody call him -- Cecil.
14  Q.   Cecil?
15  A.   Yeah.  Cecil Brown.  Yeah, Cecil Brown.
16  Q.   Did anyone else help you?
17  A.   No.
18  Q.   Did you have to give Mr. Brown anything in
19  exchange for his help?
20  A.   No.
21  Q.   Where did he help you?
22  A.   He helped me in the beginning of the lawsuit,
23  and he is still helping me now.
24  Q.   Do you work together in the law library?

Page 9

1   A.   Yes.
2   Q.   Anywhere else?
3   A.   On the tier.
4   Q.   On the tier?
5   A.   (The witness indicated.)
6   Q.   Okay.  Mr. Diaz, when were you born?
7   A.   When?
8   Q.   Your date of birth?
9   A.   Oh, 1973 -- '74.
10  Q.   What about the day and the month?  The day and
11  the month of your birth?
12  A.   September.  The day?  The 10th.
13  Q.   The 10th?
14  A.   (The witness indicated.)
15  Q.   And where were you born?
16  A.   In the Dominican Republic.
17  Q.   How long did you live there?
18  A.   I live over there almost all my life.
19  Q.   When did you move to the United States?
20  A.   Back in '93.
21  Q.   Did you move directly from the Dominican
22  Republic?
23  A.   Yes.
24  Q.   Did you ever live in any other country?

Jesus Diaz

4 (Pages 10 to 13)

| Page 10 |
|---|
| 1   A. No. |
| 2   Q. And have you been in the United States from |
| 3   1993 until today? |
| 4   A. If I been here till today? |
| 5   Q. Living here from 1993 until today. |
| 6   A. Yes. |
| 7   Q. Have you gone back to the Dominican Republic |
| 8   at all? |
| 9   A. No. |
| 10  Q. Okay. And how many immediate family members |
| 11  do you have? |
| 12  A. I got a lot of family members. |
| 13  Q. How about just brothers and sisters? |
| 14  A. I got -- just a number? |
| 15  Q. Yes. |
| 16  A. I got four brothers and two sisters. |
| 17  Q. And are they all still living in the Dominican |
| 18  Republic? |
| 19  A. Yes. There was more but two of them died. |
| 20  Q. Okay. And are your parents still alive? |
| 21  A. My father died. |
| 22  Q. And your mother is still alive? |
| 23  A. Yes. |
| 24  Q. And where does she live? |

| Page 11 |
|---|
| 1   A. In the Dominican Republic. |
| 2   Q. Do you have any family in the United States? |
| 3   A. Friends. |
| 4   Q. Just friends? |
| 5   A. (The witness indicated.) |
| 6   Q. What was your highest level of education |
| 7   completed? |
| 8   A. Eighth grade. |
| 9   Q. And that was in the Dominican Republic. |
| 10  Correct? |
| 11  A. Yes. |
| 12  Q. Have you done any other education while in the |
| 13  United States? Any technical schools or GED or anything? |
| 14  A. No. I was in welding when I was in the |
| 15  Dominican Republic. Yeah. I learned that when I was in |
| 16  my country before I came over here. So I didn't have |
| 17  no -- like no school training in the United States. |
| 18  Q. Okay. So you worked welding as a trade? |
| 19  A. In my country. |
| 20  Q. In the Dominican Republic. |
| 21  Did you ever work as a welder in the |
| 22  United States? |
| 23  A. (The witness indicated.) |
| 24  Q. You have to say yes or no. |

| Page 12 |
|---|
| 1   A. Oh, no. I'm sorry. |
| 2   Q. That's okay. |
| 3   What types of jobs have you had in the |
| 4   United States? |
| 5   A. In the United States, no job. |
| 6   Q. No jobs? |
| 7   A. (The witness indicated.) |
| 8   Q. How have you supported yourself? |
| 9   A. Basically, selling drugs. |
| 10  Q. Are you legally in the United States? |
| 11  A. No. |
| 12  Q. When did you first enter prison in the |
| 13  United States? |
| 14  A. December 31st, 2002. |
| 15  Q. And what prison was that? |
| 16  A. Oh, here. |
| 17  Q. You've been in here ever since December 31st, |
| 18  2002? |
| 19  A. Yeah. |
| 20  Q. On the same sentence? |
| 21  A. Yeah. |
| 22  Q. And when do you expect to be released? |
| 23  A. 2013. |
| 24  Q. And at that time do you expect to be deported |

| Page 13 |
|---|
| 1   back to the Dominican Republic? |
| 2   A. Yes. |
| 3   Q. What part of the prison are you currently |
| 4   housed in? |
| 5   A. 23, MHU. MHU. MHU, 23. |
| 6   Q. Is that medium security? |
| 7   A. I think so. |
| 8   Q. Do you have a cellmate? |
| 9   A. Yes. |
| 10  Q. Who is that? |
| 11  A. I don't know him that well. He's a white |
| 12  dude. |
| 13  Q. Does he have a nickname? |
| 14  A. I don't want to get him involved. He just |
| 15  got -- my other cellie, he was over there for like nine |
| 16  months. He got moved. So he's just a new cellie, so... |
| 17  Q. When did he move into your cell? |
| 18  A. I would say like a month ago. |
| 19  Q. A month ago? |
| 20  A. Yeah. |
| 21  Q. And you had your old cellmate for nine months? |
| 22  A. Yeah. Before. |
| 23  Q. And who was that? |
| 24  A. Some Muslim dude. Some Muslim person, so -- |

Page 14

1  I'm a Christian, so I don't -- sometime you got a
2  cellmate but -- you just cellmate. Sometime you don't
3  got nothing in common. You don't got no money. You
4  don't eat.
5       See, it's -- you know, I'm just a person
6  that -- I don't be getting in trouble, because I know how
7  to behave in my cell. But if I don't behave in my cell,
8  probably as many cellies that I got in the room, I would
9  be fighting. So I just let a lot of stuff go. I don't
10 pay mind when, you know -- so me and him, we ain't got
11 nothing in common. He left. And we was like -- I'm not
12 going to say enemy. But we never clicked, because
13 different religion. I'm Hispanic. He's black.
14      Q.  So you didn't have a good relationship with
15 your cellmate?
16      A.  No, no. Before, yeah. Before I had like --
17 like maybe two years ago. But for these past few
18 months -- because I was in the compound. And they give
19 me a write-up. They move me back over here. And back
20 over here, it's like everybody is angry. Everybody is
21 angry about something, you know. So sometime you get a
22 person in your cell, and it just like -- you know, like
23 sometime you don't got nothing in common or he don't like
24 you because you speak Spanish or whatever, so...

Page 15

1       Q.  Okay. Since you've been incarcerated since
2  2002 -- I know you've said you've been at Delaware
3  Correctional Center -- have you ever been transported to
4  a prison and then back here or have you stayed here the
5  entire time?
6       A.  Yeah. Here. No. When I got arrested, they
7  took me to the other place in Gander Hill, the other
8  jail -- Gander Hill. And I stay over there for like --
9  from the -- December 31st of 2002. I stay over there
10 until maybe like two week. And then they brought me
11 here. And I still here since then.
12      Q.  Okay. Did you receive my discovery request
13 that I sent to you a few weeks ago or about a month ago?
14      A.  The one that I got to answer the question?
15      Q.  That's right.
16      A.  Yeah. I got it.
17      Q.  Why haven't you answered those questions?
18      A.  Because this -- see, when I first start
19 complaining about my eyes, I never thought that I going
20 to be sitting here today with a lawsuit. So there's a
21 lot of question, right, about when this thing start.
22 They -- my witness that I used to see in here, they all
23 got fired. All the nurses that I used to see before that
24 try to help me and stuff, they all got fired. So I

Page 16

1  didn't -- I never try to like give me your name, give me
2  your name, because that was nothing that I had planned.
3       Q.  So you're saying that there's some questions
4  that you can't answer?
5       A.  Yeah. Because there's a whole bunch of
6  question like -- like -- okay -- witness. I got witness
7  but they not here no more. They all gone.
8       Q.  Do you remember any of their names?
9       A.  I remember like Kiara. I don't even know how
10 you can spell the name, but she go by the name Kiara.
11 And there was another female go by the name of Danielle.
12 And Kiara. And just so many people here. They got fired
13 between 2003 when I put my first medical slip until
14 like -- I would say in between 2003 and 2005 a lot of
15 people got fired. And back then I was back there. I was
16 in Building 22. And they usually come and see me from
17 the compound. And then -- oh, I asked for -- where's
18 my -- where's the new -- where is the other nurse? Oh,
19 she not working here no more.
20      Q.  Well --
21      A.  That's what makes it so difficult for me to
22 fill many of -- some of them question.
23      Q.  With the understanding that there might be
24 some questions you can't answer, can you make an

Page 17

1  effort -- well, you have to. At least under the rules
2  you have to make an effort to answer what you can. So
3  you'll need to sit down and fill out the answers that you
4  can answer and send those to me.
5       A.  Okay.
6       Q.  Can you do that?
7       A.  Yes.
8       Q.  Okay. Do you know who Tom Carroll is?
9       A.  Excuse me?
10      Q.  Yes.
11      A.  Just to you? Only you? I send it to you?
12      Q.  Anything you send needs to go to all the
13 parties.
14      A.  Oh. So I got to make copies --
15      Q.  Yes.
16      A.  -- to the question?
17      I got to make copy of the thing that you
18 send me to do them question?
19      Q.  Yes. And, Mr. Diaz, if you'd like, after
20 we're done with the deposition, I can talk to you about
21 procedure about how to send it to everyone. We'll do
22 that after the end so that we're not transcribing that.
23 Is that okay?
24      A.  Okay.

Jesus Diaz

6 (Pages 18 to 21)

| | Page 18 |
|---|---|
| 1 | Q. Okay. Do you know who Tom Carroll is? |
| 2 | A. No. |
| 3 | Q. Do you know that you sued him? |
| 4 | A. Yeah. |
| 5 | Q. Okay. Do you know why you sued him? |
| 6 | A. Well, when I was putting my lawsuit, right, I |
| 7 | didn't know too much about the law, right, but he just -- |
| 8 | basically, I was trying to sue -- I don't know if he |
| 9 | running the jail or running the hospital. Well, |
| 10 | basically, for -- it just like -- this is my point today. |
| 11 | Irresponsibility. I'm suing him for being irresponsible |
| 12 | for ignoring me for almost four year. Don't care about |
| 13 | me. Even ignoring me, you know. And me saying like, yo, |
| 14 | I'm going blind. Can I get some help? Can I get some -- |
| 15 | can I see somebody? I never -- and in four years |
| 16 | never -- the only people that I saw were nurses coming |
| 17 | and talk to me, telling me that they can do nothing. |
| 18 | Q. Okay. We're going to ask you about the |
| 19 | details of your medical care, so you'll have an |
| 20 | opportunity to get into that. |
| 21 | A. All right. |
| 22 | Q. Let me try to help you focus on what I'm |
| 23 | asking. When you filed the suit, there was a bunch of |
| 24 | different people who were named. You understand that; |

| | Page 19 |
|---|---|
| 1 | correct? |
| 2 | A. (The witness indicated.) |
| 3 | Q. Do you understand that? |
| 4 | A. Yes, yes. |
| 5 | Q. Okay. Did someone tell you who to name? |
| 6 | A. No. Nobody told me who to name. |
| 7 | Q. Okay. So one of the people that you named is |
| 8 | Thomas Carroll. Okay? |
| 9 | A. (The witness indicated.) |
| 10 | Q. And I was asking if you know who he is or why |
| 11 | you named him in the lawsuit. |
| 12 | A. Well, I think if he in the lawsuit he got |
| 13 | something to do with the prison or either with the |
| 14 | medical. |
| 15 | Q. Do you ever recall writing to Tom Carroll? |
| 16 | A. Well, the -- I put a grievance. |
| 17 | Q. Okay. I understand you might have written a |
| 18 | grievance. But I'm asking if you ever wrote a letter or |
| 19 | any other document or communicated to Tom Carroll. |
| 20 | A. Not that I can remember. Not that I can |
| 21 | remember. |
| 22 | Q. Do you remember ever meeting anyone named Tom |
| 23 | Carroll? |
| 24 | A. No. Not personally. |

| | Page 20 |
|---|---|
| 1 | Q. Okay. Do you know who Lise Merson is? |
| 2 | A. No. |
| 3 | Q. Do you know why she was sued? |
| 4 | A. Probably because -- she got be -- probably in |
| 5 | a higher position in -- on this place, you know. |
| 6 | Probably that's why. |
| 7 | Q. So your understanding is some of the people |
| 8 | who are in higher positions have been sued? |
| 9 | A. Not like probably everybody in high position. |
| 10 | It just probably the people that when somebody -- if |
| 11 | somebody is dying, I think they people that supposed |
| 12 | to make a decision right away to try to help that person |
| 13 | or get medication or -- it's, you know... |
| 14 | Q. Do you know if you've ever written or talked |
| 15 | to Lise Merson? |
| 16 | A. No. |
| 17 | Q. No, you haven't? |
| 18 | A. No, I haven't. |
| 19 | Q. Do you believe that some people should be sued |
| 20 | because they're supervisors? |
| 21 | A. I believe somebody -- they got to get sued |
| 22 | because -- they probably sitting in their office and they |
| 23 | don't know what's going on. They don't know what's going |
| 24 | on. And there's a lot of stuff be going on in here. And |

| | Page 21 |
|---|---|
| 1 | I think they don't take the day and the time to get into |
| 2 | it. |
| 3 | Q. Do you think that prison officials -- anyone |
| 4 | who works in the prison who's not a nurse or a doctor -- |
| 5 | do you think they should be able to know about your |
| 6 | medical care? |
| 7 | A. Well, nurses -- when you -- okay. Nurses |
| 8 | don't come and see you just like because -- nurses don't |
| 9 | come to talk to you. They say, no, you got to put in a |
| 10 | medical slip. And when you put in a medical slip, a |
| 11 | doctor is supposed to come and see you. |
| 12 | Q. Okay. I'm not asking about the nurses and |
| 13 | doctors. I'm asking about, you know, maybe a regular |
| 14 | correctional officer or a warden or someone else who |
| 15 | works for the prison. Do you think they know about your |
| 16 | medical problems? |
| 17 | A. Yeah. I think they know. |
| 18 | Q. Okay. And why do you think that? |
| 19 | A. Because I went to put in my grievance. And |
| 20 | when you put a grievance, it got to go to a higher |
| 21 | person. |
| 22 | Q. So you think that the person you submit your |
| 23 | grievance to should know about your medical problems? |
| 24 | A. Yeah. Like when I put a grievance on the |

Jesus Diaz

Page 22

1  hospital, somebody higher than the doctor -- nurses and
2  doctor -- and I think it went to somebody and -- that's why I
3  think I know that they know my problem. They know my
4  situation.
5      Q.  Well, you said you don't know Lise Merson.
6  But would you believe me if I said she was the internal
7  grievance chair? She was the person who received the
8  grievances. Does that sound correct to you?
9      A.  Oh, like when you go to the grievance board?
10 Because I went to the grievance board a couple of times.
11 But I didn't get nobody name.
12     Q.  Okay.
13     A.  Nobody never say, oh, this is my name. If you
14 got any question or whatever, this is my name.
15     Q.  A correctional officer who works on a
16 grievance board, what do you think they do when they get
17 a medical grievance?
18     A.  Well, I think, when you get in a grievance,
19 it's because a medical slip that you put in for
20 complaining about some type of problem or whatever
21 haven't been answered the right way. So when you get in
22 a grievance, it's because something is not right.
23     Q.  Do you know what the officers do when they get
24 a grievance that's about a medical problem?

Page 23

1      A.  No.
2      Q.  Okay. I'm going to pull out one of your
3  grievances as an exhibit.
4      MS. XARHOULAKOS: Mark that as
5  Exhibit 1.
6          (Diaz Deposition Exhibit No. 1 was
7  marked for identification.)
8  BY MS. XARHOULAKOS:
9      Q.  Okay. Mr. Diaz, this is a grievance reported
10 dated September 6th, 2005. If you turn to the second
11 page, do you recognize this document?
12     A.  Can you read it, please?
13     Q.  Is this your handwriting?
14     A.  No. Because -- I sign it.
15     Q.  Okay.
16     A.  Well, I don't -- like I said, I don't write
17 English. I'm not going to lie. I don't write English.
18 So I cannot write. All my grievance was write by
19 somebody else or either me maybe make somebody write the
20 grievance and then I copy it. That's the only way I can
21 do. Somebody got to write it for me first.
22     Q.  So somebody wrote this grievance for you?
23     A.  Yeah.
24     Q.  Did you tell them what to write?

Page 24

1      A.  Yes.
2      Q.  Okay. I'm going to go ahead and just read a
3  little bit of it, and you tell me if it sounds familiar
4  to you. Okay?
5      A.  Okay.
6      Q.  Since 8/29/03 I have been complaining of a
7  type of growth on my left eye. I filed a medical slip on
8  the above date and several after. My original slip was
9  returned, and it indicated that I was referred to sick
10 call. I have placed many medical slips on this issue in
11 the medical box and still have not been seen.
12          Does that sound familiar?
13     A.  Yes, yes.
14     Q.  Okay. I read about half of the first
15 paragraph just so that you're familiar with it.
16     A.  Yeah, yeah.
17     Q.  Okay.
18     A.  I remember that.
19     Q.  Okay. And do you see that this is dated
20 9/6/05 on top?
21     A.  Yeah.
22     Q.  Okay. Now, can you go ahead and turn back to
23 the first page?
24     A.  (The witness complied with counsel's request.)

Page 25

1      Q.  Okay. Do you see in the top left-hand corner
2  that there's a name? It says IGC and then there's a
3  name.
4      A.  Yeah. IGC.
5      Q.  And the name says Merson, Lise.
6          Can you understand that?
7      A.  Yeah.
8      Q.  Okay. Now, it also says on the bottom Medical
9  Grievance. Do you see that?
10     A.  Yes.
11     Q.  Okay. And it says "yes." Correct?
12     A.  Yeah.
13     Q.  Okay. And then on the next line, it says Date
14 Received By Medical Unit. Okay.
15     A.  Yeah.
16     Q.  Can you read that?
17     A.  Yeah.
18     Q.  Okay. And what is that date?
19     A.  9/13/05.
20     Q.  Okay. So we already said that this is dated
21 9/6/05, and the grievance was sent to the medical unit on
22 9/13/05. Correct?
23     A.  Can you say that again, please?
24     Q.  We said in the beginning that your grievance

Jesus Diaz

8 (Pages 26 to 29)

| Page 26 |
|---|

1  date was 9/6/05. And that was on the top right-hand
2  corner of your grievance, your handwritten grievance. Do
3  you see that?
4  A. Yeah.
5  Q. And then the date the grievance was received
6  by the medical unit is 9/13/05. Correct?
7  A. Yeah.
8      So basically what: Seven days later?
9  Q. Is it your understanding from what we just
10  went over that the grievance was submitted to the medical
11  unit?
12  A. Mm-hmm. Yes.
13  Q. Okay. Let's turn to the fourth page.
14  A. (The witness complied with counsel's request.)
15  Q. Okay. And on this page you signed off on the
16  grievance. Correct?
17  A. On this, yes.
18  Q. Okay. And what's the date of that?
19  A. What's that: 9/21?
20  Q. That's what it looks like to me.
21      Is that what it looks like to you?
22  A. Yes.
23  Q. Okay. All right. I'm going to give you
24  another grievance.

| Page 27 |
|---|

1  A. Can I make a statement on this?
2  Q. Yes. Go ahead.
3  A. Okay. When I sign -- I remember when I sign
4  this grievance. And if you see this -- she was supposed
5  to be a doctor here. And she said to me, "Don't worry,
6  Mr. Diaz. We're going to see you. We're going to take
7  care of you. We're on top of the situation, Mr. Diaz."
8  We're going to take you to the eye doctor, and we're
9  going to make sure you get the proper eye care." And I
10  remember when she wrote here -- problems.
11  Q. Okay.
12  A. Problems.
13  Q. Okay. Mr. Diaz, you're indicating the writing
14  on the page of the grievance, the Informal Resolution
15  page. Right? That's what you're referring to?
16  A. What you mean?
17  Q. You were pointing. So I just want to clarify
18  what you were pointing to.
19  A. Yeah.
20  Q. The handwriting on the Informal Resolution
21  page?
22  A. Yeah. That was the doctor. I never got
23  his -- her name. I don't know if she spelled her name
24  anymore. But she was the one that brought the -- that's

| Page 28 |
|---|

1  why I signed that grievance.
2  Q. So you did speak with a doctor at that time?
3  A. Yes. She -- yeah. When she came -- when
4  she -- that time I saw the doctor. And when she came,
5  she said: I'm a doctor. I came to see you. We're going
6  to take care of you. We're going to do that for your
7  eyes. So -- okay. And then she wrote here. And then
8  she said, "Can you sign here? We're going to take care
9  of you." I signed it.
10  Q. Do you remember what the doctor's name was?
11  A. If I -- if they got it -- I would say if they
12  have it like -- you know like every time people working
13  they get a patient. I can name -- I can take every
14  patient, every doctor, every nurse and every doctor that
15  I see in this place. And after a while she no working
16  here more. And every time they change me the nurse or
17  change probably the doctor -- so probably sometime I see
18  a doctor and I don't even know I was seeing a doctor.
19  But always was a different person. I think that's why my
20  eye always was put in back --
21  Q. Okay.
22  A. -- my situation.
23  Q. Okay. Let's take a look at the next one. Put
24  this one aside.

| Page 29 |
|---|

1      MS. XARHOULAKOS: Okay. We're going to
2  mark this as Exhibit 2.
3      (Diaz Deposition Exhibit No. 2 was
4  marked for identification.)
5  BY MS. XARHOULAKOS:
6  Q. Mr. Diaz, I'm going to go through the same
7  process, understanding that you might have trouble with
8  reading it. So we're going to do the same thing to see
9  if you're familiar with the grievance. Okay?
10  A. Yeah.
11  Q. Okay. Go ahead and turn to the second page of
12  Exhibit 2.
13  A. (The witness complied with counsel's request.)
14  Q. Okay. And on the top, the second line, it
15  says Inmate's Name. And does it say your name there?
16  The second line from the top, it says Inmate's Name.
17  A. Yes.
18  Q. Does that say your name there?
19  A. Yes.
20  Q. Okay. And then it says Date Submitted in the
21  right-hand corner. Can you tell me what that date is?
22  A. 4/13/06.
23  Q. All right. I'm going to go ahead and read a
24  couple of lines for you, and then I'll ask you if you're

Jesus Diaz

Page 30

1    familiar with it. Okay?
2        A. Okay.
3        Q. For the past three years I have been
4    complaining to the medical staff through the sick call
5    slips about my cataracts. I have filed medical
6    grievances and I have been ignored. The cataracts
7    started on my left eye and is now forming on my right
8    eye. Does that sound familiar?
9        A. Yes.
10       Q. Okay. Did you have someone else write this
11   grievance for you?
12       A. Yes.
13       Q. Okay. Do you remember who wrote it?
14       A. Not right now.
15       Q. Did you tell that person what to write?
16       A. Yes. This is my own words. That's why I
17   remember this. It is my own words, because I remember
18   me -- I was going to school for a year even though I was
19   having a lot problem with my left eye. And I discovered
20   like a little -- I discovered a little thing on the
21   corner of my right eye.
22       Q. And, Mr. Diaz, we're going to get into all
23   your medical --
24       A. No. I understand. That's why --

Page 31

1        Q. Okay.
2        A. That's why I wrote that that day. That's why
3    this grievance was submitted.
4        Q. And this is your signature. Correct?
5        A. Yes.
6        Q. Okay. Let's turn back to the first page. Go
7    back to the first page.
8        A. (The witness complied with counsel's request.)
9        Q. Now, in the right-hand corner -- I'm sorry --
10   left-hand -- again, it says IGC. Do you see that?
11       A. Yes.
12       Q. Okay. And then it says: Merson, Lise. Can
13   you read that?
14       A. Yes.
15       Q. Do you know why her name is on the grievance?
16       A. No.
17       Q. Now, go down to the bottom where it says Date
18   Received By Medical Unit. Do you see that?
19       A. Yes.
20       Q. And this is the bottom of the first page,
21   Exhibit 2. And what's that date?
22       A. 4/26/06.
23       Q. Okay. So as we stated earlier, this grievance
24   is dated 4/13/06, and it was submitted to the medical

Page 32

1    unit on 4/26/06. Does that sound accurate?
2        A. When you say "accurate," what you mean?
3        Q. This grievance is dated 4/13/06. Correct?
4        A. Yeah.
5        Q. And it was submitted to the medical unit on
6    April 26th, '06. Is that correct?
7        A. I mean, that's when they probably -- what you
8    mean? Like that's when they process the grievance.
9    That's when they was process.
10       Q. That's when this grievance was submitted to
11   the medical unit.
12       A. I don't know what to say about that, because,
13   you know, if I submit a medical grievance on the 13th and
14   they on the 26th -- like on the 26th -- what you mean?
15   Like that's when they have -- when they --
16       Q. Well, what this form says is you submitted
17   this grievance to the person who receives grievances.
18   Correct?
19       A. Okay. Yeah.
20       Q. And that person is Lise Merson. Correct?
21       A. Yeah.
22       Q. And then Lise Merson submitted this to
23   medical.
24       A. Oh, okay.

Page 33

1        Q. Does that make sense?
2        A. Yeah.
3        Q. Okay. Do you think at least that's what this
4    paper says?
5        A. Yeah. That's what it said. So now I
6    understand this. You said that she submit it -- this
7    grievance on that day.
8        Q. On that day being April 26th --
9        A. Yes.
10       Q. -- to medical.
11           Okay. Does that make sense now?
12       A. I mean, yeah.
13       Q. Okay. Let's turn to the next page of the
14   grievance, the third page.
15       A. (The witness complied with counsel's request.)
16       Q. Now, on the bottom here, it said -- under
17   Offender's Signature, can you read what that says?
18       A. Refuse to sign. Right?
19       Q. That's correct.
20           Did you refuse to sign off on this
21   grievance?
22       A. Yes.
23       Q. Do you remember why?
24       A. Because -- if I can remember, when they call

Jesus Diaz

10 (Pages 34 to 37)

| | Page 34 |
|---|---|
| 1 | me for this grievance, they was just like -- they didn't |
| 2 | take me serious. They didn't take me -- no. They didn't |
| 3 | take me serious. They like, okay, you sign here and like |
| 4 | you -- like the problem being taken care of. And I say |
| 5 | no way I'm going to sign it if I didn't even -- I don't |
| 6 | being taken care of. |
| 7 | Q. Did you appeal the decision? |
| 8 | A. No. I don't remember I appeal no decision. |
| 9 | Q. Okay. If you could turn three more pages. |
| 10 | A. Three more. |
| 11 | Q. At the bottom it says page 4 of 5. Keep |
| 12 | going. You got one more. |
| 13 | A. Okay. |
| 14 | Q. Okay. On this page it says: No appeal |
| 15 | returned as of today, 18 August 2006. Do you see that? |
| 16 | A. Yeah. |
| 17 | Q. So you did not appeal this grievance; correct? |
| 18 | A. Yeah. Probably not. |
| 19 | Q. Okay. We have one more grievance that I'm |
| 20 | going to go through with you. |
| 21 | MS. XARHOULAKOS: We'll mark this as |
| 22 | Exhibit 3. |
| 23 | (Diaz Deposition Exhibit No. 3 was |
| 24 | marked for identification.) |

| | Page 35 |
|---|---|
| 1 | BY MS. XARHOULAKOS: |
| 2 | Q. Okay. Mr. Diaz, you can again turn to the |
| 3 | second page. You may be more familiar. Is that your |
| 4 | name at the top of the second page of this exhibit? |
| 5 | A. Yes. |
| 6 | Q. Okay. And this is different handwriting from |
| 7 | the other two. Is this your handwriting? |
| 8 | A. Yeah. Probably I copy this. |
| 9 | Q. You copied it from what? |
| 10 | A. From like -- like sometime I ask people like |
| 11 | can you write me -- can you write this for me? And then |
| 12 | I'll do it in my own handwriting. |
| 13 | Q. I see. |
| 14 | So someone wrote the grievance for you, |
| 15 | and then you copied it in your handwriting? |
| 16 | A. Yeah. If they look like that, probably I did |
| 17 | it, because that's the only way I can write it. |
| 18 | Q. Do you remember who originally wrote the |
| 19 | grievance for you this time? |
| 20 | A. No. |
| 21 | Q. How did they know what to write? |
| 22 | A. Because I told them. I told them personally. |
| 23 | See, nobody going to put in a grievance for you and going |
| 24 | to write their own -- they got to ask me what I need. |

| | Page 36 |
|---|---|
| 1 | Q. Since this is your handwriting, are you more |
| 2 | able to read it? Do you recognize it? Or do you need me |
| 3 | to read it again? |
| 4 | A. Can you read it, please? |
| 5 | Q. It says: Hendricks v. Coughlin, 114 F. 3rd |
| 6 | 390 2nd CIR. Grievance clearly protected by federal |
| 7 | constitution. This is Jesus Diaz' second grievance on |
| 8 | the matter of improper medical care pursuant to his eye. |
| 9 | The exhibits attached show unduly prejudicial proceeding |
| 10 | which undetermine the fundament legality, reliability, |
| 11 | integrity or fairness of the proceedings. |
| 12 | Does that sound familiar? |
| 13 | A. No. It don't sound too familiar. But, see, I |
| 14 | got to go back and remember the way I was on that time. |
| 15 | Q. Okay. Well, the date in the top right-hand |
| 16 | corner says -- well, you tell me. What is the date on |
| 17 | that? |
| 18 | A. I don't know. That number look funny. Oh, |
| 19 | okay. Okay. This is the whole page that I submitted? |
| 20 | Q. That's correct. |
| 21 | You flipped to the next two pages. |
| 22 | Correct? |
| 23 | A. Okay. Now I remember who wrote this. |
| 24 | Q. Who was that? |

| | Page 37 |
|---|---|
| 1 | A. It was a person when I was in 22, because I'm |
| 2 | now in 23. This person used to be in 22. He was trying |
| 3 | to help me. He was trying to help me get somebody to |
| 4 | notice me -- about my eyes. So now I remember, because |
| 5 | he wrote three pages. |
| 6 | Q. So let's step back. |
| 7 | Do you think now this is not your |
| 8 | handwriting or -- |
| 9 | A. No. This is not my handwriting. |
| 10 | Q. Okay. Do you now recall the grievance? Is it |
| 11 | familiar to you now? |
| 12 | A. Yeah, yeah. |
| 13 | Q. Okay. |
| 14 | A. Yeah. I remember this person. I remember |
| 15 | this person. I don't know him like I know him, but I |
| 16 | know -- I remember when he wrote this for me. |
| 17 | Q. Okay. Let's flip back to the first page. |
| 18 | A. (The witness complied with counsel's request.) |
| 19 | Q. Okay. Again, what is the name of the IGC in |
| 20 | the top left-hand -- |
| 21 | A. Same name. |
| 22 | Q. -- column? |
| 23 | And that's Lise Merson. Correct? |
| 24 | A. Yeah. |

Jesus Diaz

11 (Pages 38 to 41)

Page 38

1    Q.    And what was the date that this grievance was
2    received by the medical unit?
3    A.    5/25/06.
4    Q.    So, again, we reviewed that you submitted this
5    grievance on 5/12/06. Or that's when you dated it.
6    Correct?
7    A.    I don't know if that's a 12 or a 2. But we
8    can say 12. You can say a 12.
9    Q.    I understand it's a little bit -- the 12 is
10   shady. 5/12 or 5/2 we'll say. But on either date it was
11   submitted or dated by you. Correct?
12   A.    Yes.
13   Q.    Okay. And then this grievance was submitted
14   to the medical unit on 5/25. Correct?
15   A.    Yeah.
16   Q.    All right. Do you know who Cindy Atallian is?
17   A.    Yes.
18   Q.    Who's that?
19   A.    She was my counselor in 22.
20   Q.    And how long was she your counselor for?
21   A.    Huh?
22   Q.    How long was she your counselor?
23   A.    She was my counselor for like -- I want to say
24   for like 30 -- 33, 34 months.

Page 39

1    Q.    How did you like her as a counselor?
2    A.    She was a good counselor.
3    Q.    Do you remember -- it might be hard to
4    remember. But do you remember what year she started
5    being your counselor?
6    A.    She was my counselor as soon as I went on the
7    building.
8    Q.    As soon as you came in the building.
9    A.    (The witness indicated.)
10   Q.    So that would have been back in 2002?
11   A.    No, no. I was -- I went -- I wasn't here in
12   the compound in 2003. So -- I got in trouble. They sent
13   me back. So I didn't come back out. So I was over there
14   from 2003. Okay. I remember now. I went over there.
15   Okay. A little bit -- I put my first medical slip. They
16   move me over there. I got in trouble. They give me a
17   write-up. They move me over there.
18   Q.    And where do you mean by "over there"?
19   A.    Over there in 22.
20   Q.    Building 22?
21   A.    Yeah. That was like -- I want to say like not
22   too far away from when I put my medical -- first medical
23   slip. Okay. So basically -- give me a second. But what
24   I'm trying to say: I was over there. So from 2003,

Page 40

1    2004, 2005. So we got like 30-some months. I was over
2    there almost three years almost.
3    Q.    So did Ms. Atallian become your counselor
4    after you were moved to Building 22?
5    A.    Yes.
6    Q.    Okay. When did she stop being your counselor?
7    A.    When I moved back out of -- when they classify
8    me out again to the compound.
9    Q.    When you were classified out of Building 22 is
10   when she stopped being your counselor?
11   A.    Yeah.
12   Q.    Okay. Did you ever complain to Ms. Atallian
13   about your eyes?
14   A.    I wouldn't say complaining. But when -- if --
15   when we -- the grievance that we wrote when I complain
16   about it's growing on my second eye, that's when the
17   first time I approached her.
18   Q.    You approached her about your eyes?
19   A.    Yeah.
20   Q.    What did you say to her?
21   A.    I said, Ms. Atallian, I don't want to give you
22   no trouble. I don't want no write-up. But I can't
23   continue going to school. And she said, "Why?" So I
24   showed her my eye. And she was -- she take it like very

Page 41

1    serious. She was like, oh, God. And, then, what they
2    doing? She asked me a couple of question. What they
3    doing about it? What -- so she was trying to help me.
4    Q.    She was concerned for you?
5    A.    Yeah.
6    Q.    And she was trying to help you?
7    A.    Yeah.
8    Q.    Do you know if she is a nurse?
9    A.    Who: Ms. Atallian?
10   Q.    Yes.
11   A.    No.
12   Q.    Is she a doctor?
13   A.    No. That I know.
14   Q.    Do you know what she did?
15   A.    Yeah.
16   Q.    What?
17   A.    Well, she wrote me back. The first letter
18   that she wrote me she said she met with mental health and
19   medical staff to discuss about my eye situation. That's
20   in the letter that she sent me.
21   Q.    So your counselor, Ms. Atallian, told you that
22   she met with medical staff about your eye situation?
23   A.    Yes.
24   Q.    Okay. And she wrote you a letter telling you

Jesus Diaz

12 (Pages 42 to 45)

Page 42

1  that. Correct?
2      A.  Yeah.
3      Q.  And that letter is attached to this grievance.
4  Correct?
5      A.  Yeah.
6      Q.  Okay.  Did you want to flip to that to take a
7  look at those?  And we're still looking at Exhibit 3.
8  And on top of this exhibit it says Exhibit E.  Correct?
9      A.  Yeah.
10         What's that mean?
11     Q.  Is this something that you wrote on top of the
12  letter?
13     A.  I don't recall.  I don't remember.
14     Q.  Do you recognize this as the letter from
15  Ms. Atallian?
16     A.  Yes.
17     Q.  And in that letter she states:  I took your
18  name to the mental health meeting to discuss your eye
19  issue.  Correct?
20     A.  That's the one?  Yeah.  Because she send me
21  like two or three different notes.
22     Q.  And this is dated January 19th, 2006.
23  Correct?
24     A.  Yeah.

Page 43

1      Q.  And you said she sent you two or three
2  different notes?
3      A.  Yeah.
4      Q.  All about your eyes?
5      A.  Yeah.  The second note she send me -- or
6  the -- I didn't remember if it was the second one.  But
7  she send me another note saying, Mr. Diaz, I discuss
8  you -- oh, she said she met -- she said, okay, I met
9  with -- she said that she met with some people in the
10  hospital and she said they going to take care of you.
11  They going to come see you.  Something like that.  Let me
12  know how everything go.  It wasn't too many writing.  It
13  was just something small.  She said just let me know how
14  everything go.
15     Q.  Do you think this was a regular part of her
16  job or do you think this was something extra she was
17  doing?
18     A.  I mean, as my counselor, I think like -- okay.
19  Because that's the only one we can go through if we got a
20  problem.  We got to go through our counselor.  If
21  something go wrong when probably -- when C/Os or when
22  nurse -- that's the close person that we have, the
23  counselor.  That's the only person that care a little bit
24  about us.

Page 44

1      Q.  Did you expect her to ever treat you
2  medically?
3      A.  Not treat me medically.  Like -- just like
4  trying to push a little bit.  Trying to push -- trying to
5  let them see my situation.
6      Q.  So you wanted her to push the medical people.
7  Is that what you're saying?
8      A.  The medical or probably somebody in charge.
9      Q.  Do you think that she did that?
10     A.  I think -- well, she wrote me, but I don't
11  know after this -- she probably did try.  But, you know,
12  there wasn't much done.  Nothing was done.
13     Q.  I guess I'm trying to understand why, you
14  know, if she was your counselor -- you had a good
15  relationship with her and she was writing these letters
16  on your behalf -- and you understand that she couldn't
17  treat you medically -- why you sued her.
18     A.  I don't know.  I think that she got -- I think
19  she got caught up in the mix.
20     Q.  She got caught up.  Is that what you're
21  saying?
22     A.  Yeah.
23     Q.  Okay.
24     A.  Being my counselor.

Page 45

1      Q.  Okay.  Do you think she did anything to
2  violate your rights?
3      A.  No, I don't think so.
4      Q.  I'm going to shift a little bit here and talk
5  about your eye.  When was the first time you noticed a
6  problem with your eye?
7      A.  The first time I notice something about my
8  eyes I would say it was like probably the -- in the same
9  month they -- that I put my first medical slip, because
10  some of these buildings you don't got mirror.  You don't
11  got mirror where you can see yourself.  And you in a dark
12  room.  And they put the lights on when they want to.
13         So I remember me coming out of the
14  shower and the guy say, yo, why your eye so red?  So I
15  said probably the hot water.  We don't got -- we just got
16  either hot water or cold water to take a shower in.
17  That's something we got to deal with every day.
18         So he said something.  Your eye so red.
19  Your eye so red.  So I didn't take it serious.  So next
20  day he said something too.  And I said, "Are you sure?"
21  So they sell here this little plastic mirror.  So I asked
22  somebody for a mirror.  And I look and I see a little --
23  in the corner of my eye it was red.
24     Q.  Do you remember what year this was?

Jesus Diaz

Page 46

1    A.  2003.
2    Q.  And do you remember the month?
3    A.  Like I said, right -- it was like in the same
4  month, because right away I put a medical slip.
5    Q.  But do you recall what that month was?
6    A.  It was 8/29 when I put my medical slip.
7    Q.  Okay.  Now, have you ever noticed a problem
8  with your eyes before you were incarcerated?
9    A.  No.  I never have a problem with my eyes.
10    Q.  Have you ever worn contacts or glasses?
11    A.  No.
12    Q.  Have you ever been to an eye doctor before you
13  were incarcerated?
14    A.  Never.
15    Q.  Okay.  Did you ever have an eye test done for
16  vision?
17    A.  Well, yeah.  Here.
18    Q.  Before you were incarcerated?
19    A.  Oh, no.
20    Q.  Before you were incarcerated, did you have a
21  personal doctor, a personal physician?
22    A.  No, ma'am.
23    Q.  Okay.  When was the last time you saw a doctor
24  before jail?

Page 47

1    A.  I don't remember.  I don't be getting sick
2  like that.
3    Q.  Have you ever seen a doctor?
4    A.  On the street?
5    Q.  What's that?
6    A.  You mean when I was out on the street?
7    Q.  Ever see a doctor before you were in jail?
8    A.  Oh, no, no.  See, I'm from another country.  I
9  don't got no Social Security.  I don't have insurance.
10  So I'm trying to move how I can.
11    Q.  Did you ever go to a clinic for anything --
12  for any medical care?
13    A.  No.
14    Q.  When you were in the Dominican Republic, did
15  you see a doctor?
16    A.  Not that I can remember.
17    Q.  Okay.  Have you ever had any major injuries?
18    A.  Yeah.  My stomach.
19    Q.  And that was while you were in prison?
20    A.  No, no.  I was -- when I was at home.
21    Q.  When you were in the Dominican Republic or
22  when you were in the United States?
23    A.  In the Dominican Republic.
24    Q.  Okay.  What was wrong with your stomach?

Page 48

1    A.  I just like -- I start drinking when I was
2  young.  And I think the alcohol -- too much drinking with
3  no eat messed up my stomach.  Something just like broke
4  inside.
5    Q.  What did you do to treat it?
6    A.  I went to the hospital.  They operate me.
7    Q.  How old were you when that happened?
8    A.  Probably 18, 19.
9    Q.  Okay.  Have you ever had any other injuries
10  that required you to go to the hospital?
11    A.  No.
12    Q.  Okay.  Any other injuries at all?
13    A.  No.
14    Q.  How about any other surgeries?
15    A.  No.
16    Q.  Is your eye bothering you right now, either of
17  them?
18    A.  Yeah.  When I'm like on the -- when I'm in the
19  light -- if the light too strong, it's bothering me.  Or
20  if I watch TV, it get irritating.
21    Q.  Is it bothering you right now?
22    A.  Not too much.  I try to not look at the light.
23    Q.  Have you had any vision problems?
24    A.  Yeah.  Since -- to be honest with you,

Page 49

1  before -- because they take me to outside operation.
2  Before my operation I was a little bit better.  But they
3  took me to outside hospital.  And the person that
4  supposed to give me the operation told me they scrub my
5  eye is better than laser surgery.  It be better than
6  laser, because it never come back.
7    Q.  Do you remember who it was that told you that?
8    A.  Yeah.  I got his name on my building.
9    Q.  Was it a doctor?
10    A.  Yeah.
11    Q.  Okay.  Was it a specialist that you were taken
12  to?
13    A.  I think so.  I don't -- to be honest with you,
14  I don't know, because he put me asleep and then he wake
15  me up.  They explain all that to me.  And then they put
16  me to sleep.  And he was scrubbing my eye.
17    So they send me back here.  No
18  medication.  No painkiller.  The doctor prescribed me
19  Percocet.  So when I come back here, no medication ever.
20  When the irritation went away, I was going crazy.  The
21  pain -- I didn't -- the pain, it was too much -- too
22  strong.
23    Q.  It might help, Mr. Diaz, if we had some dates
24  so we can know where we are.

Jesus Diaz

14 (Pages 50 to 53)

Page 50

1    A. Okay. I got my operation 10/3/06.
2    Q. Okay. And you were sent outside of the
3  institution for that operation?
4    A. Yeah.
5    Q. And the doctor put you to sleep?
6    A. He explain to me.
7    Q. Okay.
8    A. He say -- I went prior to that for explaining.
9    Q. Okay. Do you remember when you went for the
10  explanation?
11   A. I want to say like April. I don't remember
12  exactly what date. April '06.
13   Q. Around April '06?
14   A. Yeah.
15   Q. Did you go to the same doctor to talk to that
16  did the operation?
17   A. Yeah.
18   Q. Was that the first time that you saw that
19  doctor?
20   A. Yeah.
21   Q. And have you seen that same doctor since 10 of
22  '06?
23   A. Yeah. I went for the operation on 10/3/06.
24   Q. And have you been back to that doctor since?

Page 51

1    A. I went the next day.
2    Q. On 10/4/06?
3    A. Yeah.
4    Q. And have you been back before 10/4/06?
5    A. No.
6    Q. Other than that doctor that you went to for
7  your eyes that did the operation on 10/3/06, have you
8  gone to another doctor for your eyes?
9    A. Well, they got -- they supposed to got a
10  doctor here. He call me a couple of times. And --
11   Q. By "here" you mean in the prison?
12   A. In the prison.
13         And he told me: I'm going to check on
14  you every three months. And I don't remember when was
15  the last time I saw him.
16   Q. Now, you said he called you. Do you mean
17  called you for an appointment?
18   A. No. They just call me one day. They call me
19  one day. Well, I think I put a medical slip explaining
20  about -- why is this thing still on my eye when I went
21  for outside surgery? I wanted somebody to explain that
22  to me. If I went for outside surgery, how can I -- can
23  that thing still be on my eye?
24   Q. I see.

Page 52

1         So this doctor that you're speaking of
2  now was after your surgery.
3    A. Yeah.
4    Q. Okay. And do you remember the name of that
5  doctor?
6    A. Yeah. I got his name. I got his name.
7    Q. Okay. But you do remember it now?
8    A. No. I don't remember his name. I got his
9  name. I got it written down.
10   Q. Do you understand that the questions that I
11  sent you -- those are some of the things that you have to
12  put --
13   A. Okay.
14   Q. -- as answers.
15         Do you understand that?
16   A. Okay.
17   Q. Okay. Do you remember how many times you've
18  seen this doctor since the surgery?
19   A. Since the surgery for the medical slip, he
20  call me and talk to me. He say we going to keep our eye
21  on your every three months. Like I want to say five, six
22  month pass by, and then he call me for glasses. That's
23  it.
24   Q. Okay. And this doctor in the institution is

Page 53

1  the one who gave you glasses?
2    A. Yeah.
3    Q. Do you remember when that was?
4    A. I got an idea but I don't even remember. I
5  don't recall that. I don't recall like -- I know,
6  because I got a note that he say to wear the glasses if
7  you need it.
8    Q. Was it in 2007, this year?
9    A. Yeah, yeah. It was in this year.
10   Q. Do you think it was in the beginning of the
11  year or closer to the summertime?
12   A. Yeah. Probably. Probably. Probably.
13  Because I was still -- let me see. See, if I go back on
14  the -- in my building, I can maybe probably remember,
15  because I got a note from him that say that I need them
16  glasses. If I need them glasses, I got to wear them. In
17  the institution you got to have something to prove that
18  you allow to wear glasses, if you need.
19   Q. Okay. That's fine.
20         I want to go back before you got the
21  surgery, which was in October of 2006. Before you were
22  sent out for the operation, did you see any other medical
23  staff about your eyes, whether it was nurses or doctors?
24   A. Before my surgery?

Jesus Diaz

Page 54

1    Q.   Before.
2    A.   Before my surgery?
3    Q.   And before April when you had the explanation
4  of the surgery.
5    A.   Well, before my surgery I remember -- yeah.
6  They come in here in the hospital, and they told me a
7  couple of times like -- well, the night -- I think the
8  night me before my surgery they call me and told me don't
9  eat nothing.  Don't eat nothing.  I remember one time.
10  Don't eat nothing.  Don't -- because you going in for
11  surgery tomorrow.  And I said okay.  And probably before
12  that -- see, I never see an eye doctor until -- the first
13  eye doctor that I see was the dude -- the guy that did my
14  operation.  I never see eye doctor in the institution
15  before.
16    Q.   And when was the first time you saw that
17  doctor?
18    A.   The first time I saw the doctor was -- it was
19  April.  Well, I don't remember exactly the date, but I
20  remember that was my classification date.  But they
21  didn't classify me.  Ms. Atallian removed my
22  classification.  So it was in April 2006 the first time I
23  saw the guy from the outside.
24    Q.   Other than an eye doctor, did you see any

Page 55

1  other doctors or nurses about your eyes --
2    A.   Yeah.
3    Q.   -- before then?
4    A.   Yeah.
5    Q.   Do you remember when?
6    A.   Well, I saw many time.  I don't even recall
7  the time.  Like in 2003 I saw -- well, I'm going to say
8  in 2004 I saw many, many nurses.  I don't know doctors,
9  because they always -- well, they used to tell me was we
10  make an appointment.  We made an appointment for you.  We
11  made an appointment.  We made an appointment.  So in 2004
12  I seen many nurses.  And in 2005 I seen many nurses come
13  and talk to me about it and stuff.
14    Q.   And when you saw these nurses, did you always
15  mention your eyes?
16    A.   Yeah.  Because everything was about my eyes.
17  Back then I wasn't getting like medication for my stomach
18  and I wasn't getting allergy pill.  But it was --
19  everything that I put back in that time, it was about my
20  stomach -- about my eyes.  I'm sorry.  Everything was
21  about my eyes.  So every time they come -- so many nurses
22  tell me, oh, they're not going to take care of you until
23  your whole eye get covered up.  Some of the nurses tell
24  me like: Don't worry.  You're going to be seen.  We make

Page 56

1  an appointment.  And nothing doing.  When the nurse come
2  and see you, what she said, that's the way to go.
3  There's nothing I can do.
4    Q.   Okay.  Did a doctor ever tell you that your
5  vision problems are the results of the growths over your
6  eyes?
7    A.   Say that again.
8    Q.   You're having trouble with your vision now;
9  correct?
10    A.   Yeah.
11    Q.   Has a doctor ever said to you that the
12  problems you're having with your vision are caused by the
13  growths that you've had on your eyes?
14    A.   They probably never -- they never say that.
15  But I think that they don't want to probably -- they just
16  don't want to take the full responsibility.  They don't
17  want me to -- I don't -- see, I don't understand why
18  we -- why they just don't say -- I'm going to be here ten
19  year.  It was real simple.  Give me the surgery.  I told
20  them, you all give me surgery.  If it start growing back
21  again before I go home, I don't bother you no more.  I do
22  my surgery when I go home, because back there I can take
23  care of it.  But I told them I got to be here ten year.
24  I try many time.  I got to be here ten year.  And I

Page 57

1  don't -- how am I going to -- how my eye -- my vision
2  going to be when I go home?
3    Q.   Have you ever asked them?  Did you ask if the
4  vision problems you're having are a result of the growths
5  on your eyes?
6    A.   Yeah, yeah.  I want to say myself yeah.
7  Because, you see, if I didn't have that skin growing
8  right here on my left eye, my eye would have been real
9  good.  If I didn't have that skin growing from my left to
10  the right, my eye would have been -- we wouldn't be here
11  today.
12    Q.   Have your eyes ever caused you any pain?
13    A.   Sometimes pain.  Sometimes -- well, it's not
14  like a big pain.  It's like sometimes I feel like I got a
15  needle on the -- right here on this -- on the corner of
16  my eye.  And sometime my eye just get black out or
17  sometime it's like that skin produce a fluid.  And the
18  fluid get on my eye and gets irritated.
19    Q.   Does that still happen today?
20    A.   That still happen all the time.  Like when I
21  take a shower in hot water, my eye get like real, real,
22  real red.  And more now than before.
23    Q.   And you keep pointing to your left eye.  Is it
24  your left eye that's bothering you?

Jesus Diaz

16 (Pages 58 to 61)

Page 58

1    A.  Yeah.
2    Q.  Okay.  Are you having any problems with your
3  right eye?
4    A.  See, my right eye, it -- he -- it a problem,
5  but it's not too big.  And if you look right -- if you
6  take a good look, you can see.  It's like between the
7  corner on my brown spot and the white spot.  So it's
8  still small.  It's still small.
9    Q.  Does your right eye cause you any pain?
10   A.  No.  Not like my right -- not like my left
11  eye.  Not like my left eye.
12   Q.  You said a needle before.
13         How else would you describe the pain you
14  have in your eye?
15   A.  Sometimes it's like -- I don't know.  It's one
16  of them day probably like my -- the skin on my eye
17  produce a fluid.  Like some type of fluid.
18   Q.  Does that fluid hurt you?
19   A.  No, no.  What the fluid do is just make my
20  vision more unclear.
21   Q.  So the fluid blurs your vision?
22   A.  Yeah.  But sometime the needle -- the thing
23  about the needle is -- like sometime I have that little
24  pain.  I don't know if because the surgery that I had

Page 59

1  before or I don't know if the skin probably stretching
2  or...
3    Q.  Does the pain come and go?
4    A.  Yeah.  The pain come and go.
5    Q.  How often do you have it?
6    A.  I want to say like -- I got to -- see, I got
7  to keep my hand clean and try to keep my eye clean as I
8  can.  I want to say probably like -- maybe like once a
9  day, twice a day.
10   Q.  For how long?
11   A.  Maybe for a little -- I don't pay no mind to
12  it, because I got glasses.  So when I got -- when I
13  get -- my eye get like that, I put -- they give me some
14  shades to watch TV and stuff.  Dark glasses, sunglasses.
15   Q.  So when it starts to bother you, you have a
16  special pair of glasses that you put on?
17   A.  No.  I wear the glasses every time I watch the
18  TV.  I just -- I wear -- I don't be like watching TV like
19  that.  I just put it on every time I watch the TV.  It's
20  better for me to watch the TV with the glasses.
21   Q.  That the same pair of glasses that you have
22  with you today?
23   A.  No.  Those ones they gave me -- to me when I
24  have operation.

Page 60

1    Q.  Do you still have those too?
2    A.  Yes.
3    Q.  Okay.  So do you have a certain pair of
4  glasses for all the time and another pair for when you're
5  watching TV?
6    A.  Yeah.  When I watch the TV and like when the
7  sun is very strong, I got to wear them outside.
8    Q.  Does that help alleviate the pain?
9    A.  Yeah.  The thing about the sun and the light
10  is make my eye cry.  If you get a light -- if you get
11  like a -- because when I come over here to see the doctor
12  on the compound, I remember he got like a little light.
13  And he turned the lights off.  So he put something like
14  that in my eye, and my eye start weeping right away.  So
15  the light.
16         So I told him:  I need you to give me
17  something that says that I can wear these glasses.
18  Because if I get a visit from one of my friend, they got
19  all them lights out there -- all them light bulbs.  They
20  got -- the room -- in the visit room, they got too many
21  lights.
22         But the reason I did it -- because one
23  time I came over here -- I don't remember who I came and
24  see.  And the C/O told me you're not going to wear no

Page 61

1  glasses in the visiting room.  And I say I got a vision
2  problem.  I got an eye problem.
3    Q.  Okay.  But we're getting off track a little
4  bit.  Let's go back to your eyes.  So the glasses that
5  you wear for the TV and the sun are a special pair of
6  prescription glasses that are different than these
7  regular glasses.  Correct?
8    A.  Yeah.
9    Q.  Okay.  Do you wear these all the time, the
10  ones that are with you today?
11   A.  Yeah.  I wear them like -- like if there's no
12  sun outside, I wear them.
13   Q.  Okay.
14   A.  Because they told me I got to put it on so I
15  can get used to it.
16   Q.  Okay.  But you're not wearing them now?
17   A.  No.  I don't -- if I don't got to read or
18  walk, I take it off.
19   Q.  Okay.  So you just wear them to read or walk
20  around; is that right?
21   A.  Yeah.
22   Q.  Okay.  I want to just ask you a question about
23  your complaint.  I'm not going to admit this as an
24  exhibit because this is part of the record.  But this is

Jesus Diaz

Page 62

1  the complaint that you filed. Do you recognize the
2  complaint?
3      A. Yeah.
4      Q. Okay. The third page can you turn to?
5      A. (The witness complied with counsel's request.)
6  The.
7      Q. Actually, it's the fourth page.
8      A. Fourth page?
9      Q. Yes.
10     A. Okay.
11     Q. Okay. Is this complaint written in somebody
12  else's handwriting?
13     A. Yeah.
14     Q. Okay. Do you know who wrote it?
15     A. Yeah.
16     Q. Who?
17     A. Cecil Brown.
18     Q. Did you tell him what to write?
19     A. Yeah. I told him. I told him my -- I told
20  him the situation. I told him like how long I was
21  waiting for -- to see -- to been see -- I don't know how
22  long I was complaining about my eyes.
23     Q. Okay. The paragraph on page 4, the first
24  paragraph, says Plaintiff claims Thomas Carroll is the

Page 63

1  warden of DCC and he is being held liable in his
2  individual and official capacity. Plaintiff claims the
3  warden lacks education and training and is constantly
4  violating Plaintiff's 8th and 14th Constitutional
5  Amendment rights by failing to provide adequate medical
6  care or an adequate medical grievance procedure.
7         Does that sound familiar to you?
8      A. Yeah.
9      Q. Okay. What is your basis for saying that the
10  warden lacks education and training?
11     A. Well, it's the warden. Right? He the one
12  that run the prison. Right?
13     Q. Well, I'm asking you. You say he lacks
14  education and training. What is your basis for that
15  allegation?
16     A. See, I didn't put everything here. But my
17  understanding is that he -- if he would have been on top
18  of his job like the way he supposed to do it -- the way
19  that he supposed to run -- running a prison is a hard
20  job. It's hard. I'm not saying it's easy. That's why
21  you have to have the right people beside you. And the
22  right people -- the right doctor, the right counselor.
23     Q. Do you have any evidence or, you know, other
24  indication that the warden lacks education and training,

Page 64

1  or are you just making that assumption?
2      A. I'm just saying, because I'm not the only one
3  probably complaining in this institution about probably
4  eye or stomach or -- I'm not the only one.
5      Q. Do you think that the warden had any reason to
6  know about your medical problems?
7      A. Yes.
8      Q. Why?
9      A. Because if he run this prison, he supposed to
10  know everything that is going on out here.
11     Q. You think the warden knows the medical record
12  of every inmate in this prison?
13     A. Probably not. Every medical record that every
14  prisoner that go on here go -- when we talk about
15  spending money and operation, I think he probably know,
16  because they just not going to go ahead and grab me a
17  C/O, put me in a car and say, come one, we're going to
18  give you surgery. That come from a higher level.
19     Q. Do you think the warden makes decisions about
20  your medical care or do you think doctors make decisions
21  about your medical care?
22     A. Who them hospital work for? They work for the
23  prison. So the hospital make a decision about -- okay.
24  Who hired the doctors and nurses in here?

Page 65

1      Q. Do you think the warden hired the doctors and
2  nurses?
3      A. He probably don't, but he probably got
4  somebody doing it -- somebody that hire them people.
5  When those people come over here -- see, the thing about
6  doctors and nurses, right -- if you check the record --
7  not my record, like hospital record -- and you check how
8  many people they get hired and they get fired. Because
9  they know they haven't -- nobody -- no -- see, they hire
10  anybody here, because we inmate. And what they say,
11  that's what go. And I know that's why there's so many
12  people fired. I seen many faces that are not here no
13  more.
14     Q. But what I'm asking you is if you think Warden
15  Thomas Carroll is the person who hires or fires medical
16  providers.
17     A. He probably not but I know he know about it.
18     Q. How do you know that he knows about it?
19     A. Because he's the warden. The warden is
20  somebody here. I don't know what the warden -- if the he
21  one that run the jail or whatever. But I think it's a
22  high position.
23     Q. All right. Let me move to something else.
24  Let's go to page 5, the next page. On the second

Jesus Diaz

18 (Pages 66 to 69)

Page 66

1  paragraph, it says that Plaintiff claims Thomas Carroll
2  has knowingly, willingly and intentionally failed to do
3  criminal background checks or hired employees, and this
4  negligence has caused people with criminal records to
5  work at DCC and lose Plaintiff's sick call slips and
6  grievance forms, thereby causing pain and loss of sight
7  in both eyes.
8          What basis do you have for alleging that
9  Tom Carroll hires people with criminal backgrounds?
10     A.  Well, criminal background that's in here, it
11  going to stay here in this -- but I know for me -- for my
12  understanding, they hire people with no background check
13  probably, because they hire people in here with no
14  degree, no medical degree.  I see doctor get fired and a
15  lot of nurses.
16     Q.  Okay.  You said two separate things there.
17  First you said they hire people without doing a
18  background check.  What basis do you have for saying
19  that?  Why do you say that?
20     A.  Okay.  Because, like I say, how -- why they
21  hire person for a month and then fire?  And then you see
22  another person.  Like I say, between 2004 and 2005 -- or
23  in 2006 -- all them people that I see, they not working
24  here anymore.  There got to be a reason for that.

Page 67

1      Q.  So are you just assuming that that's the
2  reason?
3      A.  I'm not assuming.  I know, because I asked.  I
4  asked about it.
5      Q.  Who did you ask?
6      A.  I asked nurses.  I asked --
7      Q.  No.  I need you to give me a name.
8          Who did you ask?
9      A.  I never keep track of nurses.  Never keep
10  track of the names.  Believe me, if I would have all them
11  people name, if I would have know who wouldn't be here
12  today, I would have everything wrote down.  It ain't my
13  intention being sitting here today.
14     Q.  Did a nurse tell you that Warden Thomas
15  Carroll hired somebody without doing a background check?
16     A.  No.  A nurse never told me that.  But there
17  was this nurse that every time she come and see me she
18  make the same comment.  She say:  You haven't been seen
19  yet?  And I say no.  You haven't been seen yet?  And that
20  was the girl that I give you the name Kiara.  She always
21  used to ask me that.  She come and see me two more -- two
22  more later.  She come and see me.  She be like:  "You
23  haven't been seen yet by a specialist or by somebody or a
24  doctor?

Page 68

1      Q.  I understand that and those comments that she
2  made to you, but I'm trying to make the connection about
3  how those statements led you to state in the complaint
4  that Warden Carroll hired people without doing background
5  checks.  How does that conversation with that nurse lead
6  to that allegation?
7      A.  Can you repeat that question?
8      Q.  Okay.  In your complaint you stated that
9  Warden Carroll failed to do criminal background checks --
10     A.  Yes.
11     Q.  -- and that somehow -- well, I'll use your
12  language -- thereby causing pain and loss of sight in
13  both eyes, and this is a direct violation of Plaintiff's
14  8th and 14th Constitutional Amendment rights.
15     A.  Okay.
16     Q.  So what I want you to tell me is what evidence
17  you have to support that allegation.
18     A.  Okay.  I -- my evidence that I have right now
19  is my own self.  It's right here.
20     Q.  Do you know a name of anyone who was hired by
21  Thomas Carroll without him doing a criminal background
22  check?
23     A.  Probably not.  But there's some out there.
24     Q.  Let me move to another.

Page 69

1      A.  You're not going to find them here.  They're
2  gone.
3      Q.  We're going to move to a different part of the
4  complaint.  Okay.  Page 8.  Now, I've introduced as
5  exhibits three separate grievances that we went over.  Is
6  there a difference between a grievance and a sick call
7  slip?
8      A.  I think so.
9      Q.  What is that difference?
10     A.  Well, the difference between the medical slip
11  is to notice to -- notice them that you be having some
12  type of problem.  And the medical grievance is like when
13  you don't get no answer or they don't take care of you.
14     Q.  Are they different forms?
15     A.  Yeah.
16     Q.  And are they filed in different places?
17     A.  Yeah.
18     Q.  Okay.  Now --
19     A.  They go in different baskets.
20     Q.  Now, we went over three grievances that you
21  filed.  Are those the only three that you filed as to
22  your eyes?  Now we're talking about grievances, not sick
23  call slips.
24     A.  No.  I fill more grievances.

Jesus Diaz

Page 70

1    Q. Okay. Were they before or after the ones that
2  we discussed?
3      A. I believe I filled more grievance before than
4  after.
5      Q. Do you recall the date?
6      A. No. But I got grievances on -- probably that
7  they don't know. They sent me back the receipt. They
8  send me back a copy. I got grievances back on my
9  paperwork.
10     Q. Did you keep copies of all of those grievances
11 that you filed?
12     A. Well, the one that they -- the one they sent
13 me, because we not allowed make a grievance copy. I try.
14 They say, no, that's illegal.
15     Q. Did you keep the copy that they sent you?
16     A. Yes.
17     Q. And do you understand that you have to send me
18 copies of those as part of the discovery in this case?
19     A. You have some of them. Well, probably you
20 have some them copy because some of them grievance was
21 after my surgery.
22     Q. Can you send me copies of the grievances that
23 you have in your cell?
24     A. Yeah.

Page 71

1    Q. Okay. What is it that you're alleging
2  Corporal Lise Merson did to violate your rights?
3      A. Who is she?
4      Q. Oh.
5         Okay. Do you understand that eventually
6  in this case there might be a trial?
7      A. Yeah.
8      Q. Okay. And do you plan to call witnesses if
9  the case goes to trial?
10     A. Well, if the court can provide me medical
11 staff name and stuff, I got witness. Nurses that they
12 were trying to help.
13     Q. But can you recall any names of those nurses?
14     A. Kiara. I'm going to find out. Believe me, I
15 I'm going to get some more -- I'm going to get some name
16     Q. Okay. And if you find out, do you understand
17 you have to send those names to me?
18     A. Yeah. I'll send you the names.
19     Q. Okay. What are you seeking from this lawsuit?
20     A. What you mean?
21     Q. What do you want? Why did you file the
22 lawsuit?
23     A. I file the lawsuit because I run out of -- I
24 run out the -- I keep trying. Something like -- can you

Page 72

1  help me? Can you please take -- can you see me? Can you
2  take care of me? Not even eyedrop. Never came to me and
3  say, look, this eyedrop will stop the corner of your eye.
4      Q. So did you file the lawsuit to get treatment?
5      A. I filed the lawsuit because they violated my
6  right. They violated my right as an inmate in this
7  institution. They violated my right and they --
8  basically, they violated me. As an inmate in here, I'm
9  entitled to treatment.
10     Q. I understand the allegations in your lawsuit
11 are that your rights were violated because you're
12 entitled to treatment. Correct? Is that what you're
13 saying?
14     A. Yeah.
15     Q. But my question is: What do you want the
16 ultimate outcome of the suit to be? What do you want out
17 of it?
18     A. Whatever good come out of it, I'm okay with.
19     Q. Okay. What kind of good might come out of it?
20     A. Whatever. Money, surgery.
21     Q. Do you believe you need more surgery than
22 you've already received?
23     A. They never gave me the surgery. If you look
24 into my eye, they never gave me the surgery.

Page 73

1    Q. Didn't we discuss a little while ago a surgery
2  on October of '06?
3      A. Yeah. But you -- see, you never let me
4  finish. The guy did all that stuff. Put me to sleep.
5  Put my eye to sleep, whatever he did. If you see, you
6  can see that thing got never removed. It never had
7  removed. The guy was scrubbing my eye and send me back
8      Q. Did the doctor tell you that you need more
9  surgery?
10     A. He told me -- well, he remove that thing
11 scrubbing it. That's it. It's gone. It's not coming
12 back.
13     Q. Okay. So the doctor said that it would be
14 gone and not come back, and you're stating now that it's
15 still there.
16     A. Yeah. And not just that.
17     Q. Do you have, that you know of, any other
18 appointments to see a doctor again?
19     A. It been a while since I -- well, it been a
20 while since I had the surgery. The surgery was in 2006.
21 We almost in 2008. They don't say nothing to me.
22     Q. When did the growth come back?
23     A. The growth was there -- it take me like --
24 maybe like three week to open my eye, because my eye was

Jesus Diaz

20 (Pages 74 to 77)

| Page 74 |
| --- |

1  in a bad condition. My eye was red like tomato. And for
2  the first three days, they don't give me no painkiller.
3  That's -- I'm going to send you some of those grievance.
4  For the first three days, they didn't give me no
5  painkiller. I was here going crazy. I was here -- I
6  don't know how I don't kill myself.
7      Q. But when did you first notice that the growth
8  either came back or was not entirely gone?
9      A. Like I want to say like three week later.
10  When I was able to open my eye. Like three week later I
11  was like, what's going on?
12      Q. So do you think that it grew back or do you
13  think that the doctor just missed something?
14      A. He never removed it. He never removed it.
15      Q. Was it smaller than it was before you went?
16      A. No. It was just the same. Probably maybe a
17  little bigger now.
18      Q. Okay. What amount of money are you seeking
19  from the lawsuit?
20      A. What amount of money?
21      Q. Yes.
22      A. Well, if that's -- if we go to trial, that's
23  up for the judge to decide. I'm not -- you know what I
24  mean? I'm trying to get justice, basically. That's what

| Page 75 |
| --- |

1  I'm trying to do.
2      Q. So you don't have any idea of a number in your
3  mind?
4      A. Well, we -- I think in the lawsuit we got a
5  hundred thousand. In the lawsuit I think we got a
6  hundred thousand.
7      Q. Okay. Your arrest in 2002, what was that for?
8      A. Can you say that again?
9      Q. Your arrest in 2002, what was that for?
10      A. I was driving with somebody in a stolen
11  vehicle. I got a ride from somebody. He gave me a ride.
12  And that's the truth. Because me being illegal here in
13  the country, if you told me this car is stolen, believe
14  me, I ain't going to get in there with you. I'm not
15  trying to get arrested. Every time I get arrested I get
16  busted. I ain't got nothing. I ain't got no Social
17  Security. I ain't got nothing.
18      Q. Were you pulled over in this vehicle?
19      A. No. The guy -- I was -- I remember I was in
20  the store buying a phone card for my phone. And this guy
21  pull over. And he said something about a party. And I
22  say, okay, let's go, because there's nothing to do. So
23  when we was on our way to the party, there was a police
24  officer in the back of us, and I think he recognized the

| Page 76 |
| --- |

1  vehicle that he was driving. So when the police put the
2  lights on, he said, oh, this car is stolen. So I said --
3  he said, what you want me to do? You want me to run? So
4  as soon as he put the car in stop, I open the door and I
5  jump. I want nothing to do with it.
6      Q. Okay. Did you run?
7      A. I ran.
8      Q. Okay. And what were you ultimately charged
9  with?
10      A. Basically, I don't know what was my charge.
11  But I come out like -- I didn't know what was on my
12  charge. But they gave me a bail for like $1800 I come
13  out of jail.
14      Q. Okay. That was the bail you had to post:
15  $1800?
16      A. Something like that. I don't remember. I
17  didn't pull the bail.
18      Q. When you jumped out of the vehicle, did -- I
19  guess I need to clarify this. Did you run away? Were
20  you caught then or were you caught later?
21      A. No. When I jump out of the vehicle, we was
22  surrounded. We was surrounded. So when I jump out of
23  the vehicle, there was two police officers behind me.
24  Boom. They grab me. The guy trying to go in the

| Page 77 |
| --- |

1  vehicle, make a U-turn, and the police stop him.
2      Q. Okay. And did you have a trial or did you
3  plead guilty to the charges?
4      A. I pled guilty.
5      Q. And do you know how many felonies you pled
6  guilty to?
7      A. Not that I remember.
8      Q. Okay. Do you remember pleading guilty to
9  assault in the first degree? Three counts of that.
10      A. Are you talking about for this time that I'm
11  doing now?
12      Q. 2002, yes.
13      A. Or you talking about for the drug charge?
14      Q. Do you remember being arrested in December of
15  2002?
16      A. December 21st.
17      Q. Is that what you're serving time for now?
18      A. Yeah.
19      Q. Okay. Do you remember what charges you pled
20  guilty to?
21      A. To be honest with you, I had Jerome Capone for
22  lawyer. Jerome Capone. And he told me: I'm a criminal
23  lawyer. If you don't do what I tell you, you're going to
24  do -- you're going to spend a lot of time in jail. So

Jesus Diaz

21 (Pages 78 to 81)

Page 78

1   this is the best thing that we can do. He plead for me.
2   I sign it. I not going to lie. I sign what he --
3   whatever he plead, I sign it. I sign a 12-year plea
4   agreement. I don't know what I plea for.
5       Q. Do you understand that some of the things that
6   you pled to were felonies?
7       A. Probably, yeah. Drug charge and shooting
8   charge. That's what I have.
9       Q. Okay. You said shooting charge.
10          Did you fire a gun at somebody?
11      A. Three people said they got shot.
12      Q. And that was the same incident where you
13  jumped out of the vehicle?
14      A. No, no. That was different. See, I got lost,
15  because in 2002 before this arrest right here that I'm
16  doing time, I was driving with a person in a stolen
17  vehicle. And I come out of there. I come out of jail.
18  I paid $1500 and I did a year of probation. This is
19  separate from the stolen vehicle. This is right here --
20      Q. I see.
21      A. -- from what I'm doing time now.
22      Q. The charges that you're doing time for now,
23  those crimes occurred when you were on probation for the
24  previous?

Page 79

1       A. No. The probation was over.
2       Q. Probation was over.
3          Okay. What was the context of the
4   incident which put you in jail for this most recent --
5       A. Okay.
6       Q. -- incarceration?
7       A. They said three people got shot -- that I
8   shot. And when they arrest me, there was 800 bag of
9   crack cocaine involved in the situation.
10      Q. 800 bags of crack cocaine?
11      A. Yeah.
12      Q. Okay. Was that arrest in a house?
13      A. They find it in a hotel.
14      Q. Were you in that hotel also?
15      A. I wasn't in a hotel. My name wasn't in the
16  hotel. I didn't have no choice but to go ahead and take
17  the whole thing. You all can check. The hotel was in
18  the guy that snitch on me name. So basically I pled
19  guilty for something that I didn't have nothing to do
20  with it.
21      Q. And where did the allegation of shots fired
22  come into play?
23      A. They say that somebody said that they -- I
24  shot them, whatever. I never see nothing. So I pled

Page 80

1   guilty. I pled guilty to all.
2       Q. Was that at the hotel also?
3       A. That was -- the shooting charge happened
4   supposedly first. So when the guy point the finger on
5   me, he told the police about the hotel. But the police
6   know that hotel was in that person name. The police
7   didn't check nothing. The police didn't check nothing.
8   The police went to the hotel and got the drug. He
9   didn't -- they didn't check him. That was his hotel, his
10  name.
11      Q. Where did the shooting occur?
12      A. They said somewhere in the city. West side
13  somewhere.
14      Q. In the city.
15          I think that's all I have. Let me just
16  double-check.
17      A. I mean, why you going through all my -- why
18  you going through all my...
19          MS. XARHOULAKOS: All right. That's
20  everything for me. But Mr. Thompson represents
21  Correctional Medical. He's another defendant. So he
22  might ask you some questions now too. Okay.
23  BY MR. THOMPSON:
24      Q. Hi.

Page 81

1       A. What's your name?
2       Q. Eric Thompson.
3       A. Oh, okay.
4       Q. Do you know who Correctional Medical Services
5   is?
6       A. Medical?
7       Q. Correctional Medical Services.
8          Have you ever heard of them?
9       A. Probably not.
10      Q. Do you know you sued them in this lawsuit?
11      A. Yeah. Probably. Yeah.
12      Q. If you don't know who they are, why did you
13  sue them?
14      A. Because I'm in here doing time. It don't mean
15  I know everybody. I'm just an inmate doing time. All
16  these people, they have to know about me. I probably
17  don't know about them, but I know they know about me.
18  They know I'm incarcerated. They know when I'm going
19  home. They know all this stuff about me. It just they
20  in my lawsuit because they probably didn't -- don't --
21  they didn't do what they supposed to do.
22      Q. What is the gentleman's name, the guy who
23  helped you draft your complaint?
24      A. Cecil Brown --

Jesus Diaz

22 (Pages 82 to 85)

Page 82

1    A.  Yeah.
2    Q.  -- drafted your complaint.
3        Tell me how that process went.  I mean,
4  did you approach him?
5    A.  Yeah.  I was just speaking about it, about how
6  did the medical facility don't try to help me -- trying
7  to responsibility about my situation.  I let them know --
8  I let the people know about my situation with my eyes and
9  stuff.  And that -- those took place in conversation.
10   Q.  So did he tell you you should file suit?
11   A.  No.  I told him I -- if I -- what I need to
12 file a lawsuit.
13   Q.  Okay.
14   A.  I was asking question.
15   Q.  Well, who decided what parties to name in the
16 suit?
17   A.  It was my responsibility to sue every person
18 responsible for me in here.
19   Q.  I guess I'm a little confused; because out of
20 the names of the people that you filed suit against, you
21 don't know Corporal Merson.  You don't know CMS.
22   A.  CMS?
23   Q.  You don't know Thomas Carroll.
24   A.  CMS is the hospital, the medical --

Page 83

1    Q.  Okay.
2    A.  -- the medical staff.
3    Q.  Okay.  Tell me what you know about CMS, then.
4    A.  Well, I know about CMS.  They been corrupt.
5  And not just for me but for a lot of inmate.  And I can
6  give you -- I can -- got a letter for a lawyer that he
7  said he didn't took my case because he was to jammed up.
8  I got a letter from him saying, Mr. Diaz, the only reason
9  why I don't take your case because I got -- my table is
10 full of lawsuit from CMS from the jail.
11   Q.  Okay.  Can you send me a copy of that?  Do you
12 still have it?
13   A.  If the law library make a copy for me, I send
14 you a copy.
15   Q.  Okay.
16   A.  Because they don't make a copy for some -- I
17 got that letter.  He say that he got so many lawsuit --
18 that that's why he never took mine.  And I wrote him back
19 again.
20   Q.  Okay.
21   A.  I wrote so many people.  I wrote the Dominican
22 consulate.  I wrote the House of Justice.  I wrote the
23 House of Justice trying to get help before anything --
24 before.the lawsuit and before anything.  I wrote a lot of

Page 84

1  people.
2    Q.  Let's go back to your complaint for a second
3  here.  Now, you said you approached Mr. Brown.  You told
4  him, hey, I'm having problems with my eyes.  They're not
5  helping me.  I want to file suit.
6    A.  Yeah.
7    Q.  Did he draft the complaint for you?
8    A.  When you say "draft," what you mean?
9    Q.  Did he write this document?  Type it?  Write
10 it?  Well, it looks like it's written.  That's the
11 complaint you have in front of you.
12   A.  Yes.
13   Q.  Okay.  He wrote this?
14   A.  Yes.
15   Q.  After he wrote it, then what?  I mean, did you
16 guys have further conversations?
17   A.  Well, when he wrote it, I took them.  I put
18 them in an envelope, check them.  I check them.  I put
19 them in an envelope.  I sent it to the law library.  They
20 make copies.
21   Q.  You said you checked it.
22       What do you mean you checked it?
23   A.  Like I remember me and my roommate going
24 through it, because I didn't -- I said, yo, listen.  Can

Page 85

1  we go through it?  Because I don't try and look crazy.
2  So me -- I remember me -- I had a roommate.  We go
3  through it.
4    Q.  So Mr. Brown, he drafted this whole document,
5  the complaint, and he gave it to you.
6    A.  Yeah.
7    Q.  And then you went to the roommate.  And the
8  two of you read it?
9    A.  Yeah.  Because we was in separate -- me and
10 Mr. Brown, we were separate.
11   Q.  Okay.  Who was your roommate?
12   A.  It was a black guy.
13   Q.  What's his name?
14   A.  I only know him by "Chevy."
15   Q.  "Chevy"?  Like the truck?
16   A.  (The witness indicated.)
17       THE REPORTER:  Was that yes?
18       THE WITNESS:  I mean, I don't know how
19 you spell "Chevy."  I just call people how they...
20 BY MR. THOMPSON:
21   Q.  So is it fair to say, then, that in the
22 initial drafting of this you didn't have any input?
23 Mr. Brown drafted it and then he gave it to you?
24   A.  All this stuff in here, this is my

Jesus Diaz

23 (Pages 86 to 89)

Page 86

1  responsibility. Mr. Brown -- all he did was write it
2  down.
3        Q.  Okay.  So did you sit there with him and
4  say -- well, let's read No. 4:  Ms. Lee Anne Dunn
5  employed by medical investigating personnel for CMS and
6  DCC.  Did you tell him that?
7        A.  Yeah.
8        Q.  Verbatim?  Word for word?
9        A.  Yeah.
10       Q.  Okay.  And you did that with every single
11  paragraph?
12       A.  Yeah.
13       Q.  Since we're on the complaint here, has anybody
14  ever told you you had degenerative loss of eyesight?
15       A.  What you mean?
16       Q.  Has anybody ever told you you have
17  degenerative loss of eyesight?  Under paragraph 2,
18  subsection C (2), you wrote in -- or Mr. Brown wrote in:
19  Unresolved.  Plaintiff in pain with degenerative loss of
20  eyesight.
21       A.  Oh, yeah, yeah.  Like -- I don't know what
22  "degenerative" -- if you want to try to break it down for
23  me.  I think what he probably was trying to say there --
24  I'm having visual problem.

Page 87

1        Q.  Okay.  So these are Mr. Brown's words, not
2  your words.
3        A.  That's my word.
4        Q.  Well, you just said you didn't know what
5  "degenerative" meant.
6        A.  If "degenerative" -- with the way you saying
7  it, to me it don't make no sense.  You see, I'm Hispanic.
8  I'm Hispanic.  If I talk -- he put it in his best word.
9  But the way me explain it to him might sound different.
10  How you feel?  What you -- oh, I got vision problems,
11  pain.  I drop out of school because of the situation with
12  me reading.  It was giving me head -- it was giving me --
13  my eyes -- my eye is -- was -- my eye start like crying.
14       Q.  Now, when you said you dropped out of school
15  because your eyes were watering and you were having
16  headaches --
17       A.  Yeah.
18       Q.  -- this was back in eighth grade?
19       A.  No.  Here.
20       Q.  Here?
21       A.  Yeah.  I was going to school here for a year.
22       Q.  Okay.  While you were in prison here you were
23  going to school.
24       A.  (The witness indicated.)

Page 88

1        Q.  Okay.  Are you telling me -- and I'm not
2  trying to put words in your mouth.  But, to you,
3  "degenerative" means you're having pain in your eyes?  Am
4  I understanding that correctly?
5        A.  I was having vision problem.  I was having
6  pain on my eye.  My eye was getting bloated.  However he
7  interpret in his best interpretation, that's probably
8  what it mean.
9        Q.  Okay.  So, then, this statement --
10  "degenerative loss of eyesight" -- is Mr. Brown's
11  interpretation of what you've told him?
12       A.  Because he not going to write the same way I
13  said it.  Because the same way I said, it might look --
14  you know, maybe you don't understand.
15       Q.  Okay.
16       A.  My English not -- he don't speak Spanish.
17       Q.  Okay.
18       A.  My English -- it's like me talking to you.  If
19  I ask you to write me a letter, you going to have to
20  probably listen to me like five time before it make
21  sense.
22       Q.  Okay.  On page 6 of the complaint, you -- it's
23  the second paragraph.  And it states:  Plaintiff claims
24  CMS did knowingly, willingly and intentionally refused

Page 89

1  and delayed giving plaintiff adequate medical care to his
2  eyes thereby creating irreparable damage to the
3  plaintiff's eyes, causing loss of sight in both eyes.
4        A.  Yeah.
5        Q.  Has anybody told you you have loss of sight?
6        A.  I know myself.
7        Q.  Okay.  Has anybody told you that?
8        A.  No.  Because nobody know what -- how I see.
9        Q.  Okay.  You're wearing glasses right now;
10  correct?
11       A.  Yeah.
12       Q.  Who prescribed those glasses to you?
13       A.  The hospital.
14       Q.  Here in the prison?
15       A.  Yeah.
16       Q.  Okay.  When was that done?
17       A.  Like I said earlier, when she ask me, I got it
18  when the guy -- when the doctor -- the only way I can go
19  is by who made the prescription that I got to wear them
20  glasses.  And my eyeglasses, not this one.  That's the
21  only way I can go by it, because he got the date.  I got
22  his name and the date when he say Mr. Diaz allowed to
23  wear sunglasses if I need it.
24       Q.  Okay.  When you say the hospital here in the

Jesus Diaz

24 (Pages 90 to 93)

Page 90

1  prison, are you referring to the --
2      A. I saw -- I see the eye doctor that time.
3      Q. Okay. And they prescribed the glasses for
4  you?
5      A. He did it.
6      Q. Okay. In 2007? Is that when they prescribed
7  them? Is that correct?
8      A. It's between the -6 and -7.
9      Q. 2006 or 2007?
10     A. They -- see, they only start trying to do
11 something about me, I said, after the lawsuit was
12 submitted. That was the only way I --
13     Q. Well, actually, let's transition for a second.
14         It looks like you filed this lawsuit
15 on -- and I'm just reading the date on the front that was
16 stamped by the court. It looks like September 5th of
17 2006. Does that sound correct?
18     A. Yeah. Probably. If that's what it say, yeah.
19     Q. Now, you just testified a little bit ago that
20 you saw a doctor for your eyes in April of 2006.
21     A. Yeah.
22     Q. And then you had surgery on your eyes in
23 October of 2006.
24     A. No.

Page 91

1      Q. Or you had some procedure done on your eye?
2      A. Yeah. I had some -- supposed to have some --
3  I went for the procedure on 10/3/06.
4      Q. Okay.
5      A. The surgery never take place. I don't know
6  why.
7      Q. But the doctor that you saw outside of the
8  facility, you said he scrubbed your eye.
9      A. Yeah. That's what he explain to me. He said
10 we're going to give you a surgery to make sure that it
11 will never come back. But to be honest with you, the
12 scrubbing that he was giving me was the cheap way. It
13 was the cheap -- the low -- that's what they were trying
14 to do. And I went along with it. I said this is
15 probably going to be painful. This is probably going to
16 be bad. They going to give me medication. The
17 medicine -- I going to scrub your eye. And it never --
18 it will not come back. They give me the scrubbing
19 surgery.
20         The C/O that brought me here for the
21 hospital supposed to call the hospital here and say we
22 got this man here that need Percocet. Okay. The
23 hospital got Percocet. But they have nothing for me.
24     Q. So --

Page 92

1      A. The next day and the next day too. Then the
2  third day they give me regular Tylenol.
3      Q. Okay. So you did get Tylenol?
4      A. On the third day of my operation.
5      Q. And I think you said that you went back to
6  this doctor on October 4th --
7      A. Yeah.
8      Q. -- of 2006.
9      A. Yeah. Going crazy. I went -- I was going
10 crazy before I went.
11     Q. And this doctor is the doctor that is outside
12 of the prison?
13     A. Yeah. The one that's supposed to do the
14 surgery.
15     Q. So if I understand you correctly, I mean, he
16 did something -- some procedure to your eye.
17     A. To be honest with you, I think that when he
18 scrub my eye, he was about to mess up my eye completely.
19     Q. Okay.
20     A. And he stopped and sent me back. And these
21 people here -- excuse me -- instead of go -- see, if I
22 had it in my hand, he would have a lawsuit too. But I
23 don't have it. I'm by myself. He is a powerful man. I
24 need a strong lawyer to go behind him so he can explain

Page 93

1  to the court why I still got that on my eye. Why -- see,
2  you never been through that like me, never. Get my eye
3  scrub? You don't want to go through that. Believe me.
4      Q. Well, it sounds to me like -- just tell me if
5  you agree with this. Something was done to your eye.
6  You just don't agree with what was done. Is that fair?
7      A. To be honest with you, the only thing that was
8  done with my eye, he got me for an -- he was experiment
9  with me.
10     Q. So you don't like the treatment that you
11 received?
12     A. I still got it. There was nothing done.
13 How -- if he would remove it -- if he would have removed
14 it, then I wouldn't be sitting here with you, and my eye
15 wouldn't be -- you don't see the skin of my eye. You be
16 like, okay, you got the surgery. We might come up with
17 some understanding. The surgery never take place.
18         And another thing: Never -- I went to
19 see the institution doctor and I explain to him. Can you
20 explain to me why if I just had the surgery like 15 days
21 ago -- or a month ago or two month ago when I saw him --
22 why this thing is still over my eye? And he said, oh.
23 He don't even know what he was saying. See, every -- see
24 the thing about is they don't want to see me. They --

Jesus Diaz

25 (Pages 94 to 97)

Page 94

1   because they know...
2       Q.   So let me go back to the question I asked you.
3   Okay?
4       A.   (The witness indicated.)
5       Q.   It sounds to me like you don't like the
6   treatment you received.  Is that correct?
7       A.   Yeah.
8       Q.   Has anybody told you that your loss of sight
9   in your eyes is caused by any care you received in the
10  prison?
11      A.   No.
12      Q.   Okay.  Has anybody told you that your loss of
13  eyesight is the result of care that you didn't receive or
14  should have received while you were in the prison?
15      A.   They don't say nothing to me.  They don't tell
16  me nothing.
17      Q.   And actually, while I have this, I think I'm
18  going to give you a copy.  This is the copy of the answer
19  of CMS to your complaint.  I think there were some
20  filings that you made that you hadn't received a copy of
21  that for one reason or another.
22      A.   Yeah.  They never -- oh, that -- this is the
23  one.
24      Q.   That's the answer.  So I'm giving you a copy

Page 95

1   of that now.  Okay?  So if you didn't get the other two
2   that I sent to you, at least now I know you have a copy
3   of it.
4       A.   When you send me this?
5       Q.   Actually, I just handed that one to you.  But
6   I sent it back on August 31st, I believe.
7       A.   Oh, this is the one that I supposed to receive
8   back then?
9       Q.   Correct.
10      A.   You suppose to give it to me here?  I mean, if
11  I don't want to take it is because --
12      Q.   Well, you can refuse it if you want to refuse
13  it.  You can do whatever you want with it.
14      A.   Me, I be arguing about I never received that.
15      Q.   Okay.
16      A.   It might have got lost in the mail.  It may
17  be -- and they got proof of that.  See, they -- this --
18  my building got proof of that.  Every time I got legal
19  mail I got to sign a sheet.
20      Q.   Okay.  Well, I'm just giving you a copy of it.
21  Okay?
22      A.   (The witness indicated.)
23      Q.   Have you appealed any grievances?
24      A.   No.

Page 96

1       Q.   And that's true through your whole duration
2   here in the prison?  You've never appealed a grievance;
3   is that correct?
4       A.   No.  Yeah.
5       Q.   Now, one of the allegations you made against
6   CMS is that they have a policy or custom which shows a
7   deliberate indifference to a serious medical need.  What
8   policy or custom are you referring to?
9       A.   Can you --
10      Q.   Sure.
11      A.   -- explain that?
12      Q.   Here, I'll find the allegation for you.
13      A.   Yeah.  Maybe if you read it from there I can
14  maybe understand it better.
15      Q.   Okay.  Let's back up.  We'll go back to this
16  one.  You claim that CMS committed medical malpractice.
17      A.   Yes.
18      Q.   What is your basis for that allegation?
19      A.   Basically, my allegation was:  If CMS, right,
20  would have took responsibility when I start complaining
21  about my eye, my eye would have never get that bad.  The
22  skin would have never be that growing the way -- never
23  would be that size.
24      Q.   Okay.

Page 97

1       A.   It would have never been the size it is now if
2   they would have given me an eye drop to stop the growing
3   or something.
4       Q.   So you're saying that you never received any
5   eye drops?
6       A.   I didn't receive eye drop until April 2006.
7       Q.   Okay.
8       A.   First time I went to outside hospital.
9       Q.   Do you know who the medical provider was at
10  Delaware Correctional Center in 2003?
11      A.   Probably not.  I think, if you talking about
12  who was the doctor in charge --
13      Q.   Well, just who the medical provider was.
14      A.   I mean -- what you mean "medical provider"?
15      Q.   Who was the company that provided the medical
16  care to you in 2003?  Do you know who that was while you
17  were in the prison?
18      A.   Probably not.
19      Q.   Okay.  How about 2004?
20      A.   See, I don't know nothing about medical.  I
21  don't know nothing about that stuff.
22      Q.   Okay.  So it's fair to say that you don't know
23  who the company was that provided medical care to you at
24  any point during your stay here in DCC?

Jesus Diaz

26 (Pages 98 to 101)

Page 98

1    A.   The only thing I know is CMS is the one
2   that -- when I go through any type of problem -- I need
3   heartburn pill or I need allergy pill -- I notify CMS --
4    Q.   Okay.
5    A.   -- through a medical slip.
6    Q.   And when was the first time that you notified
7   CMS of any medical problem?
8    A.   The first time I notified CMS, it was
9   before my eye.  I was having stomach problem back then.
10   Q.   Back then?  What year?
11   A.   2003.
12   Q.   2003.
13   A.   Yeah.
14   Q.   So 2003 was the first year that you notified
15  CMS of any medical problem?
16   A.   I was new here.  That was my first year.  I
17  got arrested in 2002.  And 2003, that was my first year.
18   Q.   Did you ever take Fluoroumacil?
19   A.   Fluoroumacil?
20   Q.   Does that sound familiar to you?
21   A.   No.
22   Q.   No.  Okay.
23   A.   I don't take medication that I don't know.
24   Q.   How about Patanol?

Page 99

1    A.   What is that:  A painkiller?
2    Q.   I'm not sure.  I'll show you.
3    A.   That's my medical record?  Because those don't
4   sound familiar to me.
5    Q.   Patanol doesn't sound familiar?
6    A.   They don't sound familiar.
7    Q.   When was the first time that you said that you
8   put something into your eyes?
9    A.   The first time I start using medical eye drop,
10  it was April.  I don't know the date.
11   Q.   April of 2006?
12   A.   -6.  Because I remember it was classification.
13  And I went out that day.  The first time I use eye drop
14  for my eye was April of 2006.
15   Q.   When was the last time that you had any
16  treatment at all for your eyes, the last date?
17   A.   To be honest with you, I don't remember.  They
18  just -- sometime they just go ahead and drop the -- just
19  throw the eye drop in my cell.  And I pick it up.  And I
20  don't even know who dropped it.
21   Q.   Well, when was the last time you had received
22  eye drops?
23   A.   There's only one.  So I would say maybe like a
24  month ago.

Page 100

1    Q.   Okay.
2    A.   Maybe a month and a half ago there was eye
3   drop in my cell.
4    Q.   And that's something that you would administer
5   yourself?
6    A.   Yeah.  When my eye get like real dry,
7   irritated.
8    Q.   Okay.  And I think you testified earlier you
9   also have sunglasses that were prescribed for you.
10   A.   They wasn't prescribed.  When I had my
11  surgery, that was the glasses that I was supposed to use
12  for the sun --
13   Q.   Okay.
14   A.   -- for the light.
15   Q.   Who gave them to you?
16   A.   The surgery outside.
17   Q.   Okay.
18   A.   They prescribe them to me because they know my
19  name.  I got prescription for it.  But I took -- I take
20  maybe 10 day, 20 day -- the pain go away.  I'm good.
21  When I take the bandage out and all that stuff, I was
22  still needing glasses.
23   Q.   Okay.  Now, you testified earlier that you
24  don't agree with what CMS has done regarding your

Page 101

1   treatment; correct?
2    A.   Yeah.  I do not agree with that.
3    Q.   What do you think they should have done?
4    A.   I think they -- when I put my first medical
5   slip, right, I would expect at least somebody to see me.
6   And if not somebody see me, see the eye doctor.  And then
7   when I see the eye doctor, okay, we're going to give you
8   this eyedrop.
9    Q.   Okay.
10   A.   I never -- for 2003 when I start putting my
11  first complaint, I never seen an eye doctor until when I
12  went outside April of 2006.  And they suppose to have
13  it -- I don't know if they have an eye doctor in here.
14  But after my surgery there was an eye doctor here.  And I
15  never saw him.
16   Q.   Do you know what pterygium is?  Have you ever
17  heard that word?
18   A.   Oh, no.  I mean, if I know the word, I might
19  be able to answer.
20   Q.   Do you know what xerophthalmia is?
21   A.   No.
22   Q.   You've never heard that term before?
23   A.   Xerophthalmia?
24   Q.   Correct.

Page 102

1    I'm going to show you -- and we'll mark
2  this as an exhibit here.
3          (Diaz Deposition Exhibit No. 4 was
4  marked for identification.)
5  BY MR. THOMPSON:
6      Q.  Is that your signature?
7      A.  Yes.
8      Q.  Okay.  And what is this form?
9      A.  This is medical slip.
10     Q.  Okay.  And that's your signature?
11     A.  Yes.
12     Q.  And is that the word "xerophthalmia"?
13     A.  Yes.  But I can explain that -- the medical
14  slip.  See, this medical slip -- if you see right here,
15  it was put in by a fellow inmate in another cell that he
16  was reading book.  He was going through book trying to
17  find out what was going on with me.  And if you see right
18  here, he put his cell number.
19     Q.  You're pointing to a D --
20     A.  Yeah.
21     Q.  -- 02.
22     A.  That's -- that was my fellow man, a
23  Puerto Rican dude, Michael Rojas.  I think he still in
24  the institution.  I don't know where.  Michael Rojas, he

Page 103

1  reading book.  And he said I think I know what's wrong
2  with you.  And he filled out this medical slip for me.  I
3  sign it.  But he said don't worry about it.  Now we going
4  to let them know what kind of problem you got, and then
5  maybe they can get on top of it.
6      Q.  Okay.  So a fellow inmate told you you had
7  xerophthalmia, but no doctor ever told you that.
8      A.  No doctor, yeah.
9      Q.  Okay.
10     A.  That's what he was saying, you know.  That was
11  probably his -- he was reading book, and he saw an eye
12  with the skin growing.  And he probably say, okay, that's
13  what he got.  That's what we wrote -- that's what we put
14  in.
15     Q.  Now, you testified earlier that you think you
16  need surgery.  Did that same inmate tell you that he
17  thinks you need surgery?
18     A.  No.  I know I need surgery because -- like I
19  said earlier, I don't -- I got ten year to do.  I got
20  five more.  I be done five year in December.  I got five
21  more.  I don't know what going to happen.
22     Q.  But did any doctor tell you you need surgery?
23     A.  I haven't seen no doctor since then.
24     Q.  Well, you saw the doctor outside, correct, the

Page 104

1  one that did the scrubbing on your eye?
2      A.  Yeah.  I saw him.  And then the next day I saw
3  him.  But my eye was so red, he take the bandage out.
4  The bandage -- he saw me.  I was in so much pain.  I'm
5  just like, "Can I get some painkiller?"  No.  We don't --
6  that's the institution.  They got to deal with your
7  painkiller.  And why I know I need the surgery?  Because
8  it's obvious.  It's right there.
9      Q.  So you believe you need surgery?
10     A.  Yeah.  I need surgery.
11     Q.  And this is based upon your belief?
12     A.  It's not my belief.  It's what is on my eye.
13     Q.  Okay.  But nobody has ever told you that.
14     A.  Yeah.  Of course.
15     Q.  Okay.
16     A.  You're not going --
17     Q.  Have you ever asked anybody --
18     A.  About?
19     Q.  -- if you need surgery?
20     A.  If I ask him or her I need surgery, what's --
21  what you think?  You think I need surgery?
22     Q.  Have you asked any doctors if you need
23  surgery?
24     A.  I don't see the doctor.

Page 105

1      Q.  You've never seen the doctor inside the prison
2  the whole time you've been here?
3      A.  Like I told you, I saw the doctor -- I'm going
4  to see if I can get a copy of the prescription that he
5  gave me.  And from that day I can know what was the last
6  time I see the doctor.  And he just said to me -- they
7  got a way to -- the skin is not going further on my eye.
8  That's the only way they going to give me surgery again.
9  And I don't know how long I'm going to have to wait.
10     Q.  Oh, okay.  So they told you if it gets
11  worse --
12     A.  That's the only way --
13     Q.  -- they will do surgery?
14     A.  That's the only way they going to give me
15  surgery.
16     Q.  All right.
17     A.  They trying to say I got to be blind.  I got
18  to be blind to get surgery.
19     Q.  So that's what the doctor told you?  You have
20  to be blind before they give you surgery?
21     A.  Basically, yeah.
22     Q.  Well, basically is either yes or no.  They did
23  or didn't.
24     A.  Basically, yeah.  Because why they don't still

Jesus Diaz

28 (Pages 106 to 109)

Page 106

1  correct the problem? Why I got to do time -- why I do
2  this time here and all they want to do is give me the
3  little free shower -- the little free food they give me
4  here? That's it? That's not enough. Hey, I'm doing
5  time here. Somebody got to take responsibility for me
6  here. I know I did what I did, but that's why they got
7  jail -- to pay for my -- for the crime that I did. So
8  who responsible for me here?
9      Q.  Okay. Did you testify earlier that you're a
10  preacher?
11     A.  No.
12     Q.  Did I understand you correctly?
13     A.  I'm believing in Christianity.
14     Q.  Okay.
15     A.  So I respect all religion. But we might
16  not -- we don't talk about it because we not going to go
17  nowhere.
18     Q.  Okay. So maybe I just misheard you, then.
19         So you don't --
20     A.  No, I am not.
21     Q.  -- teach any religious classes or anything
22  like that in prison.
23     A.  Like if I see a brother and I feel I talk
24  about Christ, I talk about Christ with him.

Page 107

1      Q.  Okay. You testified earlier that you had a
2  roommate for approximately nine months, and then now you
3  have your current roommate who you've had for about a
4  month.
5      A.  Yeah.
6      Q.  And were you moved?
7      A.  No. He -- my first roommate got moved, the
8  one that was Muslim. He got moved. He got classified
9  from here to here. They got more freedom over here.
10     Q.  Oh, okay.
11     A.  This is the compound. They keep you here
12  for -- if you get a write-up, they move you from here to
13  where I'm at in 22.
14     Q.  Oh, okay.
15     A.  And then after you pay -- when they feel that
16  you can come back out to society, to the population,
17  whatever --
18     Q.  Okay. Have you ever been written up since
19  you've been in prison?
20     A.  Yeah. A couple of time.
21     Q.  For what?
22     A.  Tobacco.
23     Q.  And tobacco is prohibited here. Correct? Is
24  that right?

Page 108

1      A.  I mean -- yeah. I think so.
2      Q.  You said tobacco.
3          Anything else?
4      A.  Allergy pill. Probably disobeying order.
5      Q.  Allergy pill? Why did you get written up for
6  allergy pills?
7      A.  Okay, now -- in that time when I got write up
8  for my allergy pill, that's why I'm over here now.
9      Q.  Okay.
10     A.  I'm in 22 now. I was waiting for my allergy
11  pill. So I got some allergy pill from a friend of mine,
12  because my sinus -- when I went through my surgery, they
13  put tube through my nose. So I don't know how but I was
14  sleeping. So I know they messed up like my sinus. So
15  when the C/O came on the tier, he found the pill without
16  being prescribed.
17     Q.  Okay.
18     A.  Well, I was waiting for my prescription to
19  clear up.
20     Q.  Now, you testified earlier that there were a
21  lot of nurses who had been fired.
22     A.  Not treated me. They just came and see me.
23  Because you got a medical slip in, they call you. Hey,
24  what's your problem? Okay. My problem is I been

Page 109

1  complaining about my eyes for such amount of time, and I
2  don't know what's going on. Can I be seen for -- by
3  somebody? And they just like, okay, I going to let them
4  know, because the nurse -- the nurse just a nurse. She
5  don't got no power. All she can do is tell the doctor.
6      See, when the nurse come and see you,
7  she got to tell the doctor. That's what I think. She
8  got to tell the doctor your situation. And the doctor
9  make a decision. So I don't know what was going on
10  between nurses and doctor, because the nurse -- they got
11  to see a lot of people. So probably there was a lot of
12  misunderstanding.
13     Q.  Well, earlier when you were asked questions,
14  you testified that there were a lot of nurses who had
15  been fired.
16     A.  Yeah. A lot of nurses and male nurse that I
17  seen. They be gone.
18     Q.  How do you know they were fired and they
19  didn't just quit or get another job and leave?
20     A.  I think it -- I think somebody got fired,
21  because I ask. And people tell me, no, he got -- okay.
22  There was this time there was this Asian-looking dude,
23  like Chinese or whatever, he come and see me like three
24  time -- different occasion. And every time he come, he

Jesus Diaz

Page 110

1  told me the same thing. Like, oh, your eye is not too
2  bad. When it start growing toward your brown spot,
3  that's when they going to try to remove it. So he was
4  telling me the same thing. So I put a medical slip in.
5  And somebody happen to see me. And I ask them. They
6  say, oh, he gone. He not working here no more.
7      Q.  Okay.
8      A.  He got fired.
9      Q.  You don't remember his name?
10     A.  The doctor? Well, I remember his face.
11     Q.  This Asian gentleman.
12     A.  They got it. I remember his face. I know. I
13  know how he look like.
14     Q.  Do you know what year this was?
15     A.  I going to say between -- probably 2004.
16     Q.  Okay.
17     A.  Because, as I explain to you, when I put my
18  first medical slip, I was over here on the compound.
19  They call it compound. For the write-up for the tobacco,
20  they move me back over here. They put me a little far
21  away from the compound. So me being here -- they got to
22  come and see me from here. So now when I put my first
23  medical slip, I was here. When they were coming to see
24  me, I was back there.

Page 111

1      Q.  Okay. Now, you said there were a lot of
2  people fired, and this is one person. We don't have to
3  go through all of them. Do you know how many?
4      A.  To be honest with you, there was this -- there
5  was the -- in my complaint, this female, she was supposed
6  to be a doctor. And for some reason she got fired.
7  She -- I don't think her name is on there, but she wrote
8  that. And she was -- I remember that was the first time
9  I saw a doctor. Not eye doctor, but a doctor like, okay,
10  I'm representing the institution. I'm representing the
11  institution. She came and see me. And she told me that
12  I was about to be seen, that everything going to be all
13  right. Don't worry about it. Everything going to be
14  taken care of. And then after a while, she gone.
15     Q.  Now, you were just referring to --
16     A.  The handwriting.
17     Q.  Which one?
18     A.  Right there.
19     Q.  Okay. This looks like an informal resolution
20  dated September 14th of 2005.
21     A.  Yeah.
22     Q.  Okay. That's attached to your complaint?
23     A.  Yeah.
24     Q.  And so you're saying that's the first date you

Page 112

1  ever saw a doctor was September 14 of 2005?
2      A.  Yeah. But not an eye doctor. It was like --
3  when I got removed from here, I was seeing more the
4  nurses -- female and male nurses over here. She came.
5  And she was the one who told me that everything going to
6  be all right. That's why never no note and no doctor
7  wrote on my complaint. But she wrote here.
8      Q.  Okay.
9      A.  She wrote. She was supposed to be somebody
10  higher.
11     Q.  But that September 2005 is the first time you
12  ever saw a doctor while you were at Delaware Correctional
13  Center?
14     A.  Yeah. Well, not an eye doctor.
15     Q.  Okay. But any doctor at all?
16     A.  Yeah.
17     Q.  Now, this is Exhibit 3 which you were asked
18  about earlier. In the medical grievance form, which is
19  the second page of Exhibit 3, you said that somebody else
20  wrote that.
21     A.  Yeah.
22     Q.  Who wrote that?
23     A.  I don't know that name. I remember him. He's
24  somewhere out here in the institution. I know he got a

Page 113

1  lot of time.
2      Q.  Is --
3      A.  See, that was just people trying to help me.
4  Like the other medical slip that I told you about, the
5  guy said that I had -- whatever he said that I had -- he
6  was just trying to help me. And I got proof, because he
7  put his cell number on it.
8      Q.  Okay. You're talking about the form that we
9  referred to earlier --
10     A.  Yeah.
11     Q.  -- that said D-02.
12     A.  That person right here, he was just trying to
13  help me. I remember he wrote a letter to the House of
14  Justices. We -- he was the one that handwrite to the
15  lawyer that I told you that I got -- the lawyer that
16  wrote me back.
17     Q.  Okay. So he wrote this medical grievance
18  form, and then you signed it.
19     A.  Yeah.
20     Q.  Okay. Did you read it before you signed it?
21     A.  Yeah. But it been a while.
22     Q.  Okay. Any of these people that have helped
23  you out, are any of them -- you refer to them as
24  jailhouse lawyers?

Jesus Diaz

30 (Pages 114 to 117)

Page 114

1    A. No.
2    Q. No. Okay.
3    A. Jailhouse lawyer?
4    Q. You never heard that term before?
5    A. No.
6        MR. THOMPSON: Okay. I think those are
7    all the questions I have. Thank you.
8        MS. XARHOULAKOS: I think we're
9    finished, then.
10       THE WITNESS: Hey, can I make a
11   statement real quick?
12       MS. XARHOULAKOS: Yes. Go ahead.
13       THE WITNESS: Okay. My statement is:
14   You know where we are right now; right?
15       If the institution would have took
16   responsibility for me being in jail -- if they would have
17   took and say, okay, we going to take -- we would have
18   never been here. We would have never been here.
19       They let a little thing about this big
20   get the big as it is now. And I'm not going to go, you
21   know what I mean, preaching or whatever. But -- and,
22   then, when I went to outside hospital -- this is the
23   thing that got me mad. I'm going to outside hospital for
24   operation. I come back here. I got my eye -- they put a

Page 115

1    notation in for my -- how can I sleep? I come back here.
2    They don't got painkiller. I go through the night with
3    no painkiller. The next day they don't got painkiller
4    for me.
5        Okay. Now, the third day -- okay. The
6    second day they take me to the outside hospital. The
7    outside hospital call here. The dude that did the
8    surgery, they call here and say: Can you give that man
9    medication? Can you give that man -- oh, we don't got
10   the medication, the one he's supposed to get. I was
11   supposed to get Tylenol 3 for Percocet. That day go by.
12       The third day they give me regular
13   Tylenol. And it's like -- it's obvious. Why -- you
14   know, why go through so much pain? Why going through so
15   much problem just to take care of a little thing? Why
16   would you just never -- why you just never say, okay,
17   we're going to give you the surgery? Why they never give
18   me the surgery? From 2003 all the way down to the
19   lawsuit, that's when everything start taking place,
20   basically.
21       So I don't know where they want to go in
22   this case. If they want to go to trial --
23       (The deposition was interrupted.)
24       THE WITNESS: That's when they start

Page 116

1    trying to do something about it. And it's still nothing
2    being done. Until today nothing been done.
3        Now the thing -- the problem went from
4    my left eye to my right eye. I don't remember when the
5    last time I seen the eye doctor. And it's like, I'm
6    here. They get money from me from federal whatever,
7    because they get some type of money to deal with me here.
8    But it's like I'm not here. I'm here but I'm not. I'm
9    here to do count, to be in my cell or my room. But for
10   medical and for what I need, I'm not here. So what am I
11   going to do? Wait until 2013 until my time is over?
12   Okay. You're free to go. That's it. I don't know
13   understand that.
14       Well, whatever decision they want to do,
15   they -- whatever happen in the end, whatever the judge
16   do, because he judge, I'm okay with it. I'm just
17   trying to prove a point. I'm just trying to see -- make
18   them see that you're not going to use -- you're not going
19   to get people need treatment and treat them the way they
20   been treating me here. And not just me.
21       MS. XARHOULAKOS: Okay. Mr. Diaz, if
22   you've completed your statement, we can go off the
23   record, and I'll talk to you about procedure. Are you
24   finished?

Page 117

1        THE WITNESS: Yes.
2        MS. XARHOULAKOS: Okay. We're off the
3    record.
4        - - - - -
5        MR. THOMPSON: I have another question.
6    BY MR. THOMPSON:
7    Q. Does my name sound familiar to you?
8    A. Yeah.
9    Q. How?
10   A. Every time I write -- I send a copy -- I got
11   to --
12   Q. Okay.
13   A. You seen how I write.
14   Q. Do you recall the motion that you filed
15   against CMS?
16   A. Yeah.
17   Q. The motion for default?
18   A. Oh, like when they didn't answer my --
19   Q. Right.
20   A. -- when you all didn't answer?
21       Yeah.
22   Q. Right.
23       And the motion for sanctions?
24   A. Yeah.

Jesus Diaz

31 (Pages 118 to 121)

Page 118

1    Q.  You filed that?  Did you draft that motion?
2    A.  What you mean draft it?
3    Q.  Did you write that motion or did somebody else
4  write it for you?
5    A.  Somebody wrote it for me.
6    Q.  Okay.  And you read it?
7    A.  Yeah.
8    Q.  And you signed it?
9    A.  Yeah.
10    Q.  And filed it with the court?
11    A.  Yeah.
12        MR. THOMPSON:  Okay.  That's all I have.
13  Thank you.
14        (The deposition concluded at 3:45 p.m.
15  this same day.)
16        - - - - -
17
18
19
20
21
22
23
24

Page 119

1
2            INDEX TO TESTIMONY
3   JESUS DIAZ                    PAGE
4     Examination by Ms. Xarhoulakos      2
5     Examination by Mr. Thompson        81
6
7        - - - - -
8
9            INDEX TO EXHIBITS
10   DIAZ DEPOSITION EXHIBIT NO.      PAGE
11   1  Grievance Report dated 12/05/2005    23
12   2  Grievance Report dated 8/18/2006     29
13   3  Grievance Report dated 11/06/2006    34
14   4  Delaware Department of Corrections   102
        Request for Medical/Dental Sick Call
        Services dated 12/5/05
15
16
17        - - - - -
18
19
20
21
22
23
24

Page 120

1
2
3
4
5
6
7
8        REPLACE THIS PAGE
9
10       WITH THE ERRATA SHEET
11
12       AFTER IT HAS BEEN
13
14       COMPLETED AND SIGNED
15
16       BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 121

1            C E R T I F I C A T E
2   STATE OF DELAWARE:
                    :
3   NEW CASTLE COUNTY:
4        I, Robert Wayne Wilcox, Jr., a Registered
5   Professional Reporter and Notary Public, within and for
6   the County and State aforesaid, do hereby certify that
7   the foregoing deposition of JESUS DIAZ, was taken before
8   me, pursuant to notice, at the time and place indicated;
9   that said deponent was by me duly sworn to tell the
10  truth, the whole truth, and nothing but the truth; that
11  the testimony of said deponent was correctly recorded in
12  machine shorthand by me and thereafter transcribed under
13  my supervision with computer-aided transcription; that
14  the deposition is a true record of the testimony given by
15  the witness; and that I am neither of counsel nor kin to
16  any party in said action, nor interested in the outcome
17  thereof.
18        WITNESS my hand and official seal this 26th day
19  of November A.D. 2007.
20
21
22  _____
    ROBERT WAYNE WILCOX, JR.
    REGISTERED PROFESSIONAL REPORTER
    CERTIFICATION NO. 101-RPR
23  (Expires January 31, 2008)
24

Jesus Diaz

**A**

**ability** 6:4
**able** 21:5 36:2
  74:10 101:19
**Absolutely** 3:14
**accurate** 32:1,2
**action** 121:16
**add** 6:16
**address** 5:16
**adequate** 63:5,6
  89:1
**administer**
  100:4
**admit** 61:23
**affiliated** 1:23
**aforesaid** 121:6
**ago** 13:18,19
  14:17 15:13,13
  73:1 90:19
  93:21,21,21
  99:24 100:2
**agree** 93:5,6
  100:24 101:2
**agreement** 78:4
**ahead** 24:2,22
  27:2 29:11,23
  64:16 79:16
  99:18 114:12
**ain't** 14:10 67:12
  75:14,16,16,17
**alcohol** 48:2
**alive** 10:20,22
**allegation** 63:15
  68:6,17 79:21
  96:12,18,19
**allegations**
  72:10 96:5
**alleging** 66:8
  71:1
**allergy** 6:2 55:18
  98:3 108:4,5,6
  108:8,10,11
**alleviate** 60:8
**allow** 53:18
**allowed** 70:13
  89:22

**Amendment**
  63:5 68:14
**amount** 74:18
  74:20 109:1
**angry** 14:20,21
**Anne** 1:7 86:4
**answer** 3:24
  4:14 6:4 15:14
  16:4,24 17:2,4
  69:13 94:18,24
  101:19 117:18
  117:20
**answered** 15:17
  22:21
**answers** 2:22
  17:3 52:14
**anybody** 65:10
  86:13,16 89:5
  89:7 94:8,12
  104:17
**anymore** 27:24
  66:24
**anytime** 3:5
**anyways** 7:12
**appeal** 34:7,8,14
  34:17
**appealed** 95:23
  96:2
**APPEARANC...**
  1:13 2:1
**appointment**
  51:17 55:10,10
  55:11,11 56:1
**appointments**
  73:18
**appreciate** 3:12
**approach** 82:4
**approached**
  40:17,18 84:3
**approximately**
  107:2
**April** 32:6 33:8
  50:11,12,13
  54:3,19,22
  90:20 97:6
  99:10,11,14

  101:12
**arguing** 95:14
**arrest** 75:7,9
  78:15 79:8,12
**arrested** 15:6
  75:15,15 77:14
  98:17
**Asian** 110:11
**Asian-looking**
  109:22
**aside** 28:24
**asked** 3:19 16:17
  41:2 45:21
  57:3 67:3,4,6,6
  94:2 104:17,22
  109:13 112:17
**asking** 18:23
  19:10,18 21:12
  21:13 63:13
  65:14 82:14
**asks** 3:5
**asleep** 49:14
**assault** 77:9
**assuming** 67:1,3
**assumption** 64:1
**Atallian** 1:8 2:4
  2:16 38:16
  40:3,12,21
  41:9,21 42:15
  54:21
**attached** 36:9
  42:3 111:22
**August** 34:15
  95:6
**A.D** 121:19

  **B**

**back** 9:20 10:7
  13:1 14:19,19
  15:4 16:15,15
  24:22 28:20
  31:6,7 36:14
  37:6,17 39:10
  39:13,13 40:7
  41:17 49:6,17
  49:19 50:24

**51**:4 53:13,20
  55:17,19 56:20
  56:22 61:4
  70:7,8,8 73:7
  73:12,14,22
  74:8,12 75:24
  83:18 84:2
  87:18 91:11,18
  92:5,20 94:2
  95:6,8 96:15
  96:15 98:9,10
  107:16 110:20
  110:24 113:16
  114:24 115:1
**background**
  66:3,10,12,18
  67:15 68:4,9
  68:21
**backgrounds**
  66:9
**bad** 74:1 91:16
  96:21 110:2
**bag** 79:8
**bags** 79:10
**bail** 76:12,14,17
**bandage** 100:21
  104:3,4
**based** 104:11
**basically** 12:9
  18:8,10 26:8
  39:23 72:8
  74:24 76:10
  79:18 96:19
  105:21,22,24
  115:20
**basis** 63:9,14
  66:8,18 96:18
**baskets** 69:19
**beginning** 1:11
  4:3 8:22 25:24
  53:10
**behalf** 44:16
**behave** 14:7,7
**belief** 104:11,12
**believe** 6:3 7:22
  20:19,21 22:6

**67**:10 70:3
  71:14 72:21
  75:13 93:3
  95:6 104:9
**believing** 106:13
**best** 78:1 87:8
  88:7
**better** 7:14 49:2
  49:5,5 59:20
  96:14
**big** 57:14 58:5
  114:19,20
**bigger** 74:17
**birth** 9:8,11
**bit** 3:13 7:14
  24:3 38:9
  39:15 43:23
  44:4 45:4 49:2
  61:4 90:19
**black** 14:13
  57:16 85:12
**blind** 18:14
  105:17,18,20
**bloated** 88:6
**blurs** 58:21
**board** 22:9,10
  22:16
**book** 102:16,16
  103:1,11
**Boom** 76:24
**born** 9:6,15
**bother** 56:21
  59:15
**bothering** 48:16
  48:19,21 57:24
**bottom** 25:8
  31:17,20 33:16
  34:11
**box** 24:11
**break** 86:22
**broke** 48:3
**brother** 106:23
**brothers** 10:13
  10:16
**brought** 15:10
  27:24 91:20

Jesus Diaz

Page 2

| | | | | |
|---|---|---|---|---|
| **brown** 8:15,15 | 94:13 97:16,23 | 78:7,8,9 80:3 | **clinic** 47:11 | **complaining** |
| 8:18 58:7 | 111:14 115:15 | 97:12 | **close** 43:22 | 15:19 22:20 |
| 62:17 81:24 | **Carroll** 1:6 2:4 | **charged** 76:8 | **closer** 53:11 | 24:6 30:4 |
| 84:3 85:4,10 | 2:16 17:8 18:1 | **charges** 77:3,19 | **cloud** 6:3 | 40:14 62:22 |
| 85:23 86:1,18 | 19:8,15,19,23 | 78:22 | **CMS** 1:6 2:7 | 64:3 96:20 |
| 110:2 | 62:24 65:15 | **cheap** 91:12,13 | 82:21,22,24 | 109:1 |
| **Brown's** 87:1 | 66:1,9 67:15 | **check** 51:13 65:6 | 83:3,4,10 86:5 | **complaint** 8:7 |
| 88:10 | 68:4,9,21 | 65:7 66:12,18 | 88:24 94:19 | 61:23 62:1,2 |
| **building** 16:16 | 82:23 | 67:15 68:22 | 96:6,16,19 | 62:11 68:3,8 |
| 39:7,8,20 40:4 | **case** 2:15 4:9 | 79:17 80:7,7,9 | 98:1,3,7,8,15 | 69:4 81:23 |
| 40:9 49:8 | 6:20 8:7 70:18 | 84:18,18 | 100:24 117:15 | 82:2 84:2,7,11 |
| 53:14 95:18 | 71:6,9 83:7,9 | **checked** 84:21 | **cocaine** 79:9,10 | 85:5 86:13 |
| **buildings** 45:10 | 115:22 | 84:22 | **cold** 45:16 | 88:22 94:19 |
| **bulbs** 60:19 | **CASTLE** 121:3 | **checks** 66:3 68:5 | **COLEMAN** 2:6 | 101:11 111:5 |
| **bunch** 16:5 | **cataracts** 30:5,6 | 68:9 | **column** 37:22 | 111:22 112:7 |
| 18:23 | **caught** 44:19,20 | **Chevy** 85:14,15 | **come** 16:16 21:8 | **completed** 4:16 |
| **busted** 75:16 | 76:20,20 | 85:19 | 21:9,11 39:13 | 11:7 116:22 |
| **buying** 75:20 | **cause** 58:9 | **Chinese** 109:23 | 43:11 49:6,19 | 120:14 |
| | **caused** 56:12 | **choice** 79:16 | 54:6 55:12,21 | **completely** |
| —— **C** —— | 57:12 66:4 | **Christ** 106:24,24 | 56:1 59:3,4 | 92:18 |
| **C** 86:18 121:1,1 | 94:9 | **Christian** 14:1 | 60:11 64:17,18 | **complied** 24:24 |
| **call** 8:13 24:10 | **causing** 66:6 | **Christianity** | 65:5 67:17,21 | 26:14 29:13 |
| 30:4 33:24 | 68:12 89:3 | 106:13 | 67:22 72:18,19 | 31:8 33:15 |
| 51:10,18,18 | **Cecil** 8:13,14,15 | **Cindy** 1:8 2:4,16 | 73:14,22 76:11 | 37:18 62:5 |
| 52:20,22 54:8 | 8:15 62:17 | 38:16 | 76:12 78:17,17 | **compound** 14:18 |
| 66:5 69:6,23 | 81:24 | **CIR** 36:6 | 79:22 91:11,18 | 16:17 39:12 |
| 71:8 85:19 | **cell** 13:17 14:7,7 | **city** 80:12,14 | 93:16 107:16 | 40:8 60:12 |
| 91:21 108:23 | 14:22 70:23 | **civil** 8:3 | 109:6,23,24 | 107:11 110:18 |
| 110:19 115:7,8 | 99:19 100:3 | **claim** 96:16 | 110:22 114:24 | 110:19,21 |
| 119:14 | 102:15,18 | **claims** 62:24 | 115:1 | **computer-aided** |
| **called** 2:22 | 113:7 116:9 | 63:2 66:1 | **comfortable** 3:7 | 121:13 |
| 51:16,17 | **cellie** 13:15,16 | 88:23 | **coming** 18:16 | **concerned** 41:4 |
| **capacity** 63:2 | **cellies** 14:8 | **clarify** 27:17 | 45:13 73:11 | **concluded** |
| **Capone** 77:21 | **cellmate** 13:8,21 | 76:19 | 110:23 | 118:14 |
| 77:22 | 14:2,2,15 | **classes** 106:21 | **comment** 67:18 | **condition** 74:1 |
| **car** 64:17 75:13 | **Center** 1:11,15 | **classification** | **comments** 68:1 | **confused** 82:19 |
| 76:2,4 | 15:3 97:10 | 54:20,22 99:12 | **committed** | **connection** 68:2 |
| **card** 75:20 | 112:13 | **classified** 40:9 | 96:16 | **constantly** 63:3 |
| **care** 18:12,19 | **certain** 60:3 | 107:8 | **common** 14:3,11 | **constitution** |
| 21:6 27:7,9 | **CERTIFICA...** | **classify** 40:7 | 14:23 | 36:7 |
| 28:6,8 34:4,6 | 121:22 | 54:21 | **communicated** | **Constitutional** |
| 36:8 43:10,23 | **certify** 121:6 | **clean** 59:7,7 | 19:19 | 63:4 68:14 |
| 47:12 55:22 | **chair** 22:7 | **clear** 4:16,18,19 | **company** 5:7,8 | **consulate** 83:22 |
| 56:23 63:6 | **change** 28:16,17 | 108:19 | 5:10 97:15,23 | **contacts** 46:10 |
| 64:20,21 69:13 | **charge** 44:8 | **clearly** 36:6 | **complain** 40:12 | **context** 79:3 |
| 72:2 89:1 94:9 | 76:10,12 77:13 | **clicked** 14:12 | 40:15 | **continue** 40:23 |

Jesus Diaz

**CONT'D** 2:1
conversation
68:5 82:9
**conversations**
84:16
**converted** 4:24
**copied** 35:9,15
**copies** 17:14
70:10,18,22
84:20
**copy** 5:4,6,18
17:17 23:20
35:8 70:8,13
70:15,20 83:11
83:13,14,16
94:18,18,20,24
95:2,20 105:4
117:10
**Corbett** 1:21,23
**corner** 25:1 26:2
29:21 30:21
31:9 36:16
45:23 57:15
58:7 72:3
**Corporal** 71:2
82:21
**correct** 7:6 8:1
11:10 19:1
22:8 25:11,22
26:6,16 31:4
32:3,6,18,20
33:19 34:17
36:20,22 37:23
38:6,11,14
42:1,4,8,19,23
56:9 61:7
72:12 89:10
90:7,17 94:6
95:9 96:3
101:1,24
103:24 106:1
107:23
**correctional** 1:7
1:11,15 15:3
21:14 22:15
80:21 81:4,7

97:10 112:12
**Corrections**
119:13
**correctly** 88:4
92:15 106:12
121:11
**corrupt** 83:4
**Coughlin** 36:5
**counsel** 121:15
**counselor** 38:19
38:20,22,23
39:1,2,5,6 40:3
40:6,10 41:21
43:18,20,23
44:14,24 63:22
**counsel's** 24:24
26:14 29:13
31:8 33:15
37:18 62:5
**count** 116:9
**country** 9:24
11:16,19 47:8
75:13
**counts** 77:9
**County** 121:3,6
**couple** 22:10
29:24 41:2
51:10 54:7
107:20
**course** 104:14
**court** 1:1,24
2:21 3:9 4:23
5:3,7,9,10 7:5
71:10 90:16
93:1 118:10
**cover** 6:17
**covered** 55:23
**CPL** 1:7 2:4
**crack** 79:9,10
**crazy** 49:20 74:5
85:1 92:9,10
**creating** 89:2
**crime** 106:7
**crimes** 78:23
**criminal** 66:3,4
66:9,10 68:9

68:21 77:22
**cry** 60:10
**crying** 87:13
**current** 107:3
**currently** 13:3
**custom** 96:6,8
**C.A** 1:6
**C/O** 60:24 64:17
91:20 108:15
**C/Os** 43:21

**D**

**D** 102:19
**damage** 89:2
**Danielle** 16:11
**dark** 45:11
59:14
**date** 9:8 24:8
25:13,18 26:1
26:5,18 29:20
29:21 31:17,21
36:15,16 38:1
38:10 50:12
54:19,20 70:5
89:21,22 90:15
99:10,16
111:24
**dated** 23:10
24:19 25:20
31:24 32:3
38:5,11 42:22
111:20 119:10
119:11,12,14
**dates** 49:23
**day** 9:10,10,12
21:1 31:2 33:7
33:8 45:17,20
51:1,18,19
58:16 59:9,9
92:1,1,2,4
99:13 100:20
100:20 104:2
105:5 115:3,5
115:6,11,12
118:15 121:18
**days** 26:8 74:2,4

93:20
**DCC** 63:1 66:5
86:6 97:24
**deal** 45:17 104:6
116:7
**DEBORAH** 1:8
December 12:14
12:17 15:9
77:14,16
103:20
**decide** 74:23
**decided** 82:15
**decision** 20:12
34:7,8 64:23
109:9 116:14
**decisions** 64:19
64:20
**default** 117:17
**defendant** 2:7
80:21
**defendants** 1:9
2:4,15
**degenerative**
86:14,17,19,22
87:5,6 88:3,10
**degree** 66:14,14
77:9
**Delaware** 1:2,11
1:11,15,16,22
2:2,3,7 15:2
97:10 112:12
119:13 121:2
**delayed** 89:1
**deliberate** 96:7
**DENNEHEY**
2:6
**Department** 2:2
119:13
**deponent** 120:16
121:9,11
**deported** 12:24
**deposition** 1:10
2:17,23 3:1
17:20 23:6
29:3 34:23
102:3 115:23

118:14 119:9
121:7,14
**describe** 58:13
**details** 18:19
**Diaz** 1:3,10,14
2:9,14 9:6
17:19 23:6,9
27:6,7,13 29:3
29:6 30:22
34:23 35:2
36:7 43:7
49:23 83:8
89:22 102:3
116:21 119:2,9
121:7
**died** 10:19,21
**difference** 69:6
69:9,10
**different** 3:23
14:13 18:24
28:19 35:6
42:21 43:2
61:6 69:3,14
69:16,19 78:14
87:9 109:24
**difficult** 7:19
16:21
**direct** 68:13
**directly** 9:21
**discovered**
30:19,20
**discovery** 15:12
70:18
**discuss** 41:19
42:18 43:7
73:1
**discussed** 70:2
**disobeying**
108:4
**DISTRICT** 1:1
1:2
**disturbing** 6:7
**doctor** 21:4,11
22:1,2 27:5,8
27:22 28:2,4,5
28:14,14,17,18

28:18 41:12
46:12,21,23
47:3,7,15 49:9
49:18 50:5,15
50:19,21,24
51:6,8,10 52:1
52:5,18,24
54:12,13,14,17
54:18,24 56:4
56:11 60:11
63:22 66:14
67:24 73:8,13
73:18 74:13
89:18 90:2,20
91:7 92:6,11
92:11 93:19
97:12 101:6,7
101:11,13,14
103:7,8,22,23
103:24 104:24
105:1,3,6,19
109:5,7,8,8,10
110:10 111:6,9
111:9,9 112:1
112:2,6,12,14
112:15 116:5
**doctors** 21:13
53:23 55:1,8
64:20,24 65:1
65:6 104:22
**doctor's** 28:10
**document** 5:1
7:19 19:19
23:11 84:9
85:4
**doing** 4:18 41:2
41:3 43:17
56:1 65:4
66:17 67:15
68:4,21 77:11
78:16,21,22
81:14,15 106:4
**Dominican** 9:16
9:21 10:7,17
11:1,9,15,20
13:1 47:14,21

47:23 83:21
**door** 76:4
**double-check**
80:16
**draft** 81:23 84:7
84:8 118:1,2
**drafted** 82:2
85:4,23
**drafting** 8:6
85:22
**drinking** 48:1,2
**driving** 75:10
76:1 78:16
**drop** 87:11 97:2
97:6 99:9,13
99:18,19 100:3
**dropped** 87:14
99:20
**drops** 97:5 99:22
**drug** 77:13 78:7
80:8
**drugs** 12:9
**dry** 100:6
**dude** 13:12,24
54:13 102:23
109:22 115:7
**duly** 2:11 121:9
**Dunn** 1:7 86:4
**duration** 96:1
**dying** 20:11
**D-02** 113:11

**E**

E 42:8 121:1,1
**earlier** 31:23
89:17 100:8,23
103:15,19
106:9 107:1
108:20 109:13
112:18 113:9
**easy** 63:20
**eat** 6:6 14:4 48:3
54:9,9,10
**education** 11:6
11:12 63:3,10
63:14,24

**effort** 17:1,2
**eighth** 11:8
87:18
**either** 6:3 19:13
23:19 38:10
45:16 48:16
74:8 105:22
**else's** 62:12
**employed** 86:5
**employees** 66:3
**enemy** 14:12
**English** 7:9,12
7:17,23 8:1
23:17,17 88:16
88:18
**enter** 12:12
**entire** 15:5
**entirely** 74:8
**entitled** 72:9,12
**envelope** 84:18
84:19
**Eric** 2:5 81:2
**ERRATA**
120:10
**ESQ** 2:2,5
**eventually** 71:5
**everybody** 8:13
14:20,20 20:9
81:15
**evidence** 63:23
68:16,18
**exactly** 50:12
54:19
**Examination**
119:3,4
**examined** 2:11
**exchange** 8:19
**excuse** 17:9
92:21
**exhibit** 23:3,5,6
29:2,3,12
31:21 34:22,23
35:4 42:7,8,8
61:24 102:2,3
112:17,19
119:9

**exhibits** 36:9
69:5 119:8
**expect** 12:22,24
44:1 101:5
**experiment** 93:8
**Expires** 121:23
**explain** 49:15
50:6 51:21
87:9 91:9
92:24 93:19,20
96:11 102:13
110:17
**explaining** 50:8
51:19
**explanation**
50:10 54:3
**extra** 43:16
**eye** 24:7 27:8,9
28:20 30:7,8
30:19,21 36:8
40:16,24 41:19
41:22 42:18
45:5,6,14,18
45:19,23 46:12
46:15 48:16
49:5,16 51:20
51:23 52:20
54:12,13,14,24
55:23 57:1,8,8
57:10,16,16,18
57:21,23,24
58:3,4,9,11,11
58:14,16 59:7
59:13 60:10,14
60:14 61:2
64:4 72:3,24
73:5,7,24,24
74:1,10 87:13
87:13 88:6,6
90:2 91:1,8,17
92:16,18,18
93:1,2,5,8,14
93:15,22 96:21
96:21 97:2,5,6
98:9 99:9,13
99:14,19,22

100:2,6 101:6
101:7,11,13,14
103:11 104:1,3
104:12 105:7
110:1 111:9
112:2,14
114:24 116:4,4
116:5
**eyedrop** 72:2,3
101:8
**eyeglasses** 89:20
**eyes** 15:19 28:7
37:4 40:13,18
43:4 45:8 46:8
46:9 51:7,8
53:23 55:1,15
55:16,20,21
56:6,13 57:5
57:12 61:4
62:22 66:7
68:13 69:22
82:8 84:4
87:13,15 88:3
89:2,3,3 90:20
90:22 94:9
99:8,16 109:1
**eyesight** 86:14
86:17,20 88:10
94:13

**F**

F 36:5 121:1
**face** 110:10,12
**faces** 65:12
**facility** 82:6 91:8
**failed** 66:2 68:9
**failing** 63:5
**fair** 85:21 93:6
97:22
**fairness** 36:11
**familiar** 24:3,12
24:15 29:9
30:1,8 35:3
36:12,13 37:11
63:7 98:20
99:4,5,6 117:7

Jesus Diaz

**family** 10:10,12
11:2
**far** 39:22 110:20
**father** 10:21
**federal** 36:6
116:6
**feel** 3:17 57:14
87:10 106:23
107:15
**fellow** 102:15,22
103:6
**felonies** 77:5
78:6
**female** 16:11
111:5 112:4
**Fetzer** 1:24
**fighting** 14:9
**file** 71:21,23
72:4 82:10,12
84:5
**filed** 8:3 18:23
24:7 30:5 62:1
69:16,21,21
70:11 72:5
82:20 90:14
117:14 118:1
118:10
**filings** 94:20
**fill** 16:22 17:3
69:24
**filled** 70:3 103:2
**find** 69:1 71:14
71:16 79:13
96:12 102:17
**fine** 7:1 53:19
**finger** 80:4
**finish** 4:13 73:4
**finished** 114:9
116:24
**fire** 66:21 78:10
**fired** 15:23,24
16:12,15 65:8
65:12 66:14
79:21 108:21
109:15,18,20
110:8 111:2,6

**fires** 65:15
**first** 2:10 3:3
12:12 15:18
16:13 23:21
24:14,23 31:6
31:7,20 37:17
39:15,22 40:17
41:17 45:5,7,9
50:18 54:12,16
54:18,22 62:23
66:17 74:2,4,7
77:9 80:4 97:8
98:6,8,14,16
98:17 99:7,9
99:13 101:4,11
107:7 110:18
110:22 111:8
111:24 112:11
**five** 52:21 88:20
103:20,20,20
**flip** 37:17 42:6
**flipped** 36:21
**Floor** 2:3,6
**fluid** 57:17,18
58:17,17,18,19
58:21
**Fluoroumacil**
98:18,19
**focus** 18:22
**follows** 2:12
**food** 106:3
**foregoing** 121:7
**forget** 3:11 6:20
**form** 32:16
102:8 112:18
113:8,18
**forming** 30:7
**forms** 66:6
69:14
**found** 108:15
**four** 10:16 18:12
18:15
**fourth** 26:13
62:7,8
**free** 3:17 106:3,3
116:12

**freedom** 107:9
**French** 2:3
**friend** 8:10
60:18 108:11
**friends** 11:3,4
**front** 84:11
90:15
**full** 56:16 83:10
**fundament**
36:10
**funny** 36:18
**further** 84:16
105:7
**future** 4:9

——— **G** ———
**Gander** 15:7,8
**GED** 11:13
**gentleman**
110:11
**gentleman's**
81:22
**getting** 14:6 47:1
55:17,18 61:3
88:6
**girl** 67:20
**give** 5:16 7:18
8:18 14:18
16:1,1 26:23
39:16,23 40:21
49:4 56:19,20
60:16 64:18
67:7,20 74:2,4
83:6 91:10,16
91:18 92:2
94:18 95:10
101:7 105:8,14
105:20 106:2,3
115:8,9,12,17
115:17
**given** 97:2
121:14
**giving** 87:12,12
89:1 91:12
94:24 95:20
**glasses** 46:10

52:22 53:1,6
53:16,16,18
59:12,14,16,17
59:20,21 60:4
60:17 61:1,4,6
61:7 89:9,12
89:20 90:3
100:11,22
**go** 5:8 14:9
16:10,11 17:12
21:20 22:9
24:2,22 27:2
29:6,11,23
31:6,17 34:20
36:14 43:12,14
43:19,20,21
47:11 48:10
50:15 53:13,20
56:2,21,22
57:2 59:3,4
61:4 64:14,14
64:16 65:11,24
69:19 74:22
75:22 76:24
79:16 84:2
85:1,2 89:18
89:21 92:21,24
93:3 94:2
96:15 98:2
99:18 100:20
106:16 111:3
114:12,20
115:2,11,14,21
115:22 116:12
116:22
**God** 41:1
**goes** 71:9
**GOGGIN** 2:6
**going** 2:21,22
4:13,24 6:19
14:12 15:19
18:14,18 20:23
20:23,24 23:2
23:17 24:2
26:23 27:6,6,8
27:9 28:5,6,8

29:1,6,8,23
30:18,22 34:5
34:12,20 35:23
35:23 40:23
43:10,11 45:4
49:20 51:13
52:20 54:10
55:7,22,24
56:18 57:1,2
60:24 61:23
64:10,16,17
66:11 69:1,3
71:14,15,15
74:3,5,11
75:14 77:23,24
78:2 80:17,18
81:18 84:23
87:21,23 88:12
88:19 91:10,15
91:15,16,17
92:9,9 94:18
101:7 102:1,16
102:17 103:3
103:21 104:16
105:3,7,8,9,14
106:16 109:2,3
109:9 110:3,15
111:12,13
112:5 114:17
114:20,23
115:14,17
116:11,18,18
**good** 14:14 39:2
44:14 57:9
58:6 72:18,19
100:20
**grab** 64:16
76:24
**grade** 11:8 87:18
**grew** 74:12
**grievance** 19:16
19:18 21:19,20
21:23,24 22:7
22:9,10,16,17
22:18,22,24
23:9,18,20,22

| | H | | hurt 58:18 | 103:16 |
|---|---|---|---|---|
| 25:9,21,24 | | Hendricks 36:5 | | Inmate's 29:15 |
| 26:2,2,5,10,16 | half 24:14 100:2 | hey 84:4 106:4 | I | 29:16 |
| 26:24 27:4,14 | hand 4:4 59:7 | 108:23 114:10 | idea 53:4 75:2 | input 85:22 |
| 28:1 29:9 | 92:22 121:18 | Hi 80:24 | identification | inside 48:4 |
| 30:11 31:3,15 | handed 95:5 | high 20:9 65:22 | 23:7 29:4 | 105:1 |
| 31:23 32:3,8 | handwrite | higher 20:5,8 | 34:24 102:4 | institution 50:3 |
| 32:10,13,17 | 113:14 | 21:20 22:1 | IGC 25:2,4 | 52:24 53:17 |
| 33:7,14,21 | handwriting | 64:18 112:10 | 31:10 37:19 | 54:14 64:3 |
| 34:1,17,19 | 23:13 27:20 | highest 11:6 | ignored 30:6 | 72:7 93:19 |
| 35:14,19,23 | 35:6,7,12,15 | Hill 15:7,8 | ignoring 18:12 | 102:24 104:6 |
| 36:6,7 37:10 | 36:1 37:8,9 | hire 65:4,9 66:12 | 18:13 | 111:10,11 |
| 38:1,5,13 | 62:12 111:16 | 66:13,17,21 | illegal 70:14 | 112:24 114:15 |
| 40:15 42:3 | handwritten | hired 64:24 65:1 | 75:12 | insult 4:18 |
| 63:6 66:6 69:6 | 26:2 | 65:8 66:3 | immediate 10:10 | insurance 47:9 |
| 69:12 70:3,13 | happen 57:19,20 | 67:15 68:4,20 | improper 36:8 | integrity 36:11 |
| 70:20 74:3 | 103:21 110:5 | hires 65:15 66:9 | incarcerated | intention 67:13 |
| 96:2 112:18 | 116:15 | Hispanic 14:13 | 15:1 46:8,13 | intentionally |
| 113:17 119:10 | happened 48:7 | 87:7,8 | 46:18,20 81:18 | 66:2 88:24 |
| 119:11,12 | 80:3 | home 47:20 | incarceration | interested |
| grievances 22:8 | happens 4:12,15 | 56:21,22 57:2 | 79:6 | 121:16 |
| 23:3 30:6 | happy 3:18,24 | 81:19 | incident 78:12 | internal 22:6 |
| 32:17 69:5,20 | hard 39:3 63:19 | honest 48:24 | 79:4 | interpret 88:7 |
| 69:22,24 70:6 | 63:20 | 49:13 77:21 | incorrectly 7:4 | interpretation |
| 70:8,10,22 | head 87:12 | 91:11 92:17 | INDEX 119:1,8 | 88:7,11 |
| 95:23 | headaches 87:16 | 93:7 99:17 | indicated 3:20 | interrupt 4:14 |
| growing 40:16 | heads 3:8 | 111:4 | 6:18 9:5,14 | interrupted |
| 56:20 57:7,9 | health 41:18 | hospital 18:9 | 11:5,23 12:7 | 115:23 |
| 96:22 97:2 | 42:18 | 22:1 43:10 | 19:2,9 24:9 | introduced 69:4 |
| 103:12 110:2 | heard 81:8 | 48:6,10 49:3 | 39:9 85:16 | investigating |
| growth 24:7 | 101:17,22 | 54:6 64:22,23 | 87:24 94:4 | 86:5 |
| 73:22,23 74:7 | 114:4 | 65:7 82:24 | 95:22 121:8 | involved 13:14 |
| growths 56:5,13 | heartburn 6:2 | 89:13,24 91:21 | indicating 27:13 | 79:9 |
| 57:4 | 98:3 | 91:21,23 97:8 | indication 63:24 | irreparable 89:2 |
| guess 44:13 | held 63:1 | 114:22,23 | indifference | Irresponsibility |
| 76:19 82:19 | help 8:6,16,19 | 115:6,7 | 96:7 | 18:11 |
| guilty 77:3,4,6,8 | 8:21 15:24 | hot 45:15,16 | individual 63:2 | irresponsible |
| 77:20 79:19 | 18:14,22 20:12 | 57:21 | informal 27:14 | 18:11 |
| 80:1,1 | 37:3,3 41:3,6 | hotel 79:13,14 | 27:20 111:19 | irritated 57:18 |
| gun 78:10 | 49:23 60:8 | 79:15,16,17 | initial 85:22 | 100:7 |
| guy 45:14 54:13 | 71:12 72:1 | 80:2,5,6,8,9 | injuries 47:17 | irritating 48:20 |
| 54:23 73:4,7 | 82:6 83:23 | house 79:12 | 48:9,12 | irritation 49:20 |
| 75:19,20 76:24 | 113:3,6,13 | 83:22,23 | inmate 64:12 | issue 24:10 |
| 79:18 80:4 | helped 8:22 | 113:13 | 65:10 72:6,8 | 42:19 |
| 81:22 85:12 | 81:23 113:22 | housed 13:4 | 81:15 83:5 | |
| 89:18 113:5 | helping 8:23 | Huh 38:21 | 102:15 103:6 | J |
| guys 84:16 | 84:5 | hundred 75:5,6 | | |

Jesus Diaz

**jail** 15:8 18:9
46:24 47:7
65:21 76:13
77:24 78:17
79:4 83:10
106:7 114:16
**jailhouse** 113:24
114:3
**jammed** 83:7
**January** 42:22
121:23
**Jerome** 77:21,22
**Jesus** 1:3,10,14
2:9 36:7 119:2
121:7
**job** 12:5 43:16
63:18,20
109:19
**jobs** 12:3,6
**Jr** 1:12 121:4,21
**judge** 74:23
116:15,16
**judgment** 6:4
**jump** 76:5,21,22
**jumped** 76:18
78:13
**justice** 2:2 74:24
83:22,23
**Justices** 113:14

**K**

**keep** 4:19 34:11
52:20 57:23
59:7,7 67:9,9
70:10,15 71:24
107:11
**Kiara** 16:9,10,12
67:20 71:14
**kill** 74:6
**kin** 121:15
**kind** 72:19 103:4
**know** 4:13 6:21
6:21 8:12
13:11 14:5,6
14:10,21,22
15:2 16:9 17:8

18:1,3,5,7,8,13
19:10 20:1,3,5
20:13,14,23,23
21:5,13,15,17
21:23 22:3,3,3
22:5,23 27:23
28:12,18 31:15
32:12,13 35:21
36:18 37:15,15
37:16 38:7,16
41:8,13,14
43:12,13 44:11
44:11,14,18
49:14,24 53:5
55:8 58:15,24
59:1 62:14,21
63:23 64:6,10
64:15 65:9,11
65:17,17,18,20
66:11 67:3,11
68:20 70:7
73:17 74:6,23
76:10,11 77:5
78:4 80:6 81:4
81:10,12,15,16
81:17,17,17,18
81:18,19 82:7
82:8,21,21,23
83:3,4 85:14
85:18 86:21
87:4 88:14
89:6,8 91:5
93:23 94:1
95:2 97:9,16
97:20,21,22
98:1,23 99:10
99:20 100:18
101:13,16,18
101:20 102:24
103:1,4,10,18
103:21 104:7
105:5,9 106:6
108:13,14
109:2,4,9,18
110:12,13,14
111:3 112:23

112:24 114:14
114:21 115:14
115:21 116:12
**knowingly** 66:2
88:24
**knows** 64:11
65:18

**L**

**lacks** 63:3,10,13
63:24
**language** 68:12
**laser** 49:5,6
**law** 8:24 18:7
83:13 84:19
**lawsuit** 8:3,22
15:20 18:6
19:11,12 71:19
71:22,23 72:4
72:5,10 74:19
75:4,5 81:10
81:20 82:12
83:10,17,24
90:11,14 92:22
115:19
**lawyer** 77:22,23
83:6 92:24
113:15,15
114:3
**lawyers** 113:24
**lead** 68:5
**learned** 11:15
**leave** 109:19
**led** 68:3
**Lee** 1:7 86:4
**left** 14:11 24:7
30:7,19 57:8,9
57:23,24 58:10
58:11 116:4
**left-hand** 25:1
31:10 37:20
**legal** 95:18
**legality** 36:10
**legally** 12:10
**letter** 19:18
41:17,20,24

42:3,12,14,17
83:6,8,17
88:19 113:13
**letters** 44:15
**letting** 6:20
**let's** 26:13 28:23
31:6 33:13
37:6,17 61:4
65:24 75:22
84:2 86:4
90:13 96:15
**level** 11:6 64:18
**liable** 63:1
**library** 8:24
83:13 84:19
**lie** 23:17 78:2
**life** 9:18
**light** 48:19,19,22
60:9,10,12,15
60:19 100:14
**lights** 45:12
60:13,19,21
76:2
**line** 25:13 29:14
29:16
**lines** 29:24
**Lise** 2:16 20:1
20:15 22:5
25:5 31:12
32:20,22 37:23
71:2
**listen** 84:24
88:20
**little** 3:13 7:11
7:14 24:3
30:20,20 38:9
39:15 43:23
44:4 45:4,21
45:22 49:2
58:23 59:11
60:12 61:3
73:1 74:17
82:19 90:19
106:3,3 110:20
114:19 115:15
**live** 9:17,18,24

10:24
**living** 10:5,17
**long** 9:17 38:20
38:22 59:10
62:20,22 105:9
**look** 28:23 35:16
36:18 42:7
45:22 48:22
58:5,6 72:3,23
85:1 88:13
110:13
**looking** 42:7
**looks** 26:20,21
84:10 90:14,16
111:19
**lose** 66:5
**loss** 66:6 68:12
86:14,17,19
88:10 89:3,5
94:8,12
**lost** 78:14 95:16
**lot** 4:12 10:12
14:9 15:21
16:14 20:24
30:19 66:15
77:24 83:5,24
108:21 109:11
109:11,14,16
111:1 113:1
**low** 91:13

**M**

**machine** 121:12
**mad** 114:23
**mail** 95:16,19
**major** 47:17
**making** 5:19
64:1
**male** 109:16
112:4
**malpractice**
96:16
**man** 91:22 92:23
102:22 115:8,9
**mark** 23:4 29:2
34:21 102:1

| | | | | |
|---|---|---|---|---|
| **marked** 23:7 29:4 34:24 102:4 | 80:21 81:4,6,7 82:6,24 83:2 86:5 89:1 96:7 | **mind** 14:10 59:11 75:3 **mine** 8:10 83:18 | **N** | 15:19 16:1 18:15,16 22:13 27:22 46:9,14 |

marked 23:7
29:4 34:24
102:4
Market 1:22 2:6
MARSHALL
2:6
matter 36:8
ma'am 46:22
mean 2:19 5:4,8
27:16 32:2,7,8
32:14 33:12
39:18 42:10
43:18 47:6
51:11,16 71:20
74:24 80:17
81:14 82:3
84:8,15,22
85:18 86:15
88:8 92:15
95:10 97:14,14
101:18 108:1
114:21 118:2
meaning 7:4
means 4:2 88:3
meant 87:5
medical 1:7
16:13 18:19
19:14 21:6,10
21:10,16,23
22:17,19,24
24:7,10,11
25:8,14,21
26:6,10 30:4,5
30:23 31:18,24
32:5,11,13,23
33:10 36:8
38:2,14 39:15
39:22,22 41:19
41:22 44:6,8
45:9 46:4,6
47:12 51:19
52:19 53:22
63:5,6 64:6,11
64:13,20,21
65:15 66:14
69:10,12 71:10

80:21 81:4,6,7
82:6,24 83:2
86:5 89:1 96:7
96:16 97:9,13
97:14,15,20,23
98:5,7,15 99:3
99:9 101:4
102:9,13,14
103:2 108:23
110:4,18,23
112:18 113:4
113:17 116:10
medically 44:2,3
44:17
Medical/Dental
119:14
medication 6:8,9
6:13 20:13
49:18,19 55:17
91:16 98:23
115:9,10
medications
5:23
medicine 91:17
medium 13:6
meeting 19:22
42:18
members 10:10
10:12
mental 41:18
42:18
mention 55:15
Merson 1:7 2:4
2:16 20:1,15
22:5 25:5
31:12 32:20,22
37:23 71:2
82:21
mess 92:18
messed 48:3
108:14
met 41:18,22
43:8,8,9
MHU 13:5,5,5
Michael 102:23
102:24

mind 14:10
59:11 75:3
mine 8:10 83:18
108:11
mirror 45:10,11
45:21,22
misheard 106:18
missed 74:13
misunderstan...
109:12
misunderstood
7:5
mix 44:19
Mm-hmm 4:20
26:12
money 14:3
64:15 72:20
74:18,20 116:6
116:7
month 9:10,11
13:18,19 15:13
45:9 46:2,4,5
52:22 66:21
93:21,21 99:24
100:2 107:4
months 13:16,21
14:18 38:24
40:1 51:14
52:21 107:2
mother 10:22
motion 117:14
117:17,23
118:1,3
mouth 88:2
move 9:19,21
13:17 14:19
39:16,17 47:10
65:23 68:24
69:3 107:12
110:20
moved 13:16
40:4,7 107:6,7
107:8
Muslim 13:24
13:24 107:8

**N**
name 2:14 8:11
8:12 16:1,2,10
16:10,11 19:5
19:6 22:11,13
22:14 25:2,3,5
27:23,23 28:10
28:13 29:15,15
29:16,18 31:15
35:4 37:19,21
42:18 49:8
52:4,6,6,8,9
67:7,11,20
68:20 71:11,15
79:15,18 80:6
80:10 81:1,22
82:15 85:13
89:22 100:19
110:9 111:7
112:23 117:7
named 18:24
19:7,11,22
names 16:8
67:10 71:13,17
71:18 82:20
need 3:16 17:3
35:24 36:2
53:7,15,16,18
60:16 67:7
72:21 73:8
76:19 82:11
89:23 91:22
92:24 96:7
98:2,3 103:16
103:17,18,22
104:7,9,10,19
104:20,21,22
116:10,19
needed 6:9
needing 100:22
needle 57:15
58:12,22,23
needs 17:12
negligence 66:4
neither 121:15
never 14:12

15:19 16:1
18:15,16 22:13
27:22 46:9,14
49:6 54:12,14
56:14,14 67:9
67:9,16 72:2
72:23,24 73:3
73:6,6 74:14
74:14 79:24
83:18 91:5,11
91:17 93:2,2
93:17,18 94:22
95:14 96:2,21
96:22,22 97:1
97:4 101:10,11
101:15,22
105:1 112:6
114:4,18,18
115:16,16,17
new 13:16 16:18
98:16 121:3
nickname 13:13
night 54:7,8
115:2
nine 13:15,21
107:2
nod 3:8,8
North 1:22 2:3,6
nose 108:13
Notary 1:12
121:5
notation 115:1
note 43:5,7 53:6
53:15 112:6
notes 42:21 43:2
notice 1:10 37:4
45:7 69:11,11
74:7 121:8
noticed 45:5
46:7
notified 98:6,8
98:14
notify 98:3
November 1:12
121:19
number 10:14

Jesus Diaz

| | | | | |
|---|---|---|---|---|
| 36:18 75:2 102:18 113:7 | 55:22 71:4 76:2 81:3 | 52:7,13,16,17 52:24 53:19 | 115:5,5,16 116:12,16,21 | 112:19 119:2,9 120:8 |

36:18 75:2
102:18 113:7
**nurse** 16:18 21:4
28:14,16 41:8
43:22 56:1
67:14,16,17
68:5 109:4,4,4
109:6,10,16
**nurses** 15:23
18:16 21:7,7,8
21:12 22:1
53:23 55:1,8
55:12,12,14,21
55:23 64:24
65:2,6 66:15
67:6,9 71:11
71:13 108:21
109:10,14,16
112:4,4

---

**O**

**oath** 2:11 4:4,5
**obvious** 104:8
115:13
**occasion** 109:24
**occur** 80:11
**occurred** 78:23
**October** 53:21
73:2 90:23
92:6
**Offender's**
33:17
**office** 20:22
**officer** 21:14
22:15 75:24
**officers** 22:23
76:23
**official** 63:2
121:18
**officials** 21:3
**oh** 5:12 9:9 12:1
12:16 16:17,18
17:14 22:9,13
32:24 36:18
41:1 43:8
46:19 47:8

55:22 71:4
76:2 81:3
86:21 87:10
93:22 94:22
95:7 101:18
105:10 107:10
107:14 110:1,6
115:9 117:18
**okay** 2:24 3:3,19
4:6,7,12 5:7,14
5:20,23 6:17
6:23,24 7:13
7:16 8:1,3,11
9:6 10:10,20
11:18 12:2
15:1,12 16:6
17:5,8,23,24
18:1,5,18 19:5
19:7,8,17 20:1
21:7,12,18
22:12 23:2,9
23:15 24:2,4,5
24:14,17,19,22
25:1,8,11,13
25:14,18,20
26:13,15,18,23
27:3,11,13
28:7,21,23
29:1,9,11,14
29:20 30:1,2
30:10,13 31:1
31:6,12,23
32:19,24 33:3
33:11,13 34:3
34:9,13,14,19
35:2,6 36:15
36:19,19,23
37:10,13,17,19
38:13 39:14,15
39:23 40:6,12
41:24 42:6
43:8,18 44:23
45:1 46:7,15
46:23 47:17,24
48:9,12 49:11
50:1,2,7,9 52:4

52:7,13,16,17
52:24 53:19
54:11 56:4
58:2 60:3 61:3
61:9,13,16,19
61:22 62:4,10
62:11,14,23
63:9 64:23
66:16,20 68:8
68:15,18 69:4
69:18 70:1
71:1,5,8,16,19
72:18,19 73:13
74:18 75:7,22
76:6,8,14 77:2
77:8,19 78:9
79:3,5,12
80:22 81:3
82:13 83:1,3
83:11,15,20
84:13 85:11
86:3,10 87:1
87:22 88:1,9
88:15,17,22
89:7,9,16,24
90:3,6 91:4,22
92:3,19 93:16
94:3,12 95:1
95:15,20,21
96:15,24 97:7
97:19,22 98:4
98:22 100:1,8
100:13,17,23
101:7,9 102:8
102:10 103:6,9
103:12 104:13
104:15 105:10
106:9,14,18
107:1,10,14,18
108:7,9,17,24
109:3,21 110:7
110:16 111:1,9
111:19,22
112:8,15 113:8
113:17,20,22
114:2,6,13,17

115:5,5,16
116:12,16,21
117:2,12 118:6
118:12
**old** 13:21 48:7
**once** 3:7 59:8
**ones** 6:1 59:23
61:10 70:1
**open** 73:24
74:10 76:4
**operate** 48:6
**operation** 49:1,2
49:4 50:1,3,16
50:23 51:7
53:22 54:14
59:24 64:15
92:4 114:24
**opportunity**
6:16 7:2 18:20
**option** 5:2,17
**order** 108:4
**original** 24:8
**originally** 35:18
**outcome** 72:16
121:16
**outside** 49:1,3
50:2 51:21,22
54:23 60:7
61:12 91:7
92:11 97:8
100:16 101:12
103:24 114:22
114:23 115:6,7

---

**P**

**Paddock** 1:11,16
**page** 23:11
24:23 26:13,15
27:14,15,21
29:11 31:6,7
31:20 33:13,14
34:11,14 35:3
35:4 36:19
37:17 62:4,7,8
62:23 65:24,24
69:4 88:22

112:19 119:2,9
120:8
**pages** 34:9 36:21
37:5
**paid** 78:18
**pain** 49:21,21
57:12,13,14
58:9,13,24
59:3,4 60:8
66:6 68:12
86:19 87:11
88:3,6 100:20
104:4 115:14
**painful** 91:15
**painkiller** 49:18
74:2,5 99:1
104:5,7 115:2
115:3,3
**pair** 59:16,21
60:3,4 61:5
**paper** 33:4
**paperwork** 70:9
**paragraph**
24:15 62:23,24
66:1 86:11,17
88:23
**parents** 10:20
**part** 13:3 43:15
61:24 69:3
70:18
**parties** 17:13
82:15
**parts** 4:8,9
**party** 75:21,23
121:16
**pass** 52:22
**Patanol** 98:24
99:5
**patient** 28:13,14
**pay** 5:11 14:10
59:11 106:7
107:15
**penalties** 4:7
**people** 3:8 16:12
16:15 18:16,24
19:7 20:7,10

Jesus Diaz

Page 10

| | | | | |
|---|---|---|---|---|
| 20:11,19 28:12 | places 69:16 | 100:10 108:16 | 30:19 34:4 | 76:17 |
| 35:10 43:9 | plaintiff 1:4 | prescription | 43:20 45:6 | pulled 75:18 |
| 44:6 63:21,22 | 62:24 63:2 | 61:6 89:19 | 46:7,9 58:4 | purchase 5:2,6 |
| 65:4,5,8,12 | 66:1 86:19 | 100:19 105:4 | 61:2,2 69:12 | 5:18 |
| 66:4,9,12,13 | 88:23 89:1 | 108:18 | 86:24 88:5 | pursuant 1:10 |
| 66:17,23 67:11 | plaintiff's 63:4 | previous 78:24 | 98:2,7,9,15 | 36:8 121:8 |
| 68:4 78:11 | 66:5 68:13 | prior 50:8 | 103:4 106:1 | push 44:4,4,6 |
| 79:7 81:16 | 89:3 | prison 12:12,15 | 108:24,24 | put 4:3 16:13 |
| 82:8,20 83:21 | plan 71:8 | 13:3 15:4 | 115:15 116:3 | 19:16 21:9,10 |
| 84:1 85:19 | planned 16:2 | 19:13 21:3,4 | problems 21:16 | 21:19,20,24 |
| 92:21 109:11 | plastic 45:21 | 21:15 47:19 | 21:23 27:10,12 | 22:19 28:20,23 |
| 109:21 111:2 | play 79:22 | 51:11,12 63:12 | 48:23 56:5,12 | 35:23 39:15,22 |
| 113:3,22 | plea 78:3,3,4 | 63:19 64:9,12 | 57:4 58:2 64:6 | 45:9,12 46:4,6 |
| 116:19 | plead 77:3 78:1 | 64:23 87:22 | 84:4 87:10 | 49:14,15 50:5 |
| Percocet 49:19 | pleading 77:8 | 89:14 90:1 | procedure 17:21 | 51:19 52:12 |
| 91:22,23 | please 23:12 | 92:12 94:10,14 | 63:6 91:1,3 | 55:19 59:13,16 |
| 115:11 | 25:23 36:4 | 96:2 97:17 | 92:16 116:23 | 59:19 60:13 |
| perjury 4:8 | 72:1 | 105:1 106:22 | proceedings 5:1 | 61:14 63:16 |
| person 13:24 | pled 77:4,5,19 | 107:19 | 36:9,11 | 64:17 73:4,5 |
| 14:5,22 20:12 | 78:6 79:18,24 | prisoner 64:14 | process 29:7 | 76:1,4 79:4 |
| 21:21,22 22:7 | 80:1 | pro 1:14 | 32:8,9 82:3 | 84:17,18 87:8 |
| 28:19 30:15 | point 18:10 80:4 | probably 14:8 | produce 57:17 | 88:2 99:8 |
| 32:17,20 37:1 | 97:24 116:17 | 20:4,4,6,9,10 | 58:17 | 101:4 102:15 |
| 37:2,14,15 | pointing 27:17 | 20:22 28:17,17 | Professional | 102:18 103:13 |
| 43:22,23 49:3 | 27:18 57:23 | 32:7 34:18 | 1:12 121:5,22 | 108:13 110:4 |
| 65:15 66:21,22 | 102:19 | 35:8,16 43:21 | prohibited | 110:17,20,22 |
| 78:16 80:6 | police 75:23 | 44:8,11 45:8 | 107:23 | 113:7 114:24 |
| 82:17 111:2 | 76:1,23 77:1 | 45:15 48:8 | proof 95:17,18 | putting 18:6 |
| 113:12 | 80:5,5,6,7,8 | 53:12,12,12,14 | 113:6 | 101:10 |
| personal 46:21 | policy 96:6,8 | 54:11 56:14,15 | proper 27:9 | p.m 1:11 118:14 |
| 46:21 | population | 58:16 59:1,8 | protected 36:6 | |
| personally 19:24 | 107:16 | 64:3,3,13,15 | prove 53:17 | **Q** |
| 35:22 | position 20:5,9 | 65:3,3,17 | 116:17 | question 2:21 |
| personnel 86:5 | 65:22 | 66:13 68:23 | provide 63:5 | 3:6,13,17,18 |
| phone 75:20,20 | positions 20:8 | 70:6,19 74:16 | 71:1 | 3:22,23,24 |
| physician 46:21 | post 76:14 | 78:7 81:9,11 | provided 97:15 | 4:14,17 15:14 |
| pick 99:19 | power 109:5 | 81:16,20 86:23 | 97:23 | 15:21 16:6,22 |
| pill 6:2,2 55:18 | powerful 92:23 | 88:7,20 90:18 | provider 97:9,13 | 17:16,18 22:14 |
| 98:3,3 108:4,5 | preacher 106:10 | 91:15,15 97:11 | 97:14 | 41:2 61:22 |
| 108:8,11,11,15 | preaching | 97:18 103:11 | providers 65:16 | 68:7 72:15 |
| pills 108:6 | 114:21 | 103:12 108:4 | pterygium | 82:14 94:2 |
| place 15:7 20:5 | prejudicial 36:9 | 109:11 110:15 | 101:16 | 117:5 |
| 28:15 82:9 | prescribe 100:18 | probation 78:18 | Public 1:12 | questioning 6:15 |
| 91:5 93:17 | prescribed | 78:23 79:1,2 | 121:5 | questions 3:21 |
| 115:19 121:8 | 49:18 89:12 | problem 7:20 | Puerto 102:23 | 6:4 15:17 16:3 |
| placed 24:10 | 90:3,6 100:9 | 22:3,20,24 | pull 23:2 75:21 | 16:24 52:10 |

Jesus Diaz

80:22 109:13
114:7
**quick** 114:11
**quit** 109:19

_____

**R**

R 121:1
**ran** 76:7
**read** 7:2,6,9,10
  7:19 23:12
  24:2,14 25:16
  29:23 31:13
  33:17 36:2,3,4
  61:17,19 85:8
  86:4 96:13
  113:20 118:6
**reading** 7:18,20
  7:23 29:8
  87:12 90:15
  102:16 103:1
  103:11
**real** 56:19 57:8
  57:21,21,22
  100:6 114:11
**reason** 60:22
  64:5 66:24
  67:2 83:8
  94:21 111:6
**recall** 19:15
  37:10 42:13
  46:5 53:5,5
  55:6 70:5
  71:13 117:14
**receipt** 70:7
**receive** 15:12
  94:13 95:7
  97:6
**received** 22:7
  25:14 26:5
  31:18 38:2
  72:22 93:11
  94:6,9,14,20
  95:14 97:4
  99:21
**receives** 32:17
**recognize** 23:11

36:2 42:14
  62:1
**recognized**
  75:24
**record** 3:4 4:8
  4:16,18,19 5:1
  5:18 6:16
  61:24 64:11,13
  65:6,7,7 99:3
  116:23 117:3
  121:14
**recorded** 121:11
**records** 66:4
**red** 45:14,18,19
  45:23 57:22
  74:1 104:3
**refer** 113:23
**referred** 24:9
  113:9
**referring** 27:15
  90:1 96:8
  111:15
**refuse** 33:18,20
  95:12,12
**refused** 88:24
**regarding**
  100:24
**Registered** 1:12
  121:4,22
**regular** 21:13
  43:15 61:7
  92:2 115:12
**relationship**
  14:14 44:15
**released** 12:22
**reliability** 36:10
**religion** 14:13
  106:15
**religious** 106:21
**remember** 3:17
  6:19 16:8,9
  19:20,21,22
  24:18 27:3,10
  28:10 30:13,17
  30:17 33:23,24
  34:8 35:18

36:14,23 37:4
  37:14,14,16
  39:3,4,4,14
  42:13 43:6
  45:13,24 46:2
  47:1,16 49:7
  50:9,11 51:14
  52:4,7,8,17
  53:3,4,14 54:5
  54:9,19,20
  55:5 60:12,23
  75:19 76:16
  77:7,8,14,19
  84:23 85:2
  99:12,17 110:9
  110:10,12
  111:8 112:23
  113:13 116:4
**remind** 3:11
  6:19
**remove** 73:10
  93:13 110:3
**removed** 54:21
  73:6,7 74:14
  74:14 93:13
  112:3
**repeat** 3:16,18
  68:7
**rephrase** 3:22
**REPLACE**
  120:8
**Report** 119:10
  119:11,12
**reported** 23:9
**reporter** 1:12
  2:21 3:9 4:23
  5:10 7:5 85:17
  121:5,22
**Reporters** 1:24
**reporting** 5:3,7
**representing**
  2:15 111:10,10
**represents** 80:20
**Republic** 9:16
  9:22 10:7,18
  11:1,9,15,20

13:1 47:14,21
  47:23
**request** 15:12
  24:24 26:14
  29:13 31:8
  33:15 37:18
  62:5 119:14
**required** 48:10
**resolution** 27:14
  27:20 111:19
**respect** 106:15
**responsibility**
  56:16 82:7,17
  86:1 96:20
  106:5 114:16
**responsible**
  82:18 106:8
**restate** 3:23
**result** 57:4 94:13
**results** 56:5
**returned** 24:9
  34:15
**review** 7:3
**reviewed** 38:4
**re-ask** 4:17
**Rican** 102:23
**ride** 75:11,11
**right** 2:20 3:10
  15:15,21 18:6
  18:7,21 20:12
  22:21,22 26:23
  27:15 29:23
  30:7,14,21
  33:18 38:16
  46:3,4 48:16
  48:21 57:8,10
  57:15 58:3,4,5
  58:9,10 60:14
  61:20 63:11,12
  63:21,22,22,22
  65:6,23 68:18
  68:19 72:6,6,7
  78:15,19 80:19
  89:9 96:19
  101:5 102:14
  102:17 104:8

105:16 107:24
  111:13,18
  112:6 113:12
  114:14,14
  116:4 117:19
  117:22
**rights** 45:2 63:5
  68:14 71:2
  72:11
**right-hand** 26:1
  29:21 31:9
  36:15
**Road** 1:11,16
**Robert** 1:12
  121:4,21
**RODWELLER**
  1:8
**Rojas** 102:23,24
**room** 14:8 45:12
  60:20,20 61:1
  116:9
**roommate** 84:23
  85:2,7,11
  107:2,3,7
**rules** 3:3 17:1
**run** 63:12,19
  64:9 65:21
  71:23,24 76:3
  76:6,19
**running** 18:9,9
  63:19

_____

**S**

**sanctions** 117:23
**saw** 18:16 28:4
  46:23 50:18
  51:15 54:16,18
  54:23 55:6,7,8
  55:14 90:2,20
  91:7 93:21
  101:15 103:11
  103:24 104:2,2
  104:4 105:3
  111:9 112:1,12
**saying** 5:17 16:3
  18:13 43:7

Jesus Diaz

Page 12

| | | | | |
|---|---|---|---|---|
| 44:7,21 63:9 | 35:13,23 36:13 | 43:5,7 49:17 | shower 45:14,16 | 39:23 45:9 |
| 63:20 64:2 | 43:11 44:5 | 70:8,17,22 | 57:21 106:3 | 46:4,6 51:19 |
| 66:18 72:13 | 45:11,22 47:7 | 71:17,18 73:7 | shows 96:6 | 52:19 69:7,10 |
| 83:8 87:6 | 47:8,15 51:24 | 74:3 83:11,13 | sick 24:9 30:4 | 98:5 101:5 |
| 93:23 97:4 | 53:13,13,22 | 95:4 117:10 | 47:1 66:5 69:6 | 102:9,14,14 |
| 103:10 111:24 | 54:12,12,13,14 | sense 5:21 33:1 | 69:22 119:14 | 103:2 108:23 |
| says 25:2,5,8,11 | 54:24 56:2,17 | 33:11 87:7 | side 80:12 | 110:4,18,23 |
| 25:19 29:15,16 | 57:7 58:4,6 | 88:21 | sight 66:6 68:12 | 113:4 |
| 29:20 31:10,12 | 59:6 60:11,24 | sent 15:13 25:21 | 89:3,5 94:8 | slips 24:10 30:5 |
| 31:17 32:16 | 62:21,21 63:16 | 39:12 41:20 | sign 23:14 27:3 | 66:5 69:23 |
| 33:4,17 34:11 | 65:5,9 66:14 | 43:1 50:2 | 27:3 28:8 | slow 3:13,18 |
| 34:14 36:5,16 | 66:21,23 67:17 | 52:11 53:22 | 33:18,20 34:3 | small 43:13 58:8 |
| 42:8 60:17 | 67:21,22 72:1 | 70:7,12,15 | 34:5 78:2,2,3 | 58:8 |
| 62:24 66:1 | 73:3,5,6,18 | 84:19 92:20 | 95:19 103:3 | smaller 74:15 |
| SBI 1:15 | 78:14,20 79:24 | 95:2,6 | signature 31:4 | Smyrna 1:11,16 |
| school 11:17 | 87:7 89:8 90:2 | sentence 12:20 | 33:17 102:6,10 | snitch 79:18 |
| 30:18 40:23 | 90:10 92:21 | separate 66:16 | signed 26:15 | Social 47:9 |
| 87:11,14,21,23 | 93:1,15,19,23 | 69:5 78:19 | 28:1,9 113:18 | 75:16 |
| schools 11:13 | 93:23,24 95:17 | 85:9,10 | 113:20 118:8 | society 107:16 |
| SCOTT 2:5 | 97:20 101:5,6 | September 9:12 | 120:14 | somebody 7:15 |
| scrub 49:4 91:17 | 101:6,7 102:14 | 23:10 90:16 | simple 56:19 | 18:15 20:10,11 |
| 92:18 93:3 | 102:14,17 | 111:20 112:1 | single 86:10 | 20:21 22:1,2 |
| scrubbed 91:8 | 104:24 105:4,6 | 112:11 | sinus 108:12,14 | 23:19,19,21,22 |
| scrubbing 49:16 | 106:23 108:22 | serious 34:2,3 | sisters 10:13,16 | 37:3 44:8 |
| 73:7,11 91:12 | 109:6,6,11,23 | 41:1 45:19 | sit 17:3 86:3 | 45:22 51:21 |
| 91:18 104:1 | 110:5,22,23 | 96:7 | sitting 2:20 | 62:11 65:4,4 |
| se 1:14 | 111:11 113:3 | SERVICE 1:7 | 15:20 20:22 | 65:20 67:15,23 |
| seal 121:18 | 116:17,18 | Services 81:4,7 | 67:13 93:14 | 75:10,11 78:10 |
| second 23:10 | seeing 28:18 | 119:14 | situation 22:4 | 79:23 101:5,6 |
| 29:11,14,16 | 112:3 | serving 77:17 | 27:7 28:22 | 106:5 109:3,20 |
| 35:3,4 36:7 | seeking 71:19 | Seven 26:8 | 41:19,22 44:5 | 110:5 112:9,19 |
| 39:23 40:16 | 74:18 | shades 59:14 | 62:20 79:9 | 118:3,5 |
| 43:5,6 65:24 | seen 24:11 47:3 | shady 38:10 | 82:7,8 87:11 | soon 39:6,8 76:4 |
| 84:2 88:23 | 50:21 52:18 | sheet 95:19 | 109:8 | sorry 12:1 31:9 |
| 90:13 112:19 | 55:12,12,24 | 120:10 | six 52:21 | 55:20 |
| 115:6 | 65:12 67:18,19 | shift 45:4 | size 96:23 97:1 | sound 22:8 |
| security 13:6 | 67:23 101:11 | shooting 78:7,9 | skin 57:7,9,17 | 24:12 30:8 |
| 47:9 75:17 | 103:23 105:1 | 80:3,11 | 58:16 59:1 | 32:1 36:12,13 |
| see 7:3,21 14:5 | 109:2,17 | shorthand | 93:15 96:22 | 63:7 87:9 |
| 15:18,22,23 | 111:12 116:5 | 121:12 | 103:12 105:7 | 90:17 98:20 |
| 16:16 18:15 | 117:13 | shot 78:11 79:7 | sleep 49:16 50:5 | 99:4,5,6 117:7 |
| 21:8,11 24:19 | self 68:19 | 79:8,24 | 73:4,5 115:1 | sounds 24:3 93:4 |
| 25:1,9 26:3 | sell 45:21 | shots 79:21 | sleeping 108:14 | 94:5 |
| 27:4,6 28:5,15 | selling 12:9 | show 36:9 99:2 | slip 16:13 21:10 | Spanish 14:24 |
| 28:17 29:8 | send 17:4,11,12 | 102:1 | 21:10 22:19 | 88:16 |
| 31:10,18 34:15 | 17:18,21 42:20 | showed 40:24 | 24:7,8 39:15 | speak 3:13 7:14 |

Jesus Diaz

14:24 28:2
88:16
**speaking** 52:1
82:5
**special** 59:16
61:5
**specialist** 49:11
67:23
**spell** 16:10 85:19
**spelled** 27:23
**spend** 77:24
**spending** 64:15
**spot** 58:7,7
110:2
**Stacey** 2:2,14
**staff** 30:4 41:19
41:22 53:23
71:11 83:2
**stamped** 90:16
**start** 15:18,21
48:1 56:20
60:14 87:13
90:10 96:20
99:9 101:10
110:2 115:19
115:24
**started** 30:7
39:4
**starts** 59:15
**state** 2:2 3:22
68:3 121:2,6
**stated** 31:23
68:8
**statement** 6:22
27:1 88:9
114:11,13
116:22
**statements** 4:3,4
68:3
**states** 1:1 9:19
10:2 11:2,13
11:17,22 12:4
12:5,10,13
42:17 47:22
88:23
**stating** 7:16

73:14
**stay** 15:8,9 66:11
97:24
**stayed** 15:4
**step** 37:6
**stolen** 75:10,13
76:2 78:16,19
**stomach** 6:7
47:18,24 48:3
55:17,20 64:4
98:9
**stop** 40:6 72:3
76:4 77:1 97:2
**stopped** 40:10
92:20
**store** 75:20
**street** 1:22 2:3,6
47:4,6
**stretching** 59:1
**strong** 48:19
49:22 60:7
92:24
**stuff** 14:9 15:24
20:24 55:13
59:14 71:11
73:4 81:19
82:9 85:24
97:21 100:21
**subject** 4:7
**submit** 21:22
32:13 33:6
**submitted** 26:10
29:20 31:3,24
32:5,10,16,22
36:19 38:4,11
38:13 90:12
**subsection** 86:18
**sue** 18:8 81:13
82:17
**sued** 18:3,5 20:3
20:8,19,21
44:17 81:10
**suing** 18:11
**suit** 18:23 72:16
82:10,16,20
84:5

**summertime**
53:11
**sun** 60:7,9 61:5
61:12 100:12
**sunglasses** 59:14
89:23 100:9
**supervision**
121:13
**supervisors**
20:20
**support** 68:17
**supported** 12:8
**suppose** 95:10
101:12
**supposed** 20:11
21:11 27:4
49:4 51:9
63:18,19 64:9
81:21 91:2,21
92:13 95:7
100:11 111:5
112:9 115:10
115:11
**supposedly** 80:4
**sure** 3:6,14 27:9
45:20 91:10
96:10 99:2
**surgeries** 48:14
**surgery** 49:5
51:21,22 52:2
52:18,19 53:21
53:24 54:2,4,5
54:8,11 56:19
56:20,22 58:24
64:18 70:21
72:20,21,23,24
73:1,9,20,20
90:22 91:5,10
91:19 92:14
93:16,17,20
100:11,16
101:14 103:16
103:17,18,22
104:7,9,10,19
104:20,21,23
105:8,13,15,18

105:20 108:12
115:8,17,18
**surrounded**
76:22,22
**sworn** 2:11 4:2
121:9

---

**T**

T 121:1,1
**table** 83:9
**take** 2:22 3:9
6:11,13 21:1
27:6,8 28:6,8
28:13,23 34:2
34:2,3 40:24
42:6 43:10
45:16,19 49:1
55:22 56:16,22
57:21 58:6
61:18 69:13
72:1,2 73:23
79:16 83:9
91:5 93:17
95:11 98:18,23
100:19,21
104:3 106:5
114:17 115:6
115:15
**taken** 1:10 2:17
7:3 34:4,6
49:11 111:14
121:7
**talk** 7:15 17:20
18:17 21:9
45:4 50:15
52:20 55:13
64:14 87:8
106:16,23,24
116:23
**talked** 20:14
**talking** 69:22
77:10,13 88:18
97:11 113:8
**teach** 106:21
**technical** 11:13
**tell** 19:5 23:24

24:3 29:21
30:15 36:16
55:9,22,23
56:4 62:18
67:14 68:16
73:8 77:23
82:3,10 83:3
86:6 93:4
94:15 103:16
103:22 109:5,7
109:8,21 121:9
**telling** 18:17
41:24 88:1
110:4
**ten** 56:18,23,24
103:19
**tend** 3:8
**term** 101:22
114:4
**test** 46:15
**testified** 2:12
90:19 100:8,23
103:15 107:1
108:20 109:14
**testify** 106:9
**testimony** 119:1
121:11,14
**Thank** 114:7
118:13
**thereof** 121:17
**thing** 4:12 15:21
17:17 29:8
30:20 51:20,23
58:22 60:9
65:5 73:6,10
78:1 79:17
93:7,18,22,24
98:1 110:1,4
114:19,23
115:15 116:3
**things** 52:11
66:16 78:5
**think** 6:17 13:7
19:12 20:11
21:1,3,5,15,17
21:18,22 22:2

Jesus Diaz

Page 14

| | | | |
|---|---|---|---|
| 22:3,16,18 | 77:9 78:11 | 49:4,7 51:13 | two 10:16,19 |
| 28:19 33:3 | 79:7 109:23 | 54:6,8 56:19 | 14:17 15:10 |
| 37:7 43:15,16 | throw 99:19 | 56:23 60:16,24 | 35:7 36:21 |
| 43:18 44:9,10 | tier 9:3,4 108:15 | 61:14 62:19,19 | 42:21 43:1 |
| 44:18,18 45:1 | till 10:4 | 62:19,20 67:16 | 66:16 67:21,21 |
| 45:3 48:2 | time 12:24 15:5 | 73:10 75:13 | 76:23 85:8 |
| 49:13 51:19 | 21:1 28:2,4,12 | 77:22 80:5 | 93:21 95:1 |
| 53:10 54:7 | 28:16 35:19 | 82:11 84:3 | Tylenol 92:2,3 |
| 56:15 64:5,11 | 36:14 40:17 | 86:14,16 88:11 | 115:11,13 |
| 64:15,19,20 | 45:5,7 46:23 | 89:5,7 94:8,12 | type 22:20 24:7 |
| 65:1,14,21 | 50:18 51:15 | 103:6,7 104:13 | 58:17 69:12 |
| 69:8 74:12,13 | 54:9,16,18,22 | 105:3,10,19 | 84:9 98:2 |
| 75:4,5,24 | 55:6,7,19,21 | 110:1 111:11 | 116:7 |
| 80:15 86:23 | 56:24 57:20 | 112:5 113:4,15 | types 12:3 |
| 92:5,17 94:17 | 59:17,19 60:4 | Tom 2:15 17:8 | |
| 94:19 97:11 | 60:23 61:9 | 18:1 19:15,19 | **U** |
| 100:8 101:3,4 | 67:17 75:15 | 19:22 66:9 | ultimate 72:16 |
| 102:23 103:1 | 77:10,17,24 | tomato 74:1 | ultimately 76:8 |
| 103:15 104:21 | 78:16,21,22 | tomorrow 54:11 | unclear 58:20 |
| 104:21 108:1 | 81:14,15 88:20 | top 24:20 25:1 | understand 3:22 |
| 109:7,20,20 | 90:2 95:18 | 26:1 27:7 | 4:1,10,21 5:15 |
| 111:7 114:6,8 | 97:8 98:6,8 | 29:14,16 35:4 | 7:11,12,14,17 |
| thinks 103:17 | 99:7,9,13,15 | 36:15 37:20 | 8:1 18:24 19:3 |
| third 33:14 62:4 | 99:21 105:2,6 | 42:8,11 63:17 | 19:17 25:6 |
| 92:2,4 115:5 | 106:1,2,5 | 103:5 | 30:24 33:6 |
| 115:12 | 107:20 108:7 | track 61:3 67:9 | 38:9 44:13,16 |
| Thomas 1:6 2:4 | 109:1,22,24,24 | 67:10 | 52:10,15 56:17 |
| 19:8 62:24 | 111:8 112:11 | trade 11:18 | 68:1 70:17 |
| 65:15 66:1 | 113:1 116:5,11 | training 11:17 | 71:5,16 72:10 |
| 67:14 68:21 | 117:10 121:8 | 63:3,10,14,24 | 78:5 88:14 |
| 82:23 | times 22:10 | transcribed 3:4 | 92:15 96:14 |
| Thompson 2:5 | 51:10 52:17 | 7:4 121:12 | 106:12 116:13 |
| 3:5 80:20,23 | 54:7 | transcribing | understanding |
| 81:2 85:20 | tobacco 107:22 | 17:22 | 16:23 20:7 |
| 102:5 114:6 | 107:23 108:2 | transcript 5:11 | 26:9 29:7 |
| 117:5,6 118:12 | 110:19 | transcription | 63:17 66:12 |
| 119:4 | today 4:5,8 5:19 | 121:13 | 88:4 93:17 |
| thought 15:19 | 6:5,8,11,12,13 | transition 90:13 | undetermine |
| thousand 75:5,6 | 7:3,7,16 10:3,4 | transported | 36:10 |
| three 2:15 30:3 | 10:5 15:20 | 15:3 | unduly 36:9 |
| 34:9,10 37:5 | 18:10 34:15 | treat 44:1,3,17 | unit 25:14,21 |
| 40:2 42:21 | 57:11,19 59:22 | 48:5 116:19 | 26:6,11 31:18 |
| 43:1 51:14 | 61:10 67:12,13 | treated 108:21 | 32:1,5,11 38:2 |
| 52:21 69:5,20 | 116:2 | 108:22 | 38:14 |
| 69:21 73:24 | told 19:6 35:22 | treating 116:20 | United 1:1 9:19 |
| 74:2,4,9,10 | 35:22 41:21 | treatment 72:4,9 | 10:2 11:2,13 |

Jesus Diaz

11:17,22 12:4
12:5,10,13
47:22
**Unresolved**
86:19
**use** 6:6 68:11
99:13 100:11
116:18
**usually** 16:16
**U-turn** 77:1

**V**

**v** 1:5 36:5
**vehicle** 75:11,18
76:1,18,21,23
77:1 78:13,17
78:19
**verbalize** 3:6
**Verbatim** 86:8
**violate** 45:2 71:2
**violated** 72:5,6,7
72:8,11
**violating** 63:4
**violation** 68:13
**vision** 46:16
48:23 56:5,8
56:12 57:1,4
58:20,21 61:1
87:10 88:5
**visit** 60:18,20
**visiting** 61:1
**visual** 86:24

**W**

**wait** 105:9
116:11
**waiting** 62:21
108:10,18
**wake** 49:14
**walk** 61:18,19
**want** 5:18 6:16
6:17,21,22 7:6
13:14 27:17
38:23 39:21
40:21,22 42:6
45:12 50:11
52:21 53:20

56:15,16,17
57:6 59:6,8
61:22 68:16
71:21 72:15,16
74:9 76:3,3,5
84:5 86:22
93:3,24 95:11
95:12,13 106:2
115:21,22
116:14
**wanted** 44:6
51:21
**warden** 1:6 2:4
21:14 63:1,3
63:10,11,24
64:5,11,19
65:1,14,19,19
65:20 67:14
68:4,9
**WARNER** 2:6
**wasn't** 39:11
43:12 44:12
55:17,18 79:15
79:15 100:10
**watch** 48:20
59:14,17,19,20
60:6
**watching** 59:18
60:5
**water** 45:15,16
45:16 57:21
**watering** 87:15
**way** 3:23 22:21
23:20 34:5
35:17 36:14
56:2 63:18,18
75:23 87:6,9
88:12,13 89:18
89:21 90:12
91:12 96:22
105:7,8,12,14
115:18 116:19
**Wayne** 1:12
121:4,21
**wear** 53:6,16,18
59:17,18 60:7

60:17,24 61:5
61:9,11,12,19
89:19,23
**wearing** 61:16
89:9
**week** 15:10
73:24 74:9,10
**weeks** 15:13
**weeping** 60:14
**welder** 11:21
**welding** 11:14
11:18
**went** 21:19 22:2
22:10 26:10
39:6,11,14
48:6 49:20
50:8,9,23 51:1
51:6,20,22
69:5,20 74:15
80:8 82:3 85:7
91:3,14 92:5,9
92:10 93:18
97:8 99:13
101:12 108:12
114:22 116:3
**West** 80:12
**we'll** 17:21
34:21 38:10
96:15 102:1
**we're** 2:20,21
5:18 17:20,22
18:18 27:6,6,7
27:8,8 28:5,6,8
29:1,8 30:22
42:7 61:3
64:17 69:3,22
86:13 91:10
101:7 114:8
115:17 117:2
**white** 13:11 58:7
**Wilcox** 1:12,21
1:23,24 121:4
121:21
**willingly** 66:2
88:24
**Wilmington**

1:22 2:3,7
**witness** 2:10
3:20 6:18 9:5
9:14 11:5,23
12:7 15:22
16:6,6 19:2,9
24:24 26:14
29:13 31:8
33:15 37:18
39:9 62:5
71:11 85:16,18
87:24 94:4
95:22 114:10
114:13 115:24
117:1 121:15
121:18
**witnesses** 71:8
**word** 7:5,6,11
86:8,8 87:3,8
101:17,18
102:12
**words** 30:16,17
87:1,2 88:2
**work** 8:24 11:21
64:22,22 66:5
**worked** 11:18
**working** 16:19
28:12,15 66:23
110:6
**works** 5:10 21:4
21:15 22:15
**worn** 46:10
**worry** 27:5
55:24 103:3
111:13
**worse** 105:11
**wouldn't** 40:14
57:10 67:11
93:14,15
**write** 23:16,17
23:18,18,19,21
23:24 30:10,15
35:11,11,17,21
35:24 62:18
84:9,9 86:1
88:12,19 108:7

117:10,13
118:3,4
**write-up** 14:19
39:17 40:22
107:12 110:19
**writing** 19:15
27:13 43:12
44:15
**written** 19:17
20:14 52:9
62:11 84:10
107:18 108:5
**wrong** 43:21
47:24 103:1
**wrote** 19:18
23:22 27:10
28:7 30:13
31:2 35:14,18
36:23 37:5,16
40:15 41:17,18
41:24 42:11
44:10 62:14
67:12 83:18,21
83:21,22,22,24
84:13,15,17
86:18,18
103:13 111:7
112:7,7,9,20
112:22 113:13
113:16,17
118:5

**X**

**Xarhoulakos**
2:2,13,14 23:4
23:8 29:1,5
34:21 35:1
80:19 114:8,12
116:21 117:2
119:3
**xerophthalmia**
101:20,23
102:12 103:7

**Y**

**yeah** 5:22,24
6:10 7:24 8:2,2

Jesus Diaz

Page 16

| | | | | |
|---|---|---|---|---|
| 8:15,15 11:15 | 101:2 102:20 | 119:12 | 111:20 112:1 | **4th** 92:6 |
| 12:19,21 13:20 | 103:8 104:2,10 | **114** 36:5 | 112:11 | **4/13/06** 29:22 |
| 13:22 14:16 | 104:14 105:21 | **1181** 1:11,16 | **2006** 34:15 | 31:24 32:3 |
| 15:6,16 16:5 | 105:24 107:5 | **12** 38:7,8,8,9 | 42:22 53:21 | **4/26/06** 31:22 |
| 18:4 21:17,24 | 107:20 108:1 | **12-year** 78:3 | 54:22 66:23 | 32:1 |
| 23:23 24:16,16 | 109:16 111:21 | **12/05/2005** | 73:20 90:9,17 | **474251** 1:15 |
| 24:21 25:4,7 | 111:23 112:2 | 119:10 | 90:20,23 92:8 | |
| 25:12,15,17 | 112:14,16,21 | **12/5/05** 119:14 | 97:6 99:11,14 | **5** |
| 26:4,7 27:19 | 113:10,19,21 | **1220** 2:6 | 101:12 | **5** 34:11 65:24 |
| 27:22 28:3 | 117:8,16,21,24 | **13th** 32:13 | **2007** 1:12 53:8 | **5th** 2:6 90:16 |
| 29:10 32:4,19 | 118:7,9,11 | **14** 112:1 | 90:6,9 121:19 | **5/12** 38:10 |
| 32:21 33:2,5 | **year** 18:12 30:18 | **14th** 63:4 68:14 | **2008** 73:21 | **5/12/06** 38:5 |
| 33:12 34:16,18 | 39:4 45:24 | 111:20 | 121:23 | **5/2** 38:10 |
| 35:8,16 37:12 | 53:8,9,11 | **15** 93:20 | **2013** 12:23 | **5/25** 38:14 |
| 37:12,14,24 | 56:19,23,24 | **18** 34:15 48:8 | 116:11 | **5/25/06** 38:3 |
| 38:15 39:21 | 78:18 87:21 | **19** 48:8 | **21st** 77:16 | **571-0510** 1:22 |
| 40:11,19 41:5 | 98:10,14,16,17 | **19th** 42:22 | **22** 16:16 37:1,2 | |
| 41:7,15 42:2,5 | 103:19,20 | **1973** 9:9 | 38:19 39:19,20 | **6** |
| 42:9,20,24 | 110:14 | **19801** 1:22 2:3,7 | 40:4,9 107:13 | **6** 88:22 90:8 |
| 43:3,5 44:22 | **years** 14:17 | **1993** 10:3,5 | 108:10 | 99:12 |
| 46:17 47:18 | 18:15 30:3 | **19977** 1:16 | **23** 13:5,5 37:2 | **6th** 2:3 23:10 |
| 48:18,24 49:8 | 40:2 | | 119:10 | |
| 49:10 50:4,14 | **yo** 18:13 45:14 | **2** | **230** 1:22 | **7** |
| 50:17,20,23 | 84:24 | **2** 29:2,3,12 | **26th** 32:6,14,14 | **7** 90:8 |
| 51:3 52:3,6 | **young** 48:2 | 31:21 38:7 | 33:8 121:18 | **74** 9:9 |
| 53:2,9,9,12 | | 86:17,18 119:3 | **29** 119:11 | |
| 54:5 55:2,4,16 | **$** | 119:11 | | **8** |
| 56:10 57:6,6,6 | **$1500** 78:18 | **2nd** 36:6 | **3** | **8** 69:4 |
| 58:1,22 59:4 | **$1800** 76:12,15 | **20** 1:12 100:20 | **3** 34:22,23 42:7 | **8th** 63:4 68:14 |
| 60:6,9 61:8,11 | | **2002** 12:14,18 | 112:17,19 | **8/18/2006** |
| 61:21 62:3,13 | **0** | 15:2,9 39:10 | 115:11 119:12 | 119:11 |
| 62:15,19 63:8 | **02** 102:21 | 75:7,9 77:12 | **3rd** 36:5 | **8/29** 46:6 |
| 69:15,17 70:24 | **06** 32:6 50:12,13 | 77:15 78:15 | **3:45** 118:14 | **8/29/03** 24:6 |
| 71:7,18,72:14 | 50:22 73:2 | 98:17 | **30** 38:24 | **800** 79:8,10 |
| 73:3,16 77:18 | **06-550-SLR** 1:6 | **2003** 16:13,14 | **30-some** 40:1 | **81** 119:4 |
| 78:7 79:11 | | 39:12,14,24 | **302** 1:22 | **820** 2:3 |
| 81:11,11 82:1 | **1** | 46:1 55:7 | **31** 121:23 | |
| 82:5 84:6 85:6 | **1** 23:5,6 119:10 | 97:10,16 98:11 | **31st** 12:14,17 | **9** |
| 85:9 86:7,9,12 | **1:00** 1:11 | 98:12,14,17 | 15:9 95:6 | **9/13/05** 25:19,22 |
| 86:21,21 87:17 | **10** 50:21 100:20 | 101:10 115:18 | **33** 38:24 | 26:6 |
| 87:21 89:4,11 | **10th** 9:12,13 | **2004** 40:1 55:8 | **34** 38:24 119:12 | **9/21** 26:19 |
| 89:15 90:18,18 | **10/3/06** 50:1,23 | 55:11 66:22 | **390** 36:6 | **9/6/05** 24:20 |
| 90:21 91:2,9 | 51:7 91:3 | 97:19 110:15 | | 25:21 26:1 |
| 92:7,9,13 94:7 | **10/4/06** 51:2,4 | **2005** 16:14 | **4** | **93** 9:20 |
| 94:22 96:4,13 | **101-RPR** 121:22 | 23:10 40:1 | **4** 34:11 62:23 | |
| 98:13 100:6 | **102** 119:13 | 55:12 66:22 | 86:4 102:3 | |
| | **11/06/2006** | | 119:13 | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JESUS DIAZ,                              )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )    Civ. No. 06-550 SLR
                                         )
WARDEN THOMAS CARROLL, CMS               )    JURY TRIAL
CORRECTIONAL MEDICAL SERVICE,            )    DEMANDED
CPL. MERSON, LEE ANNE DUNN,              )
DEBORAH RODWELLER and CINDY              )
ATALLIAN,                                )
                                         )
            Defendants.                  )

**O R D E R**

AND NOW, this _____ day of _____, 2007, upon consideration of the Motion of Defendant, Correctional Medical Services, Inc., for Summary Judgment with Memorandum of Points and Authorities and plaintiff's Response thereto, it is hereby Ordered that the Motion is Granted and summary judgment is entered in favor of defendant, Correctional Medical Services, and against plaintiff.

_____
                                          J.

15/588538.v1